UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------

THE NEW YORK STATE RIFLE & PISTOL
ASSOCIATION, ROMOLO COLANTONE, EFRAIN
ALVAREZ, and JOSE ANTHONY IRIZARRY,

                          Plaintiffs,

     -against-

THE CITY OF NEW YORK and THE NEW YORK CITY
POLICE DEPARTMENT - LICENSE DIVISION,

                          Defendants.

------------------------------------X

A P P E A R A N C E S :

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/5/15
```

13 Civ. 2115 (RWS)

OPINION

<u>Attorneys for Plaintiffs</u>

GOLDBERG SEGALLA, LLP
170 Hamilton Avenue
White Plains, NY 10601
By:  Brian T. Stapleton, Esq.

GOLDBERG SEGALLA, LLP
665 Main Street, Suite 400
Buffalo, NY 14203
By:  Christopher Bopst, Esq.
     Matthew S. Lerner, Esq.

GOLDBERG SEGALLA, LLP
8 Southwoods Boulevard, Suite 300
Albany, NY 12211
By:  Frank J. Ciano, Esq.

Attorneys for Defendants

ZACHARY W. CARTER
CORPORATION COUNSEL OF THE CITY OF NEW YORK
100 Church Street, 5th Floor
New York, NY  10007
By:  Michelle Goldberg-Cahn, Esq.
     Sheryl Neufeld, Esq.
     Benjamin Hillengas, Esq.

**Sweet, D.J.**

Plaintiffs New York State Rifle & Pistol Association
(the "Association"), Romolo Colantone ("Colantone"), Efrain
Alvarez ("Alvarez") and Jose Anthony Irizarry ("Irizarry")
(collectively, "Plaintiffs") have moved for summary judgment
pursuant to Rule 56 of the Federal Rules of Civil Procedure and
for a preliminary injunction pursuant to Rule 65 of the Federal
Rules of Civil Procedure.  Plaintiffs seek a declaration that
restrictions on a Premises Residence license issued by Defendant
the City of New York (the "City") through Defendant the New York
City Police Department License Division (the "License Division")
(collectively the "Defendants") are unconstitutional.
Defendants have cross moved for summary judgment pursuant to
Rule 56, seeking dismissal of Plaintiffs' complaint.  Upon the
facts and conclusions of law set forth below, the Defendants'
cross motion is granted, and the complaint is dismissed.

These motions present the sensitive issue of gun
control in our largest city, an issue critical to the public
safety and the protection of significant constitutional rights.
Handguns are unfortunately not exclusively used for the
legitimate purposes of law enforcement, civilian self-

1

protection, or for sport.  Handguns in this and other large cities are also the instruments with which violent crimes are perpetuated, and whose improper use has led to numerous accidental deaths in public places.  Legislators and members of the executive branch at municipal, state, and federal levels of government have grappled with these problems, and promulgated and enforced laws in the hopes of reducing the deleterious effects of handguns while protecting citizens' constitutionally-protected rights to bear arms.  One such law is Title 38, Chapter Five, Section 23 of Rules of the City of New York ("RCNY").

Plaintiffs seek to partially invalidate 38 RCNY § 5-23, which limits transport of a handgun through the following provision: "To maintain proficiency in the use of the handgun, the licensee may transport her/his handgun(s) directly to and from an authorized small arms range/shooting club, unloaded, in a locked container, the ammunition to be carried separately." Plaintiffs contend that the decisions of the Supreme Court in District of Columbia v. Heller, 554 U.S. 570 (2008), and McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010), render unconstitutional 38 RCNY § 5-23's limitations on transport, specifically, the prohibition against transporting a handgun to

a second residence outside the City, for target price, or for competitive shooting outside the City.

**Prior Proceedings**

Plaintiffs filed an initial complaint on March 29, 2013 and filed the operative amended complaint on May 1, 2013. On May 7, 2013, Plaintiffs filed a motion for a preliminary injunction, which was stayed by this Court on September 20, 2013 pending the Court of Appeals' decision in Osterweil v. Bartlett, 706 F.3d 139, 140 (2d Cir.), certified question accepted, 20 N.Y.3d 1058 (N.Y. 2013) and certified question answered, 21 N.Y.3d 580 (N.Y. 2013). See generally, New York State Rifle & Pistol Ass'n v. City of New York, 13 CIV. 2115, 2013 WL 5313438 (S.D.N.Y. Sept. 20, 2013). Plaintiffs renewed their motion for a preliminary injunction in February 2014, and the parties filed cross motions for summary judgment on June 6, 2014 and July 16, 2014. The instant motions were heard and marked fully submitted on October 8, 2014.

**Facts**

The facts have been set forth in Plaintiffs' Local Rule 56.1 Statement of Uncontested Facts, Defendants' Statement

3

of Undisputed Material Facts pursuant to Local Rule 56.1,
Plaintiffs' Local Rule 56.1 Statement in Response to the
Defendants' Rule 56.1 Statement, and Defendants' Responses and
Objections to Plaintiffs' Statement pursuant to Local Rule 56.1.
These facts are not in dispute except as noted below.

New York State law prohibits an individual from
possessing a pistol or revolver without a license.  N.Y. Penal
Law §§ 265.01, 265.20(a)(3).  Violation of this statute is a
Class A Misdemeanor punishable by up to one year in prison, a
$1,000 fine, or both.  N.Y. Penal Law §§ 265.01, 60.01(3),
70.15.  The State of New York specifies certain classes of gun
licenses under Penal Law § 400.00(2).

Defendant, the City of New York, is a domestic
municipal corporation organized and existing under the laws of
the State of New York.  See New York City Charter § 1.  The
License Division reviews applications for Premises Residence
firearms licenses and issues licenses following an investigation
of the applicant.  See Lunetta Dec., ¶¶ 1, 15-27; Penal Law §§
400.00, 265.00(10).

The different firearms licenses and permits issued by
the License Division, along with a description of the license

4

type are codified in 38 RCNY 5-23 (types of handgun licenses)
and 38 RCNY 1-02 (rifle, shotgun, and longarm permits).  One of
the licenses available for New York City residents to obtain is
a Premises License—Residence, which allows an individual to keep
a handgun in his or her home.  38 RCNY §§ 5-01, 5-23.

Premises Residence handgun licensees are restricted to
possessing the licensed weapon at the specific home address
designated on the license.  See 38 RCNY § 5-01(a).  Premises
Residence licensees are also authorized to transport the
licensed handgun directly to and from an authorized small arms
range/shooting club, secured and unloaded in a locked container.
See 38 RCNY §§ 5-01(a); 5-22(a)(14).  Title 38 was amended in
May 2001 to read as follows:

> (a) Premises License-Residence or Business.  This
> is a restricted handgun license, issued for
> the protection of a business or residence
> premises.
>
> (1)  The handguns listed on this license may
> not be removed from the address specified
> on the license except as otherwise
> provided in this chapter.
>
> (2)  The possession of the handgun for
> protection is restricted to the inside of
> the premises which address is specified
> on the license.

5

      (3) To maintain proficiency in the use of the handgun, the licensee may transport her/his handgun(s) directly to and from an authorized small arms range/shooting club, unloaded, and in a locked container, the ammunition to be carried separately.

      (4) A licensee may transport his/her handgun(s) directly to and from an authorized area designated by the New York State Fish and Wildlife Law and in compliance with all pertinent hunting regulations, unloaded, in a locked container, the ammunition to be carried separately, after the licensee has requested and received a "Police Department – City of New York Hunting Authorization" Amendment attached to her/his license.

38 RCNY § 5-23.


      Pursuant to New York State Penal Law § 400.00(1), "[n]o license shall be issued or renewed pursuant to this section except by the licensing officer, and then only after investigation and finding that all statements in a proper application for a license are true."  New York's Penal Law details the duties of the licensing officer which include, <u>inter alia</u>, determining whether the applicant meets the eligibility requirements set forth under Penal Law § 400.00(1); inspecting mental hygiene records for previous or present mental illness; investigating the truthfulness of the statements in the application; and having the applicant's fingerprints forwarded

6

for review against the records of the New York State Division of
Criminal Justice Services and the FBI to ascertain any previous
criminal record.  See Penal Law §§ 400.00(1), 400.00(4).  After
an investigation, the licensing officer may not approve the
application if, inter alia, "good cause exists for the denial of
the license."  Penal Law § 400.00(1)(g).

There are currently over 40,000 active licenses that
have been issued by the License Division for the possession of
handguns in New York City; and over 20,000 active permits for
the possession of rifles and shotguns.  The License Division
currently processes an average of 3,200 new applications and
over 9,000 renewal applications each year for the issuance and
renewal of the various types of handgun licenses issued by the
License Division.  In addition, the License Division processes
an average of 850 applications for rifle and shotgun permits and
5,000 renewal applications per year.  The License Division
currently has 79 employees.  It is divided into several
different sections and units, and is overseen by a five member
Executive Staff, that includes a director, deputy inspector
(serving as commanding officer), a captain (serving as executive
officer), and a lieutenant and sergeant (serving as Integrity
Control Officer and Assistant).  The License Division has an

7

Incident Section that investigates on average 600 incidents pertaining to handgun licenses per year.  The License Division receives reports from the New York State Division of Criminal Justice System regarding all arrests made within the State of New York for which an arrestee is fingerprinted.  No formal report is forwarded to the License Division for summonses and other arrests, and for incidents for which a detainee is not fingerprinted.  The NYPD Department Manual includes a procedure for NYPD personnel to investigate incidents involving holders of handgun licenses and rifle/shotgun permits to the License Division Incident Section.

Under current New York State Penal Law, there is no "target license" class permitting the transport of an unloaded registered firearm to and from an authorized shooting range or club for regular target shooting purposes.  This class was eliminated in 2001 due to repeated incidents of permit holders not complying with the limitations on the target license.

The NYPD established a procedure for individuals or organizations to apply to the NYPD for special designation to operate a small arms range in New York City.  The application process includes submission of an application for approval as a

8

Small Arms Range in New York City.  The applicant for a license
for approval as a Small Arms Range must provide a name and
address for the applicant, location for the proposed range,
information about whether the proposed range is outdoor or
indoors, and if indoors, where in the building it would be
located, information about any clubs or organizations the range
is associated with, the types of weapons to be used at the
range, and other information.  The License Division conducts a
background check on applicants for approval as Small Arms
Ranges, including consulting with the New York City Department
of Buildings for a review of the zoning, property, and land use
designation for the proposed site.  Approval letters for
authorized Small Arms Ranges include requirements for the
appropriate sound absorbent materials, fireproofing, and
specifics on how targets and fire booths must be set up to
ensure public safety, along with other rules.

There are currently eight NYPD-approved Small Arms
Ranges in New York City, exclusive of police or military ranges.
Defendants assert that seven of the eight ranges are open to any
person possessing a valid NYPD license or permit for a firearm,
but Plaintiffs dispute that those ranges are truly open as they
require users to become members in order to gain access.  These

ranges include the Westside Rifle & Pistol Range on West 20th Street in Manhattan, the Woodhaven Rifle & Pistol Range in Queens, the Bay Ridge Road and Gun Club, Inc. in Brooklyn, Colonial Rifle & Pistol Club in Staten Island, the Richmond Borough Gun Club in Staten Island, and the Olinville Arms in the Bronx.  Defendants further assert that the Richmond Borough Gun Club holds regular shooting competitions and other events. Plaintiffs also dispute this assertion in part noting that the Richmond Borough Gun Club requires membership, thus shooting competitions and other events are available to those members only.  The parties agree that there is at least one NYPD-approved shooting range open to the public within City borders, though Plaintiffs emphasize that only that one exists. Defendants assert that some of the ranges require patrons to pay a fee for use of their range while Plaintiffs contend that all of the ranges charge a fee for use.

Colantone, Alvarez, and Irizarry are all holders of Premises Residence Licenses issued by New York City and subject to the restrictions of 38 RCNY § 5-23.  They each assert that they previously regularly traveled outside of New York City and New York State to attend shooting competitions in order to maintain proficiency in handgun use.  The Defendants dispute the

10

contention that Colantone's, Alvarez's, and Irizarry's affidavits support these assertions.

On May 8, 2012, to confirm that their licenses allowed them to participate in a shooting competition held in New Jersey, Colantone and Alvarez wrote separately to Deputy Inspector Andrew Lunetta of the License Division to inquire about the scope of 38 RCNY § 5-23's restrictions.  Colantone Aff., ¶ 7, Ex. A; Alvarez Aff., ¶ 7, Ex. A.  The Defendants dispute the characterization of Colantone's and Alvarez's letters.  In letters dated May 15, 2012, Deputy Inspector Lunetta advised Colantone and Alvarez that:

> The Rules of the City of New York contemplate that an authorized small arms range/shooting club is one authorized by the Police Commissioner.  Therefore the only permissible ranges for target practice or competitive shooting matches by NYC Premises Residence License Holders are those located in New York City.
> Premises license holders who have obtained the Hunting Authorization from the License Division may transport their handgun to those areas outside of City of New York designated by the New York State Fish and Wildlife Law for the purpose of hunting: no areas outside of New York State are permissible for this purpose.
> These rules do not apply to New York City issued long gun permits.  Long guns owned and registered under a NYC Rifle and Shotgun permit can be transported out of the City and back to the permit holder's residence if they are unloaded, in a locked non-transparent case, with ammunition carried

11

separately.

Colantone Aff., Ex B; Alvarez Aff., Ex B.


Colantone's family has owned land in the Catskill region of New York for the past thirty-two years.  He built a second family home eight years ago in Hancock, New York. Colantone's Hancock house is located in a remote area and its location presents a threat to the safety of Colantone and his family when they stay at the house.  Colantone and his family visit the land and second home several times each year.  As a result of Deputy Inspector Lunetta's letter, Colantone has refrained from taking his handgun licensed in New York City to his house in Hancock, New York.


Alvarez and Irizarry have each been advised by out-of-state ranges that they were not permitted to engage in target practice or participate in shooting competitions at those ranges because of New York City's enforcement of 38 RCNY § 5-23. Consequently, Colantone, Alvarez, and Irizarry all assert that they have refrained from engaging in target practice or participating in shooting competitions outside New York City as a result of 38 RCNY § 5-23.  Defendants dispute the evidence submitted supports this assertion.

12

**Applicable Standards**

Summary judgment is appropriate only where "there is
no genuine issue as to any material fact and . . . the moving
party is entitled to a judgment as a matter of law."  Fed. R.
Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).  The relevant inquiry on application for summary
judgment is "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of law."  Id.
at 251-52.  A court is not charged with weighing the evidence
and determining its truth, but with determining whether there is
a genuine issue for trial.  Westinghouse Elec. Corp. v. N.Y.
City Transit Auth., 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990)
(quoting Anderson, 477 U.S. at 249).

A fact is "material" only if it will affect the
outcome of the suit under applicable law, and such facts
"properly preclude the entry of summary judgment."  Anderson,
477 U.S. at 248.  Disputes over irrelevant facts will not
preclude summary judgment.  Id.  The goal is to "isolate and

13

dispose of factually unsupported claims." Celotex Corp. v.
Catrett, 477 U.S. 317, 323-24 (1986).  "[I]t ordinarily is
sufficient for the movant to point to a lack of evidence . . .
on an essential element of the non-movant's claim . . . . [T]he
nonmoving party must [then] come forward with admissible
evidence sufficient to raise a genuine issue of fact for trial .
. . ." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d
Cir. 2008) (internal citations omitted); see also Goenaga v.
March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.
1995) (same).  "The evidence of the non-movant is to be
believed, and all justifiable inferences are to be drawn in his
favor." Anderson, 477 U.S. at 255.

        The general purpose of a preliminary injunction is to
avoid irreparable injury to the movant and to preserve the
court's power to render a meaningful decision after a trial on
the merits.  See WarnerVision Entm't Inc. v. Empire of Carolina,
Inc., 101 F.3d 259, 261 (2d Cir. 1996); see also 11A Charles A.
Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ., § 2947 (3d
ed.).  A party seeking a preliminary injunction typically must
establish: (1) either (a) a likelihood of success on the merits,
or (b) sufficiently serious questions going to the merits of its
claims to make them fair ground for litigation, plus a balance

14

of the hardships tipping decidedly in favor of the moving party;
(2) irreparable harm; and (3) that issuance of the injunction
would be in the public interest.  See Oneida Nation of N.Y. v.
Cuomo, 645 F.3d 154, 164 (2d Cir. 2011) (internal quotations and
citations omitted); Red Earth LLC v. United States, 657 F.3d
138, 143 (2d Cir. 2011).  Where "the moving party seeks to stay
governmental action taken in the public interest pursuant to a
statutory or regulatory scheme," as is the case here, a
preliminary injunction may only be granted if the moving party
meets the more rigorous likelihood of success on the merits of
its claim standard.  Plaza Health Labs., Inc. v. Perales, 878
F.2d 577, 580 (2d Cir. 1989).


        The Second Circuit has held that "[v]iolations of
First Amendment rights are commonly considered irreparable
injuries for the purposes of a preliminary injunction."  Bery v.
City of New York, 97 F.3d 689, 693 (2d Cir. 1996), cert. denied,
520 U.S. 1251 (1997).  "In exercising their sound discretion,
courts of equity should pay particular regard for the public
consequences in employing the extraordinary remedy of
injunction."  Weinberger v. Romero-Barcelo, 456 U.S. 305, 312
(1982); see also Million Youth March. Inc. v. Safir, 155 F.3d
124, 125-26 (2d Cir. 1998) (modifying injunction because

15

District Court failed to consider government's interest in public health, safety and convenience in balance against First Amendment rights).  In considering an injunction, the Court must balance the interests and possible injuries to both parties. See Yakus v. U.S., 321 U.S. 414, 440 (1944).  Whether the relief sought is in the public interest is a factor to be considered. Standard & Poor's Corp. v. Commodity Exchange, Inc., 683 F.2d 704, 711 (2d Cir. 1982).

    In concluding that the District of Columbia's outright ban on the possession of handguns in the home violated the Second Amendment, the Supreme Court in Heller expressly provided that certain regulations are "presumptively valid," including prohibitions on possession by certain categories of people, such as felons or the mentally ill, prohibitions on possession in certain places (such as schools and other sensitive places), and the imposition of "conditions and qualifications on commercial sale."  554 U.S. at 626-27.  In McDonald v. City of Chicago, 561 U.S. 742, 787 (2010), the Court affirmed these presumptively lawful prohibitions.  These "presumptively valid" regulations, presume a licensing scheme.  Indeed, in McDonald, the Supreme Court emphasized that the Second Amendment "limits, but by no means eliminates," governmental discretion to regulate activity

16

falling within the scope of the right and that incorporation "does not imperil every law regulating firearms."   561 U.S. 742, 904.

As the Court of Appeals for the Second Circuit noted in Kachalsky v. County of Westchester, the Supreme Court in Heller stressed that while prohibiting handguns in the home is not permissible, "a variety of other regulatory options remain available, including categorical bans on firearm possession in certain public locations."  701 F.3d at 81, 94 (2d Cir. 2012) (citing Heller, 554 U.S. at 626-27 & n.26).  Since Heller, several other courts have upheld registration and licensing requirements, along with certain prohibitions on firearms.  See, e.g., Kachalsky, 701 F.3d 81, 97 (upholding New York State's "proper cause" requirement for license to carry a concealed firearm); United States v. DeCastro, 682 F.3d 160, 168 (2d Cir. 2012) (upholding statute prohibiting transportation into New York of firearm purchased in another state); Heller v. District of Columbia ("Heller II"), 670 F.3d 1244, 1261-64 (D.C. Cir. 2011) (upholding prohibition on possession of ammunition magazines in excess of certain capacity); United States v. Masciandaro, 638 F.3d 458, 473 (4th Cir. 2011), cert. denied, 132 S. Ct. 756 (2011) (upholding statute prohibiting carrying or

17

possession of weapon in motor vehicle in national park); United States. V. Marzzarella, 614 F.3d 85 (3d Cir. 2010), cert. denied, 131 S, Ct. 958 (2011) (upholding prohibition on possession of firearms with obliterated serial numbers because the law did not "severely limit the possession of firearms"); United States v. Skoien, 614 F.3d 638, 645 (7th Cir.2010) (en banc), cert. denied, 131 S. Ct. 1674 (2011) (upholding law prohibiting the possession of firearms by any person convicted of misdemeanor domestic violence crime).

A majority of courts, including the Second Circuit and courts in this Circuit, apply intermediate scrutiny to general challenges under the Second Amendment, even when reviewing statutes or laws that may restrict the possession of handguns in the home. See, e.g., Kwong v. Bloomberg, 723 F.3d 160, 167-68 (2d Cir. 2013), cert. denied, sub nom., Kwong v. DeBlasio, 134 S.Ct. 2696 (June 2, 2014) (applying intermediate scrutiny to fee governing New York City premises residence licenses); Kachalsky, 701 F.3d at 96 (applying intermediate scrutiny to New York's "proper cause" requirement for carry licenses); United States v. Reese, 627 F.3d 792, 800 (10th Cir. 2010), cert. denied, 131 S.Ct. 2476 (2011) (applying intermediate scrutiny to statute prohibiting gun possession - even in the home - for those who

18

have an outstanding order of protection as opposed to a criminal conviction); United States v. Skoien, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc) (applying intermediate scrutiny to law prohibiting the possession of firearms by any person convicted of misdemeanor domestic violence crime); United States v. Chester, 628 F.3d 673, 677 (4th Cir. 2010) (same); United States v. Marzzarella, 614 F.3d 85, 97 (3d Cir. 2010) (applying intermediate scrutiny to law limiting possession of firearms with obliterated serial number because the law did not "severely limit the possession of firearms"); United States. v. Oppedisano, 09-CR-0305, 2010 WL 4961663, at *2 (E.D.N.Y. Nov. 30, 2010) (applying intermediate scrutiny to challenge of federal statute prohibiting persons convicted of certain crimes from possessing firearms); New York State Rifle & Pistol Ass'n v. Cuomo, 990 F.Supp.2d 349, 366 (W.D.N.Y. Dec. 31, 2013) (applying intermediate scrutiny to New York SAFE Act and concluding that a mild form of intermediate scrutiny applies to restrictions posing modest burdens on the right to possess firearms). As the Second Circuit recently noted, intermediate scrutiny is satisfied if the regulation "is substantially related to the achievement of an important governmental interest." Kachalsky, 701 F.3d at 96-97.

19

Plaintiffs contend that strict scrutiny is
appropriate.  However, strict scrutiny does not apply here
because the challenged rule does not impinge on the "core" of
the Second Amendment, as it does not establish or purport to
establish a prohibition or ban on the exercise of Plaintiffs'
Second Amendment right to possess a handgun in the home for
self-defense.  Cf. Heller (ban on guns in the home, weapons must
be completely disassembled); Ezell, 651 F.3d 684, 708 (applying
more rigorous scrutiny, "if not quite 'strict scrutiny,'" to
Chicago's absolute prohibition on firing ranges in the context
of law requiring training at a firing range to qualify for a
premises gun license).

Plaintiffs contend that the challenged rule
"categorically prohibits engaging in target practice or
participating in shooting competitions," "effectively prohibits
. . . the right to keep and bear arms," and otherwise makes it
"impossible" to engage in target practice.  Pl. Mem. at 11-12,
14.  However, the rule does not prevent or prohibit anyone from
engaging in target practice or shooting competitions, rather it
prohibits transporting the handgun to a range not approved by
the City.  The laws struck down in Heller and McDonald, by
contrast, were laws that prohibited or banned firearms rather

20

than regulating them.   In <u>Ezell</u> the ordinance was impossible to satisfy within City limits; a law requiring practice at a firing range could not be reconciled with a law prohibiting any such firing ranges from operating within city limits.   651 F.3d at 708 ("The City's firing-range ban is not merely regulatory; it prohibits the 'law-abiding, responsible citizens' of Chicago from engaging in target practice in the controlled environment of a firing range").

Here, there is no ban, prohibition or otherwise, on firing ranges in New York City.   Although Plaintiffs state that only one such range exists that is open to the public, there is nothing in the challenged rule that prohibits public gun ranges from operating in New York City.   Though Defendants strenuously dispute Plaintiffs' claim that only one range open to the public operates in New York City (Lunetta Dec., ¶¶ 39-40), the fact that few, or even no, such ranges exist is not tantamount to a ban; the number of firing ranges open to the public is a function of the market, and not the challenged rule.   <u>See, e.g.</u>, <u>U.S. Smokeless Tobacco Mfg. Co, v. City of New York</u>, 708 F.3d 428, 436 n.3 (2d Cir. 2013) ("Decision by owners of tobacco bars not to sell the product is a commercial choice that does not result from the ordinance itself.").

Unlike the ban on firing ranges which made compliance
with the statute impossible in Ezell, the requirement that
Premises Residence licensees only transport their firearms to
approved ranges (located in New York City) is a regulatory
measure which does not prevent people from going to a range to
engage in target shooting practice or competitive shooting.  The
rule "merely regulate[s] rather than restrict[s]" the right to
possess a firearm in the home and is a minimal, or at most,
modest burden on the right.  Ezell, 651 F.3d at 708-09.
Premises Residence licensees are authorized to possess an
assembled firearm in their home and to transport the weapon to a
City-authorized firing range to engage in target practice in a
controlled environment.  See 38 RCNY §§ 5-01(a), 5-22(a)(14).
As such, strict scrutiny is not applied, and intermediate level
scrutiny is appropriate in analyzing Second Amendment challenges
- even those that touch upon the claimed "core" Second Amendment
right to self-defense in the home.  See also, Kwong, 763 F.3d at
167-68.

## 38 RCNY § 5-23(a)(3) Does Not Violate the Second Amendment

The Plaintiffs' contention that the challenged rule
deprives them of the ability to protect themselves in their

22

second homes outside of New York City does not present a Second Amendment problem.  The Premises Residence license is only issued to persons with residences in New York City, and it is limited only to the specific premise for which it is issued. See N.Y. Penal Law § 400.00(6); 38 RCNY §§ 5-01(a), 5-02(9), 5-23(a)(1)-(2).  There is nothing in the Penal Law or RCNY preventing such persons from obtaining an appropriate license to possess or utilize a firearm, in the jurisdiction of their second home.  Following this Court's stay opinion, the New York Court of Appeals concluded that an applicant who owns a part-time residence in New York, but is permanently domiciled elsewhere is eligible for a New York handgun license under Penal Law § 400.00(3)(a) where the applicant is a resident.  Osterweil v. Bartlett, 21 N.Y.3d 580, 584 (N.Y. Ct. App. 2013).  Thus, the Penal Law simply requires one to be a resident, not a domiciliary, for purposes of eligibility of a firearms license.

        According to Plaintiffs, Premises Residence license statute violates the Second Amendment's right to bear arms in two ways: (1) prohibiting transportation of the licensee's handgun from the authorized residence in the City to another out-of-City residence; and (2) barring transportation of the licensee's handgun to neighboring municipalities or states to

23

participate in shooting competitions or for use in target
ranges.  Pls.' Mem. in Supp't 7.  However, these regulations are
reasonable and result from the substantial government interest
in public safety.

Plaintiffs argue that Defendants' reliance on
Osterweil does not alleviate the Second Amendment concern
because, in their view, it is an impermissible burden to have to
have separate firearms for each residence.  Pl. Mem. at 9-10.
However, nothing in the Second Amendment requires municipalities
or states to allow citizens to transport their firearms if they
are owned under a restricted license.  This Court has already
stated that if Plaintiffs are permitted to obtain a firearms
license both in New York City as well as other locations in the
State of New York where they may have other residences, then
"the cogency of Plaintiffs' second home argument suffers
considerably as their complaint could be met with a rejoinder to
simply acquire a handgun license from the county in which the
second home is located and keep a gun in that home for use when
it is being used as a residence."  New York State Rifle, 2013 WL
5313438, at *2.  The Premises Residence license is specific to
the New York City residence and the firearms listed on the
license must be connected to the license.  Those requirements do

24

not generate a constitutional issue. A gun owner may apply for
a different type of firearm license permitting transportation of
a firearm throughout New York State should he or she qualify.
See, e.g., 38 RCNY § 5-01.

Intermediate scrutiny requires that the government
interest be important and that the fit between the regulation
and the government's interest be reasonable. "To withstand
intermediate scrutiny, a statutory classification must be
substantially related to an important governmental objective,"
Clark v. Jeter, 486 U.S. 456, 461 (1988). Our Circuit has found
that "the fit between the challenged regulation need only be
substantial, 'not perfect.'" Kachalsky, 701 F.3d at 97 (quoting
Marzzarella, 614 F.3d at 97).

The Circuit has held that "New York has substantial,
indeed compelling, governmental interests in public safety and
crime prevention." Kachalsky, 701 F.3d at 97 (citing Schenck v.
Pro-Choice Network, 519 U.S. 357, 376 (1997); Schall v. Martin,
467 U.S. 253, 264 (1984); Hodel v. Virginia Surface Mining &
Reclamation Ass'n, 452 U.S. 264, 300 (1981); and Kuck v.
Danaher, 600 F.3d 159, 166 (2d Cir. 2010)). The City's interest
here in limiting the permissible transport of dangerous firearms

25

outside of the home is vital.  Lunetta Dec., ¶¶ 2-7.  Indeed,

courts have found that "outside the home, firearms safety

interests often outweigh individual interests in self-defense."

Masciandaro, 638 F.3d at 470.  The Second Circuit in Kachalsky

noted that because of the "dangers posted to public safety,"

there "is a longstanding tradition of states regulating firearm

possession and use," 701 F.3d at 94-94 (collecting statutes from

Founding era), and that, "while the Second Amendment's core

concerns are strongest inside hearth and home, states have long

recognized a countervailing and competing set of concerns with

regard to handgun ownership and use in public."  Id. at 96.


     The restrictions on the transport of firearms for

practice or competition applicable to Premises Residence

licensees set forth in 38 RCNY § 5-23(a)(3) are substantially

related to the City's substantial interest in public safety and

crime prevention.  It is well-established that firearms in the

public present a greater public danger than firearms inside

one's home.  See Kachalsky, 701 F.3d at 94-99.  Permitting

Premises Residence licensees to travel with their firearms to

only approved ranges, or for regulated and approved hunting,

ensures that licensees are not travelling in the public with

their firearms to any place of their choosing.  If holders of

26

Premises Residence licenses believe that they may carry their firearms anywhere in New York State or across state lines, past experience indicates that many licensees will transport firearms in their vehicles, thus eviscerating the restrictions on Premises Residence licenses.  The License Division's experience with the now-eliminated target license,[1] and the abuse by target licensees who were caught travelling with their firearms when not on their way to or from an authorized range, supports this interest.  Here, by ensuring that Premises Residence licensees only travel with their firearms to authorized ranges in New York City, the City is able to ensure that licensees are only travelling to limited areas with their restricted licenses while affording them the opportunity to maintain their proficiency in the use of their firearms.

Further, the License Division is better able to investigate the credibility of licensees' assertions regarding the purpose for transporting their handguns when the incident

---

[1] There is no provision in the N.Y. Penal Law (§ 400.00(4)) for a target license, whereas the Penal Law expressly provides for a license to possess a firearm in the home.  See Penal Law § 400.00(2)(a).  The New York State Supreme Court, Appellate Division, First Department upheld the elimination of the target license.  De Illy v. Kelly, 6 A.D.3d 217 (App. Div. 2004).  There, the Court concluded that although a Premises Residence license is "limited to that licensee's dwelling, we do not view respondent's expansion of that right, to allow transport of such arms to authorized target ranges and hunting areas for proficiency enhancement, as supplanting the statue but merely supplementing it."  6 A.D.3d at 218.

27

was reported by an NYPD officer, as well as the ability to better police and monitor whether the person was, in fact travelling directly to or from an authorized range.  Practice at an authorized range that has been investigated by the NYPD and is required to adhere to certain safety requirements ensures the public safety.  The NYPD has the ability to monitor approved ranges, reviews the books of such ranges, and is aware of any incidents that occur at such ranges.

Plaintiffs have noted the exemption in 38 RCNY § 5-23(a)(4) authorizing Premises Residence licensees to transport their handgun directly to or from an area authorized by N.Y. State Fish & Wildlife Law.  Pl. Mem. at 16.  However, a Premises Residence licensee with a hunting authorization is not permitted to unregulated travel around New York State with their firearms. Pursuant to Article 11, Title 7 of the New York State Environmental Conservation Law ("ECL"), authorization to hunt may be exercised only at the times, places, manner and to the extent as permitted by specific licenses and stamps to hunt specific species.  See, e.g., ECL §§ 11-0701, 11-0703.  The state law further sets out limitations on the use and possession of firearms.  See, e.g., ECL §§ 11-0931, 11-1321.  Hunting authorizations only allow the transport of a firearm for hunting

28

that is authorized pursuant to the New York State Fish and
Wildlife Law.  As such, any licensee observed by law enforcement
in New York State to be travelling with a firearm stating that
they were on a direct route to hunting would be required to
produce a copy of the New York City Premises Residence license,
a City hunting authorization, a valid hunting license for the
specific season and area at issue, and have knowledge of many
other rules specific to the game and area (such as weapon types,
ammunition restrictions, time and day restrictions, and game
gender and size restrictions).  An officer anywhere in the state
may ask a person with a weapon about game tags, or many other
specific questions to evaluate the credibility of the assertion
that the person was en route to an area covered by the Fish and
Wildlife Law.  In short, it would be a far more elaborate lie to
justify the illegal transport of firearms under the N.Y. State
Fish & Wildlife Law, than by falsely stating that the gun holder
is en route to a range or shooting competition located anywhere
in the state.

## 38 RCNY § 5-23(a)(3) Does Not Violate Plaintiffs' Right to Travel

Plaintiffs contend that the restriction on Premises

29

Residence licenses impedes their fundamental right to travel.
See Pl. Mem. 20-32.  It is well-settled that the "constitutional
right to travel from one State to another . . . occupies a
position fundamental to the concept of our Federal Union."
Shapiro v. Thompson, 394 U.S. 618 (1969).  This constitutional
protection for interstate travel has been extended, in the
Second Circuit, to intrastate travel as well.  King v. New
Rochelle Municipal Housing Auth., 442 F.2d 646, 648 (2d Cir.)
(1971), cert. denied, 404 U.S. 863 (1971).

        Here, however, Plaintiffs point to nothing that
requires New York City to allow its licensees to transport their
restricted firearms to other states, or to other locales within
New York State.  Limiting restricted Premises Residence
licensees to keep their firearms in their residences, or to and
from an authorized small arms range, does not impede on
Plaintiffs' right to travel.  Courts have found that "'travelers
do not have a constitutional right to the most convenient form
of travel [, and] minor restrictions on travel do not amount to
the denial of a fundamental right.'"  Town of Southhold v. Town
of East Hampton, 477 F.3d 38, 53 (2d Cir. 2 2007) (citations
omitted).  "When a statute or regulation has merely . . . an
effect on travel, it does not raise an issue of constitutional

30

dimension.  A statute implicates the constitutional right to
travel when it actually deters such travel, or when the
impedance of travel is its primary objective, or when it uses
any classification which serves to penalize the exercise of that
right." Five Borough Bicycle Club v. City of New York, 483 F.
Supp.2d 351, 362-63 (S.D.N.Y. 2007) (quoting Soto-Lopez v. New
York City Civil Serv. Comm'n, 755 F.2d 266, 278 (2d Cir. 1985))
(internal quotations omitted).  Nothing in the rules pertaining
to Premises Residence licenses impedes, deters, or punishes
travel.  While the rule admittedly does not allow for
unrestricted travel with a firearm outside New York City, the
rule does not prevent Premises Residence licensees from
travelling outside of New York City – it simply prevents them
from travelling with their firearm.  In Town of Southhold, the
Second Circuit held that "[t]he fact that the [law] may make
travel less direct for some passengers does not meet the
threshold required for strict scrutiny review . . . something
more than a negligible or minimal impact on the right to travel
is required before strict scrutiny is applied."  477 F.3d at 54
(internal quotations and citations omitted).  The Second Circuit
has recognized that minor restrictions on travel "simply do not
amount to the denial of a fundamental right." Selevan v. New
York Thruway Auth., 71 F.3d 253, 257-58 (2d Cir. 2013); see also

31

Joseph v. Hyman, 659 F.3d 215, 279 (2d Cir. 2011).  Moreover, in

Turley v. New York City Police Dep't, the plaintiff street

musician challenged certain City regulations as violating the

First Amendment, and raised a right to travel allegation arguing

that he cannot afford to buy multiple permits for each day of

performing for different locations.  93 CIV. 8748, 1996 WL

93726, at *1 (S.D.N.Y. Mar. 5, 1996), aff'd in part. rev'd in

part, after trial on other issues, 167 F.3d 757 (2d Cir. 1999).

In Turley, the Court found that "the right to travel is not

violated by police power regulations that impose reasonable

restrictions on the use of streets and sidewalks."  Id. at *7;

see also Lutz v. City of New York, 899 F.2d 255, 270 (3d Cir.

1990) (finding state ordinance outlawing "cruising" was a

reasonable time, place and manner restriction on right to local

travel).


        Here, like the regulations discussed above requiring

sound permits for speech in Turley and Lutz, or the requirement

to pay tolls to commute to work in Selevan, the requirement that

Premises Residence licensees not travel unrestricted with their

firearms throughout or outside of the state does not infringe on

any fundamental right.  Such restrictions are reasonable in

time, place, and manner restrictions on the possession and use

32

of a firearm.

Plaintiffs' argument that 38 RCNY § 5-23(a)(3)
conflicts with the Firearms Owners' Protection Act ("FOPA"), 18
U.S.C. § 9264, is similarly unconvincing.  See Pl. Mem. at 27.
FOPA protects individuals from prosecution for illegally
transporting firearms when the origin or destination of the
transfer is a place where the individual "may lawfully possess
and carry such firearm."  18 U.S.C. § 926A.  In Torraco v. Port
Auth. of N.Y. & N.J., 615 F.3d 129, 139 (2d Cir. 2010), the
Second Circuit held that FOPA does not create a presumption that
gun owners may travel interstate with their guns to places that
do not permit unlicensed firearm possession.  Similarly, in a
state court challenge invoking FOPA, the Appellate Division held
that "[w]here the licensee is not permitted by the terms of the
license to lawfully carry the firearm at the time he embarks on
a trip to another state, FOPA is inapplicable."  Beach v. Kelly,
52 A.D.3d 436, 437 (App. Div. 2008).  Here, Premises Residence
licensees are not authorized to carry firearms under the terms
of their restricted license, other than in the limited exception
of travel to a New York City authorized range.  Thus, Plaintiffs
do not meet the lawful carry requirement set forth in 18 U.S.C.
§ 926A.

33

## 38 RCNY § 5-23(a)(3) Does Not Violate The First Amendment

The First Amendment protects the right of individuals to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for redress of grievances, and the exercise of religion.  Roberts v. United States Jaycees, 468 U.S. 609, 618 (1984); Sanitation Recycling Indus. v. City of New York, 107 F.3d 985, 996-97 (2d Cir. 1997).  However, government regulation or conduct that makes it "more difficult for individuals to exercise their freedom of association . . . does not, without more, result in a First Amendment violation."  Fiehting Finest. Inc. v. Bratton, 95 F.3d 224, 228 (1996).  Rather, "[t]o be cognizable, the interference with associational rights must be direct and substantial or significant."  Id. quoting Lyng v. UAW, 485 U.S. 360, 366-67 n. 5 (1988) (internal quotations omitted).  Moreover, the existence of a "chilling effect even in the area of First Amendment rights" does not support a freedom of expressive association claim.  Id. quoting Younger v. Harris, 401 U.S. 37, 57 (1971) (internal quotations omitted).

Plaintiffs have not alleged how engaging in target practice and competitive shooting outside of New York City

34

constitutes expressive matter or free association protected by the First Amendment.   In order for an activity to fall within the ambit of the First Amendment's protection of expressive association, "a group must engage in some form of expression, whether it be public or private."   Boy Scouts of Am. v. Dale, 530 U.S. 640, 648 (2000).   Plaintiffs have asserted that practicing at ranges and participating in shooting competitions is protected expressive or associational conduct.   See Pl. Mem. at 17-19.   However, asserting that gathering to practice and use what Plaintiffs deem to be their constitutional rights protected under the Second Amendment does not serve to create a right to expression and association protected under the First Amendment. Courts have viewed with care the implication of First Amendment rights in the context of the Second Amendment.   See, e.g., Kachalsky, 701 F.3d at 91-92 ("it would be . . . imprudent to assume that the principles and doctrines developed in connection with the First Amendment apply equally to the Second [Amendment].");   Plastino v. Koster, 12-CV-1316, 2013 WL 1769088, at *3 (E.D. Mo. Apr. 24, 2013), appeal dismissed (Oct. 11, 2013);   Woolard v. Sheridan, 863 F. Supp.2d 462, 472 (D. Md. 2012), rev'd on other grounds, sub. nom, Woolard v. Gallagher, 712 F.3d 865, 883 fn. 11 (4th Cir. Mar. 21, 2013);   Piszczatoski v. Filko, 840 F. Supp.2d 813, 832 (D.N.J. 2012) (declining to

apply the First Amendment's prior restraint doctrine to a Second Amendment case).

The requirement that Premises Residence licensees only utilize New York City authorized small arms ranges for purposes of practicing with their restricted firearm does not directly and substantially interfere with the rights of Plaintiffs to exercise their right to freely associate.  The requirement simply affects the place and manner in which Plaintiffs may engage in target shooting - an activity that is elective. Although Plaintiffs argue that 38 RCNY § 5-23(a)(3) sets forth a requirement that Premises Residence licensees practice "[t]o maintain proficiency in the use of the handgun," nothing in that rule is compulsory, requiring licensees to practice at a range, it simply permits it.  Nothing prevents Plaintiffs from associating with other handgun licensees at ranges in New York City, or any shooting competitions held therein.  The City's rule does not prevent any of the Plaintiffs from obtaining a license to utilize, possess, or carry a handgun in the states or localities where Plaintiffs seek to engage in target practice or shooting competitions outside of New York City.

## 38 RCNY § 5-23(a)(3) Does Not Violate The Dormant Commerce Clause

Article I, Section 8, Clause 3 of the United States Constitution provides that Congress shall have power "[t]o regulate Commerce with foreign Nations, and among several States, and with the Indian Tribes." In addition to this express grant of power to Congress, the Commerce Clause contains a negative implication – commonly referred to as the dormant Commerce Clause – "which limits the power of local governments to enact laws affecting interstate commerce." Town of Southold, 477 F.3d at 47. The chief concern of the dormant Commerce Clause is economic protectionism – "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." McBurney v. Young, 133 S. Ct. 1709, 1719 (Apr. 20, 2013) (internal quotations omitted).[2] However, this restriction is not absolute, and "the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be

---

[2] The U.S. Supreme Court recently expressed some misgivings about the Dormant Commerce Clause framework, but nevertheless continued to apply it. McBurney, 133 S. Ct. at 1719-1720; see also id. at 1721 (J. Thomas, concurrence) ("I continue to adhere to my view that 'the negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application, and, consequently, cannot serve as a basis for striking down a state statute.'") (quoting Hillside Dairy Inc. v. Lyons, 539 U.S. 59, 68 (2003)).

affected." Maine v. Taylor, 477 U.S. 131, 138 (1986); see also
McBurney, 133 S. Ct. at 1719-20.  Plaintiffs have contended that
38 RCNY § 5-23(a)(3) is unconstitutional because it: (1) amounts
to extraterritorial control of commerce; and (2) imposes a
burden on interstate commerce outweighed by local benefits.

A law may violate the dormant Commerce Clause in three
ways.  First, if a statute clearly discriminates against
interstate commerce on its face or in effect, it is virtually
invalid per se.  See Town of Southold, 477 F.3d at 47.  Such a
law can withstand judicial scrutiny only if the purpose is
unrelated to economic protectionism.  See McBurney, 133 S. Ct.
at 1719-20; Town of Southhold, 477 F.3d at 47; Selevan, 584 F.3d
at 94-95.  Second, when a law regulates evenhandedly to
effectuate a legitimate public interest, and burdens interstate
commerce only incidentally, the balancing test articulated in
Pike v. Bruce Church. Inc., 397 U.S. 137, 142 (1970) is applied.
Under Pike, the statute will be upheld unless the burden on
interstate Commerce:

> is clearly excessive in relation to the putative local
> benefits.  If a legitimate local purpose is found,
> then the question becomes one of degree.  And the
> extent of the burden that will be tolerated will of
> course depend on the nature of the local interest
> involved, and on whether it could be promoted as well

38

with a lesser impact on interstate activities.

Id.  A party challenging a law on either of these two grounds
must first demonstrate that the statute has a "disparate impact"
on interstate commerce.  See Town of Southold, 477 F.3d at 47.
In other words, the statute "must impose a burden on interstate
commerce that is qualitatively or quantitatively different from
that imposed on intrastate commerce."  National Elec. Mfrs.'
Ass'n v. Sorrell, 272 F.3d 104, 109 (2d Cir. 2001).  Third, a
statute is invalid per se "if it has the practical effect of
'extraterritorial' control of commerce occurring entirely
outside the boundaries of the state in question."  Freedom
Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004).[3]

     The extraterritorial aspect of dormant Commerce Clause
jurisprudence emerged from Supreme Court price-regulation cases.
See Freedom Holdings, 357 F.3d at 219.  The last in this line of
cases, Healy v. The Beer Inst., 491 U.S. 324 (1989), sets forth
the following three principles to guide an extraterritoriality
analysis:

---

[3] The extraterritorial reach of a statute is sometimes analyzed as a type of
"disparate impact" under the Pike balancing test rather than as an
independent basis for invalidity.  See Freedom Holdings, 357 F.3d at 216,
fn.11.  The outcome here is the same under both approaches.

> First, the Commerce Clause precludes the application
> of a state statute that takes place wholly outside of
> the State's borders, whether or not the commerce has
> effects within the State, and specifically, a State
> may not adopt legislation that has the practical
> effect of establishing a scale of prices for use in
> other states.  Second, a statute that directly
> controls commerce occurring wholly outside the
> boundaries of a State exceeds the inherent limits of
> the enacting State's authority and is invalid
> regardless of whether the statute's extraterritorial
> reach was intended by the legislature . . . .  Third,
> the practical effect of the statute must be evaluated
> not only by considering the consequences of the
> statute itself, but also by considering how the
> challenged statute may interact with the legitimate
> regulatory regimes of other States and what effect
> would arise if not one, but many or every, State
> adopted similar legislation.

Id. at 336 (internal quotations and citations omitted).


38 RCNY § 5-23(a) differs markedly from the laws at issue in the price regulation cases.  First, the rule does not "establish a scale of prices" or affect interstate pricing decisions.  Second, the Connecticut price affirmation statute struck down in Healy constituted economic protectionism.  Here, the rule regarding where restricted licensees may carry their firearms has nothing to do with economic interests.  Third, the rule does not directly control commercial activity occurring wholly outside New York State.  The price regulation statutes made specific reference to the conduct of out-of-state actors. Unlike those regulations, the challenged rule does not mention

40

other states for any purpose.  See National Elec. Mfrs.' Ass'n
v. Sorrell, 272 F.3d at 110.  The rule simply provides that
restricted licensees may only deviate from the restriction of
using their firearm in their home in the limited circumstance of
carrying their firearms to authorized ranges, in order to
protect the public safety.[4]  The rule does not prohibit persons
from purchasing firearms or attending shooting competitions.
Like the statute challenged in Brown & Williamson Tobacco Com.
v. Pataki, 320 F.3d 200, 214 (2d Cir. 2003), the rule "neither
impedes nor obstructs the flow of" firearms in interstate
commerce, it regulates the manner in which licensees transport
their firearms.

     At most, Plaintiffs have demonstrated that 38 RCNY §
5-23(a)(3) is a municipal regulation that has minor, indirect
ripple effects outside the City's boundaries.  However, such
effects are without constitutional significance where, as here,
the challenged law does not directly control commerce and out-
of-state entities "remain free to conduct commerce on their own
terms. . . ."  Freedom Holdings, 357 F.3d at 221; see also

---

[4] Plaintiffs' entire extraterritoriality argument rests upon the notion that
Premises Residence licensees are "lawfully licensed to carry firearms,"
which, according to the terms of such license, they are not.  Pl. Mem. at 22
(emphasis added).  Indeed, City residents bearing carry license can certainly
travel with their license outside of the state if they are lawfully permitted
to carry and possess a license in the other jurisdiction.

Instructional Sys., Inc. v. Computer Curriculum Corp., 35 F.3d
813, 825 (3d Cir. 1994) ("[I]t is inevitable that a state's law
. . . will have extraterritorial effects.  The Supreme Court has
never suggested that the dormant Commerce Clause requires
Balkanization, with each state's law stopping at the border.").

        In the alternative, Plaintiffs argue that the rule
imposes a burden on commerce incommensurate with the local
benefits, or the Pike balancing test.  See Pl. Mem., at 23.
However, before the balancing test is applied, Plaintiffs must
make a threshold showing of disparate impact.  Town of Southold
v. Town of East Hampton, 477 F.3d 38, 50 (2d Cir. 2007).
Plaintiffs have not met their burden of establishing that the
rule has an impact on commerce.  Further, any purportedly unique
burden on commerce is outweighed by the strength of the local
benefits, and thus, the Pike balancing test is satisfied.
Because the important local interests at stake outweigh any
negligible burden on interstate commerce, and nondiscriminatory
alternatives are not available, 38 RCNY § 5-23(a)(3) is not
unconstitutional under the Pike balancing test.

        Plaintiffs contend that the rule's effect on commerce
outweighs its local benefits.  However, the rule is narrowly

42

drawn and reasonably constructed to accomplish the City's stated public safety goals.  Local laws promoting public safety have a presumption of validity.  See Bibb v. Navajo Freight Lines, 359 U.S. 520, 524 (1959).  Courts have also found that "[c]onsiderable deference must be given to the legislature's policy determinations as to the local benefits of the challenged legislation."  Eric M. Berman, P.C. v. City of New York, 895 F. Supp. 2d 453, 492 (E.D.N.Y. 2012).  These factors militate against partial invalidation of 38 RCNY § 5-23.

**Conclusion**

Based on the conclusions set forth above, the Plaintiffs' motions for summary judgment and preliminary injunction are denied and the Defendants' cross motions for summary judgment dismissing the Amended Complaint is granted.

It is so ordered.

**New York, NY**
**February    , 2015**

_____

**ROBERT W.  SWEET**
**U.S.D.J.**

43

public safety goals.  Local laws promoting public safety have a presumption of validity.  See Bibb v. Navajo Freight Lines, 359 U.S. 520, 524 (1959).  Courts have also found that "[c]onsiderable deference must be given to the legislature's policy determinations as to the local benefits of the challenged legislation."  Eric M. Berman, P.C. v. City of New York, 895 F. Supp. 2d 453, 492 (E.D.N.Y. 2012).  These factors militate against partial invalidation of 38 RCNY § 5-23.

**Conclusion**

Based on the conclusions set forth above, the Plaintiffs' motions for summary judgment and preliminary injunction are denied and the Defendants' cross motions for summary judgment dismissing the Amended Complaint is granted.

It is so ordered.

**New York, NY**
**February 4, 2015**

ROBERT W. SWEET
U.S.D.J.

43