# No. 15-638

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

THE NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC.,
ROMOLO COLANTONE, EFRAIN ALVAREZ, AND
JOSE ANTHONY IRIZARRY,

*Plaintiffs-Appellants*,

v.

THE CITY OF NEW YORK AND
THE NEW YORK CITY POLICE DEPARTMENT – LICENSE DIVISION,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of New York, No. 1:13-cv-2115

## BRIEF FOR APPELLANTS

BRIAN T. STAPLETON
MATTHEW S. LERNER
GOLDBERG SEGALLA LLP
11 Martine Avenue
Suite 750
White Plains, NY 10606
(914) 798-5400
bstapleton@goldbergsegalla.com

PAUL D. CLEMENT
 *Counsel of Record*
D. ZACHARY HUDSON
ANDREW N. FERGUSON
BANCROFT PLLC
500 New Jersey Avenue NW
7th Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellants*

June 16, 2015

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant New York State Rifle & Pistol Association certifies that it does not have a parent corporation and that no publicly held corporation owns more than 10% of its stock. The remaining Appellants are individuals.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iii

INTRODUCTION ............................................................................................. 1

JURISDICTION................................................................................................ 4

STATEMENT OF THE ISSUES ....................................................................... 4

STATEMENT OF THE CASE AND FACTS .................................................... 5

    A.    Statutory and Regulatory Background ................................................ 5

        1.    New York City's licensure system ............................................ 5

        2.    Target shooting in New York City ............................................ 7

    B.    Facts.................................................................................................. 8

    C.    Proceedings Below ............................................................................ 9

SUMMARY OF ARGUMENT...........................................................................11

STANDARD OF REVIEW ............................................................................... 14

ARGUMENT .................................................................................................... 15

I.    The City's Handgun Transportation Ban Violates The Second
    Amendment...................................................................................... 15

    A.    Section 5-23 Fails Strict Scrutiny or any Similarly Rigorous
        Test ................................................................................................. 16

    B.    Section 5-23 Cannot Withstand Intermediate Scrutiny,
        Properly Applied.............................................................................. 24

        1.    The City failed to prove a substantial relationship
            between its asserted public safety interest and section
            5-23 ...................................................................................... 25

        2.    The City's evidence is not just conclusory but clearly
            insufficient to carry its burden under intermediate
            scrutiny ................................................................................. 31

II.     The City's Handgun Transportation Ban Violates The Commerce Clause.................................................................................... 39

    A.     Section 5-23 Facially Discriminates Against Interstate Commerce and Is Invalid *Per Se*........................................ 42

    B.     Section 5-23 Impermissibly Controls Economic Activity Occurring Entirely Outside New York City. ...................................... 45

III.    The Handgun Transportation Ban Violates Plaintiffs' Fundamental Right To Travel ............................................................. 46

IV.     The Handgun Transportation Ban Impermissibly Burdens Plaintiffs' First Amendment Rights ................................................ 49

CONCLUSION ................................................................ 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Abood v. Detroit Bd. of Educ.*,
    431 U.S. 209 (1977)............................................................................51

*Att'y Gen. of N.Y. v. Soto-Lopez*,
    476 U.S. 898 (1986)................................................................... 46, 47

*Baldwin v. G.A.F. Seelig, Inc.*,
    294 U.S. 511 (1935)............................................................................42

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
    481 U.S. 537 (1987)............................................................................50

*Bounds v. Smith*,
    430 U.S. 817 (1977)............................................................................34

*Boy Scouts v. Dale*,
    530 U.S. 640 (2000)................................................................... 14, 50

*Brown & Williamson Tobacco Corp. v. Pataki*,
    320 F.3d 200 (2d Cir. 2003)..............................................................40

*C&A Carbone, Inc. v. Town of Clarkstown*,
    511 U.S. 383 (1994)............................................................. 13, 43, 44

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010)............................................................................17

*City of Los Angeles v. Preferred Commc'ns, Inc.*,
    476 U.S. 488 (1986)............................................................................27

*City of Philadelphia v. New Jersey*,
    437 U.S. 617 (1978)............................................................................40

*Clark v. Jeter*,
    486 U.S. 456 (1988)................................................................... 12, 24

*Cleveland Bd. of Educ. v. LaFleur*,
    414 U.S. 632 (1974)............................................................................35

*de Illy v. Kelly*,
6 A.D.3d 217 (N.Y. App Div. 2004) ....................................................................6

*Dean Milk Co. v. City of Madison*,
340 U.S. 349 (1951) ...............................................................................44

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................................ *passim*

*Edenfield v. Fane*,
507 U.S. 761 (1993) ............................................................ 27, 30

*Edwards v. California*,
314 U.S. 160 (1941) ...............................................................................46

*Elrod v. Burns*,
427 U.S. 347 (1976) ...............................................................................28

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ............................................................ *passim*

*Ezell v. City of Chicago*,
No. 10 C 5135, 2010 WL 3998104
(N.D. Ill. Oct. 12, 2010) ...............................................................................21

*Forsyth Cnty. v. Nationalist Movement*,
505 U.S. 123 (1992) ...............................................................................35

*Foster-Fountain Packing Co. v. Haydel*,
278 U.S. 1 (1928) ...............................................................................44

*Freedom Holdings, Inc. v. Spitzer*,
357 F.3d 205 (2d Cir. 2004) ............................................................ 40, 41, 45

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997) ...............................................................................40

*H. P. Hood & Sons, Inc. v. Du Mond*,
336 U.S. 525 (1949) ...............................................................................42

*Harman v. Forssenius*,
380 U.S. 528 (1965) ...............................................................................48

*Healy v. Beer Inst.*,
   491 U.S. 324 (1989).............................................................. 13, 41, 45

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ............................................. *passim*

*Irby v. N.Y.C. Transit Auth.*,
   262 F.3d 412 (2d Cir. 2001) ...................................................14

*Kachalsky v. Cnty. of Westchester*,
   701 F.3d 81 (2d Cir. 2012) ................................................ *passim*

*Keller v. State Bar of Cal.*,
   496 U.S. 1 (1990).....................................................................51

*King v. New Rochelle Mun. Hous. Auth.*,
   442 F.2d 646 (2d Cir. 1971) ...................................................49

*Knox v. Serv. Emps. Int'l Union*,
   132 S. Ct. 2277 (2012)............................................................50

*Kwong v. Bloomberg*,
   723 F.3d 160 (2d Cir. 2013) ...................................................17

*Leebaert v. Harrington*,
   332 F.3d 134 (2d Cir. 2003) ...................................................16

*Maine v. Taylor*,
   477 U.S. 131 (1986)................................................................39

*McBurney v. Young*,
   133 S. Ct. 1709 (2013)............................................................39

*McCutcheon v. FEC*,
   134 S. Ct. 1434 (2014)............................................................38

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010)......................................................... *passim*

*Mincey v. Arizona*,
   437 U.S. 385 (1978)................................................................35

*New Energy Co. of Ind. v. Limbach,*
    486 U.S. 269 (1988)...........................................................39

*Or. Waste Sys., Inc. v. Dep't of Env'tl Quality*,
    511 U.S. 93 (1994).................................................... 40, 41

*Osterweil v. Bartlett*,
    21 N.Y.3d 580 (2013)................................................ 10, 36

*Osterweil v. Bartlett*,
    706 F.3d 139 (2d Cir. 2013) ...........................................10

*Peruta v. Cnty. of San Diego*,
    742 F.3d 1144 (9th Cir. 2014)........................................38

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970)............................................. 41, 43, 45

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992)........................................................18

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)........................................................49

*S. Cent. Timber Dev., Inc. v. Wunnicke*,
    467 U.S. 82 (1984).........................................................44

*Saenz v. Roe*,
    526 U.S. 489 (1999)................................................. 46, 47

*Schad v. Borough of Mount Ephraim*,
    452 U.S. 61 (1981)................................................... 38, 50

*Schneider v. New Jersey*,
    308 U.S. 147 (1939)......................................................38

*Shapiro v. Thompson*,
    394 U.S. 618 (1969)......................................................49

*Stanley v. Illinois*,
    405 U.S. 645 (1972)......................................................34

*Town of Southold v. Town of East Hampton*,
   477 F.3d 38 (2d Cir. 2007) ..................................................... 39, 40, 47

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) .................................................................... 26, 31

*Ullman v. United States*,
   350 U.S. 422 (1956) ...........................................................................19

*United Haulers Ass'n, Inc.*
   *v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
   550 U.S. 330 (2007) ...........................................................................39

*United States v. Decastro*,
   682 F.3d 160 (2d Cir. 2012) ...................................................... 16, 17, 38

*United States v. Guest*,
   383 U.S. 745 (1966) ...........................................................................46

*United States v. Masciandaro*,
   638 F.3d 458 (4th Cir. 2011) ...............................................................17

*United States v. Playboy Entm't Grp.*,
   529 U.S. 803 (2000) .............................................................. 18, 22, 26

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ....................................................... 24, 26, 31

*United States v. United Foods, Inc.*,
   533 U.S. 405 (2001) ...........................................................................51

*Valley Forge Christian Coll.*
   *v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) .................................................................... 19, 35

*W. Lynn Creamery, Inc. v. Healy*,
   512 U.S. 186 (1994) ...........................................................................42

*W. Va. Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ...........................................................................51

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ...........................................................................16

*Wooley v. Maynard*,
  430 U.S. 705 (1977)................................................................51

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992)................................................................40

**Statutes**

18 U.S.C. §926A ............................................................... 23, 36

28 U.S.C. §1291 ......................................................................4

28 U.S.C. §1331 ......................................................................4

42 U.S.C. §1983 ......................................................................9

N.Y. Penal Law §265.00(10) ..................................................5

N.Y. Penal Law §265.01 ........................................................5

N.Y. Penal Law §265.20(a)(3) ...............................................5

N.Y. Penal Law §400.00 .....................................................5, 6

N.Y.C. Admin. Code §10-131(c) ...........................................7

**Rules**

23 R.C.N.Y. §5-01............................................................ 6, 37

38 R.C.N.Y. §1-03(d) ............................................................5

38 R.C.N.Y. §5-23........................................................... *passim*

**Constitutional Provisions**

U.S. Const. amend. I ..............................................................5

U.S. Const. amend. II ....................................................... *passim*

U.S. Const. art. I, §8, cl. 3............................................. 3, 4, 39

U.S. Const. amend. XIV, §1 ..................................................4

**INTRODUCTION**

The U.S. Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), were watershed decisions. In *Heller*—resolving a question that had been the subject of debate for the better part of a century—the Court held that the text, structure, and history of the Second Amendment confirm that it "confer[s] an individual right to keep and bear arms." 554 U.S. at 595. And in *McDonald*, the Court held that the right to keep and bear arms is not just an individual right, but a fundamental one applicable against the state and local governments and entitled to the same robust protections as other fundamental rights enshrined in the Constitution. 561 U.S. at 791.

These transformational rulings have to date been largely symbolic for law-abiding gun owners in New York City, which continues to operate as if *Heller* and *McDonald* were never decided. For example, just as it did when Second Circuit law recognized only a collective right, 38 R.C.N.Y. §5-23 strictly limits the ability of a New York City resident safely to transport a lawfully owned and licensed firearm between locations where he or she may lawfully use and possess that firearm:

> The possession of the handgun for protection is restricted to the inside of the premises which address is specified on the license.

38 R.C.N.Y. §5-23(a)(2). This near-categorical ban on transporting handguns— even firearms that are unloaded and locked in a container with the ammunition stored

separately—contains only two modest exceptions: a licensee may transport a handgun directly to and from either an authorized small arms range/shooting club or an authorized area designated by the New York State Fish and Wildlife Law.

This pre-*Heller* regulation, which—as far as Plaintiffs are aware—the City has not reexamined in the wake of *Heller* and *McDonald*, is wholly anachronistic (and unconstitutional) in a world where the Second Amendment confers an individual and fundamental constitutional right.  An individual can have a license to possess a firearm in a residence in New York City and a license to possess a firearm in a second residence elsewhere in or outside the state, but cannot transport his or her firearm between these two residences.  Notwithstanding the Supreme Court's recognition that defense of hearth and home is in the heartland of Second Amendment protections, the City's handgun transportation ban prohibits citizens from taking their handguns to second residences for exactly that core purpose, with the bizarre effect of forcing someone to store a second handgun in a largely vacant second home.  Along the same lines, while tacitly acknowledging the importance of maintaining proficiency in handgun use, which is critical to the effective exercise of Second Amendment rights, section 5-23 limits City residents to use of a small number of locations within New York City for this purpose; residents may not lawfully travel to neighboring municipalities or states to participate in shooting

competitions or to go to target ranges, even if those ranges are closer than any range in New York City.

These restrictions on the fundamental right to have a firearm for self-defense and to train so as to be able to use it effectively for that purpose are plainly unconstitutional following *Heller* and *McDonald*. The district court resisted that conclusion, but only because it adopted a view of Second Amendment rights that essentially recreates the pre-*Heller* status quo. The district court refused to treat the Second Amendment right to keep and bear arms like all other fundamental rights and evaluated section 5-23 under a watered-down standard that differed from rational basis in name only. Compounding its error, the court allowed the City to carry its burden of justifying section 5-23's restrictions based on the conclusory and unsupported submission of a lone policeman.

While the Second Amendment problem with the handgun transportation ban is the most glaring, it is not the regulation's only fatal constitutional problem. Among other things, by limiting City residents to the use of in-City firing ranges, section 5-23 violates the Commerce Clause, U.S. Const. art. I, §8, cl. 3. The City could not limit its residents to shopping in New York City stores or even to disposing trash in New York City dumps. The City certainly does not have a freer hand when it comes to constitutionally protected activity. The regulation also runs afoul of the fundamental right to travel by conditioning such travel on the forfeiture of a separate,

but equally important, constitutional right. And section 5-23 unconstitutionally burdens First Amendment rights by forcing City residents to forego preferred associations and speech in favor of City-sanctioned associations.

## JURISDICTION

The district court had subject-matter jurisdiction over this action under 28 U.S.C. §1331. The district court's order granting summary judgment to the City and denying Plaintiffs' motion for a preliminary injunction was entered on February 9, 2015. ECF No. 57. Plaintiffs timely noticed this appeal on March 3, 2015. Joint Appendix ("JA") 217-218. This Court has jurisdiction over this appeal from a final judgment under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether a regulation that forbids transportation of an unloaded handgun outside of the promulgating jurisdiction to participate in target shooting and shooting competitions in order to maintain proficiency with a firearm, or to defend one's home outside of the jurisdiction, infringes the fundamental rights secured by the Second Amendment, U.S. Const. amend. II, and the Due Process Clause of the Fourteenth Amendment, *id.* amend. XIV, §1, to keep and bear arms.

2. Whether a regulation that forbids transportation of an unloaded handgun to participate in economic activity outside of the promulgating jurisdiction violates the Commerce Clause, U.S. Const. art. I, §8, cl. 3.

3. Whether a regulation that forbids transportation of an unloaded handgun outside of the promulgating jurisdiction to participate in constitutionally protected activities violates the fundamental constitutional right to travel.

4. Whether a regulation that requires citizens who lawfully possess handguns in the promulgating jurisdiction to join gun clubs in the jurisdiction in order to exercise the constitutionally protected right to maintain proficiency with those handguns violates the First Amendment's guarantee of free association. U.S. Const. amend. I.

## STATEMENT OF THE CASE AND FACTS

### A.     Statutory and Regulatory Background

#### 1.      New York City's licensure system

New York state law forbids its residents from possessing handguns in their homes without a license.  N.Y. Penal Law §§265.01, 265.20(a)(3) (McKinney 2013). In order to exercise this core Second Amendment right, one must first apply for a license "to the licensing officer in the city or county … where [he or she] resides." *Id.* §400.00(3)(a).  In New York City, the Police Commissioner ("Commissioner") is the licensing officer charged with administering the handgun licensing system, N.Y. Penal Law §265.00(10), and, through the New York City Police Department License Division ("License Division"), processes applications and investigates whether an applicant satisfies the strict statutory criteria for a license, *see id.* §§400.00(1), (3); 38 R.C.N.Y. §1-03(d); JA143 ¶2; JA150 ¶2.  The application

evaluation process includes, among other things, an assessment of the applicant's mental health, a crosscheck of the applicant's statements on his or her license application, and a criminal records check. JA178-79. The Commissioner may deny an application for "good cause." JA179.

New York law creates several different types of licenses. Most relevant here, state law provides for a license permitting a resident to "have and possess" a handgun "in his dwelling …." N.Y. Penal Law §400.00(2)(a). Regulations issued by the Commissioner define this license as a "premises license." 38 R.C.N.Y. §5-01(a) ("Premises Residence license"). A Premises Residence license limits the holder's possession to the address listed on the license except that the license holder "may transport his/her handgun(s) directly to and from an authorized small arms range/shooting club, unloaded, in a locked container, the ammunition to be carried separately." *Id.* §5-23(a)(3). Neither New York law nor the Commissioner's rules authorize a New York City license holder to transfer their handgun to a separate residence or to transport a handgun outside of the City solely for purposes of target shooting.[1]

---

[1] The Commissioner's rules previously provided for a distinct "target license" authorizing the transportation of an unloaded handgun to an authorized gun range, but that license was eliminated in 2001 in favor of allowing transportation privileges as part of the premises license. *See, e.g., de Illy v. Kelly*, 6 A.D.3d 217, 218 (N.Y. App Div. 2004); JA77-79 ¶¶27-31.

## 2.    Target shooting in New York City

New York City law prohibits discharging a handgun within the city except in "premises designated by the police commissioner."  N.Y.C. Admin. Code §10-131(c).  The Commissioner has established a procedure by which certain persons or entities may apply for designation as an authorized small arms range for purposes of section 10-131.  JA80 ¶36.

The Commissioner has approved eight such ranges in a city of nearly nine million people, exclusive of police or military ranges.  JA81 ¶39; JA121-22; JA148 ¶27; JA163-64 ¶27.  Defendants contend that six of the eight—Westside Rifle & Pistol Range in Manhattan, Woodhaven Rifle & Pistol Range in Queens, Seneca Sporting Range in Queens, Bay Ridge Road & Gun Club in Brooklyn, Colonial Rifle & Pistol Club in Staten Island, Richmond Borough Gun Club in Staten Island, and Olinville Arms in the Bronx—are open to any license holder to join after payment of a fee or successfully becoming a member.  JA81-82 ¶¶40-41; JA148-49 ¶¶28-35, 37-38.

Plaintiffs dispute the availability of authorized small ranges.  They adduced evidence below showing that only one range—Westside Rifle—is open to license holders who are not club members.  ECF No. 20-1 ¶4; JA164, 167 ¶¶29, 38.  The district court did not resolve this dispute.

## B. Facts

Romolo Colantone is a resident of Staten Island and has held a premises license since 1979. JA31 ¶3. Jose Anthony Irizarry and Efrain Alvarez are residents of the Bronx and have held premises licenses for more than a decade. JA41 ¶¶2, 3; JA45 ¶¶2, 3. To maintain their handgun proficiency, Colantone, Irizarry, and Alvarez previously participated in competitive shooting events beyond the City's borders and, sometimes, outside the state. JA31-32 ¶¶4, 5; JA41-42 ¶¶5, 6; JA45-46 ¶¶5, 6. Consistent with their interest in honing their skills, Colantone, Irizarry, and Alvarez sought to attend a regional shooting competition in Old Bridge, New Jersey, in June 2012. JA32 ¶6; JA42 ¶7; JA45, ¶7. The competition organizers, however, informed them that they could not participate because section 5-23 prohibited City residents from bringing their handguns to Old Bridge. JA32, ¶6; JA42 ¶7; JA45 ¶7.

After receiving notice of ineligibility from the competition organizers, Colantone and Alvarez wrote letters to the Licensing Division to clarify whether section 5-23 permitted transporting unloaded handguns outside of the City solely for target shooting. JA32 ¶7; JA46 ¶8. Deputy Inspector Andrew Lunetta replied: "The Rules of the City of New York contemplate that an authorized small arms range/shooting club is one authorized by the Police Commissioner. Therefore the only permissible ranges for target practice or competitive shooting matches by NYC

Premises Residence license holders are those located in New York City." JA38; JA50. Because of the License Division's interpretation of section 5-23, Plaintiffs have declined to participate in any shooting competitions or events outside the borders of the City since June 2012 for fear of revocation of their Premises Residence licenses and of criminal prosecution. JA33-34 ¶¶10, 13; JA42-43 ¶¶9-10; JA46-47 ¶¶9-10.

Colantone also owns a second home in Hancock, New York, in Delaware County. JA33 ¶11. He and his family visit the property often. *Id.* While visiting, he wishes to keep his handgun at his second property to defend himself and his family. *Id.* He has declined to take his handgun from the City to Hancock, however, for fear of prosecution under section 5-23. JA33-34 ¶¶12, 14.

### C. Proceedings Below

Colantone, Irizarry, Alvarez, and the New York State Rifle & Pistol Association (collectively "Plaintiffs") filed this action under 42 U.S.C. §1983 on March 29, 2013.[2] Plaintiffs alleged that section 5-23 violated the Second Amendment's prohibition on laws infringing the right to bear arms, the Commerce Clause, the fundamental right to travel, and the First Amendment's prohibition on laws abridging the freedom of speech. They sought to enjoin the City of New York and the New York City Police Department-License Division (collectively

---

[2] Plaintiffs filed their operative complaint on May 1, 2013. JA1, 8.

"Defendants" or "City") from enforcing section 5-23 against Premises Residence license holders traveling with their handguns to gun ranges, shooting competitions, or homes outside of the City.

Plaintiffs moved for a preliminary injunction on May 7, 2013. ECF No. 9. While the motion was pending, this Court certified to the New York Court of Appeals the question whether section 400.00(a)(3)'s command that individuals apply for a license "in the city or county … where the applicant resides" permitted only persons domiciled in a New York city or county to apply for a premises license. *See Osterweil v. Bartlett*, 706 F.3d 139, 140 (2d Cir. 2013), *certified question accepted*, 20 N.Y.3d 1058 (2013). The district court stayed Plaintiffs' motion for a preliminary injunction pending the Court of Appeals' resolution of the certified question. ECF No. 22, at 6. After the Court of Appeals decided that section 400.00(a)(3) requires only that an applicant be a resident of the city or county in which he applies for a license, *Osterweil v. Bartlett*, 21 N.Y.3d 580 (2013), the district court vacated the stay, ECF No. 23. Plaintiffs renewed their motion for a preliminary injunction, ECF No. 28, and the parties cross-filed for summary judgment, ECF Nos. 33, 43.

The district court granted summary judgment to the City. In an opinion that lifted *verbatim* long passages from the City's summary judgment papers, the court held that intermediate scrutiny was the appropriate level of review for section 5-23's burden on Plaintiffs' Second Amendment rights. JA194. Purporting to apply

"intermediate scrutiny" but, in fact, applying something akin to rational basis review, the district court held that section 5-23 was reasonably related to the City's interest in public safety and crime prevention. JA198. That holding was based almost entirely on the only substantive evidence produced by the City: a single declaration of the police official in charge of the licensing division outlining in the most conclusory terms the City's reasoning for forbidding Plaintiffs from transporting their handguns outside of the City. The court also rejected Plaintiffs' right-to-travel argument on the ground that the City's handgun transportation ban is a "reasonable … time, place, and manner restriction[] on the possession and use of a firearm." JA204-05. It similarly held that section 5-23 did not violate Plaintiffs' First Amendment right to freely associate because it left Plaintiffs free to associate with "other handgun licensees at ranges in New York City." JA208. Finally, it held that section 5-23 did not discriminate against interstate commerce. JA212-14. Judge Robert W. Sweet entered final judgment on February 9, 2015, and Plaintiffs timely filed a notice of appeal with this Court on March 3, 2015.

## SUMMARY OF ARGUMENT

The decision below cannot be squared with the recognition of this Court and the U.S. Supreme Court that the right to keep and bear arms is fundamental. The City's handgun transportation ban prohibits New York City residents from transporting their lawfully owned and licensed handguns to their own second

residences outside City borders, simultaneously hindering their right to use a handgun to defend hearth and home and creating perverse incentives to proliferate the numbers of guns stored at often-vacant homes. The ban also makes it such that City residents may not transport their handguns beyond City boundaries to engage in constitutionally-protected target practice and shooting competitions, which exist so that individuals can learn to safely and effectively exercise their constitutional rights.

That section 5-23's restrictions run to the heart of Second Amendment protections means that the district court's failure to apply the most rigorous level of scrutiny outlined in *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012), was error. But the district court's fatally flawed approach to intermediate scrutiny, which—as applied by the district court—was little more than mislabeled rational basis review, was equally problematic and also requires reversal. The court failed to hold the City to its burden to establish that section 5-23 is "substantially related to an important governmental interest." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). While the court purported to require the City to prove that its interests in crime prevention and public safety are actually served by its handgun transportation ban, it allowed the conclusory and unsupported declaration of a single New York City official to carry the day. And the district court's error was compounded by the fact

that this lone declaration comes nowhere close to establishing the required fit between section 5-23 and the City's asserted interests.

The handgun transportation ban's problems do not end there. Section 5-23 also runs afoul of the Commerce Clause. It is blackletter law that "[s]tate and local governments may not use their regulatory power to favor local enterprise by prohibiting patronage of out-of-state competitors or their facilities." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 394 (1994). But section 5-23 does precisely that. It forbids New York City residents from using their lawfully owned and licensed handguns at out-of-city firing ranges that compete directly with New York City ranges. The City could not adopt a similar scheme for grocery shopping or waste disposal, and its power to limit residents to in-City purveyors hardly increases when constitutionally-protected activity is at stake. And that is not the regulation's only Commerce Clause problem. Section 5-23 imposes burdens on interstate commerce that far exceed any purported local benefits and regulates commerce taking place entirely outside of New York City in a manner that the Commerce Clause unequivocally forbids. *Healy v. Beer Inst.*, 491 U.S. 324, 331 (1989).

Section 5-23 likewise infringes Plaintiffs' fundamental right to intra- and interstate travel. The City forbids Plaintiffs from exiting City limits to engage in the constitutionally protected activities of maintaining proficiency with their lawfully

possessed and licensed handguns and from using those handguns to defend homes outside the City. In effect, the handgun transportation ban requires City residents to choose: either exercise their fundamental Second Amendment rights or their fundamental right to travel. But the Constitution does not permit the City to put its residents to such a choice and the City cannot condition the exercise of Plaintiffs' fundamental right to travel on their surrendering of a different, but equally fundamental, constitutional right.

Last but by no means least, the City's handgun transportation ban violates the First Amendment. The First Amendment protects the right to associate with others "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts v. Dale*, 530 U.S. 640, 647 (2000) (quotation marks omitted). Section 5-23 requires Plaintiffs to associate with firing ranges and gun clubs in New York City instead of their preferred ranges and clubs outside of the City limits. It therefore both denies Plaintiffs their right to associate with organizations of their choice, and forces them to associate with others. It doubly infringes the First Amendment and therefore cannot stand.

## STANDARD OF REVIEW

This Court reviews the district court's decision on summary judgment *de novo*. *See Irby v. N.Y.C. Transit Auth.*, 262 F.3d 412, 413 (2d Cir. 2001).

**ARGUMENT**

**I.    The City's Handgun Transportation Ban Violates The Second Amendment.**

The Second Amendment to the U.S. Constitution provides:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend II.  Following years of debate about the scope of this amendment, and despite the contrary view of the vast majority of the circuits, in 2008 the Supreme Court held that the amendment protects the individual right to keep and bear arms in the home and for self-defense.  *District of Columbia v. Heller*, 554 U.S. 570 (2008).  Two years later, the Court concluded that the Second Amendment right recognized in *Heller* was a fundamental right that was fully applicable to the States. *McDonald v. Chicago*, 561 U.S. 742 (2010).

Notwithstanding the sea change brought about by these decisions, New York City continues to adhere to a licensing scheme that unconstitutionally restricts the rights of its residents to keep and bear arms in defense of themselves and their families.  By prohibiting residents from transporting their licensed handguns beyond city borders, 38 R.C.N.Y. §5-23 significantly burdens the right of those residents who own a second home outside of the city to protect themselves, their families, and their property with a licensed handgun.  The City's handgun transportation ban also substantially burdens the ability of residents with a single home to hone the skills

necessary for effective self-defense by proscribing the use of lawfully licensed handguns at target ranges and shooting competitions outside City borders. As a result, section 5-23 violates the Second Amendment under any arguably applicable level of scrutiny. Reversal of the judgment below is required.

## A. Section 5-23 Fails Strict Scrutiny or any Similarly Rigorous Test.

In *McDonald*, the Supreme Court unequivocally recognized that the Second Amendment right to keep and bear arms counts "among those fundamental rights necessary to our system of ordered liberty." 561 U.S. at 778. And the precedents of both this Court and the Supreme Court have long recognized that "[w]here the right infringed is fundamental, strict scrutiny is applied to the challenged governmental regulation." *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003); *see also Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997). Taken together, *McDonald* and the precedent regarding fundamental rights definitively establish that infringements of Second Amendment rights should be subjected to the most rigorous and exacting scrutiny provided by law. This Court's Second Amendment precedents are in accord. In *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012), this Court expressly recognized that the right to keep and bear arms is "fundamental to our scheme of ordered liberty," and in *Kachalsky v. County of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012), this Court indicated that it would apply strict scrutiny (or something like it) to regulations which "burden the 'core' protection of self-defense

16

in the home," *see also Decastro*, 682 F.3d at 167 (holding that heightened scrutiny should apply where the law "substantially burdens Second Amendment rights"); *Kwong v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013); *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1257 (D.C. Cir. 2011) (regulations which substantially burden the core of the right to keep and bear arms require "strong justification"); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("[W]e assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny.").

The district court did not hold that section 5-23 survived the exacting scrutiny contemplated in *Kachalsky*. In fact, the City never even attempted to establish that section 5-23's handgun transportation ban "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). Instead, the City contended, and the district court held, that the most exacting level of scrutiny identified in *Kachalsky* was inapplicable in this case because "the challenged rule does not impinge on the 'core' of the Second Amendment, as it does not establish or purport to establish a prohibition or ban on the exercise of Plaintiffs' Second Amendment right to possess a handgun in the home for self-defense." JA192; *see also* JA193-94 (strict scrutiny inapplicable because section 5-23 is not a "ban, prohibition or otherwise").

The district court's narrow view of core Second Amendment protections is unsupportable. As an initial matter, while courts have embraced different views as to when, if, and how strict scrutiny applies in the Second Amendment context, no court has held that the scrutiny applicable to infringements of other fundamental rights applies only when a complete ban is at issue. As *Heller* made clear, a complete ban is so antithetical to the Second Amendment that it is unconstitutional without regard to the level of scrutiny. Thus, the level of scrutiny is only relevant when it comes to burdens on the right that fall short of a complete ban.

The district court's contrary approach would render the Supreme Court's identification of the Second Amendment right as fundamental all but meaningless. No court has held that the highest level of scrutiny under the First Amendment applies only when a complete ban on speech is at issue. As the Supreme Court has explained in the speech context, "[i]t is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning [constitutionally protected activity] is but a matter of degree." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 812 (2000); *see also Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 877 (1992) (holding that statute imposed undue burden on exercise of due process rights notwithstanding that it did not prohibit them). The district court's holding in this case in the Second Amendment context thus runs headlong into the Supreme Court's admonition that no constitutional right is "less

'fundamental' than" another, and that there is "no principled basis on which to create a hierarchy of constitutional values …." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc*., 454 U.S. 464, 484 (1982); *accord Ullman v. United States*, 350 U.S. 422, 428-29 (1956) ("To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it.  This is to disrespect the Constitution."); *see also McDonald*, 561 U.S. at 781 (refusing government's plea to treat right to keep and bear arms "as a second-class right").

In all events, even under the district court's unduly narrow view of *Kachalsky*, strict scrutiny applies here because section 5-23 burdens the "core" right to keep and bear arms for self-defense in the home.  Most obviously, section 5-23 prevents Plaintiff Colantone from transporting his handgun to his home outside of the City for self-defense and, as a result, categorically prohibits him from using that handgun for the core purpose of defense of hearth and home.  *See Kachalsky*, 701 F.3d at 93.  That restriction is undoubtedly a restriction on the exercise of the core right protected by the Second Amendment and unquestionably triggers strict scrutiny.  While someone in Colantone's position could perhaps buy a second handgun and obtain a second premises license, that does not alleviate the substantial burden and only highlights the absurdity of the government's approach.  The cost and inconvenience associated with obtaining and licensing a second handgun clearly constitute a substantial burden that is necessitated by section 5-23's needless restriction on

transporting the primary handgun even in a storage case separate from the ammunition. And to the extent section 5-23 incentivizes the proliferation of handguns stored in houses that remain vacant much of the year, the regulation hardly furthers the government's stated interests.

Nor is this problem limited to second homes. A City resident temporarily displaced from his primary residence who needs to spend a few nights in a friend's home should not need to surrender his constitutional right to self-defense or be forced to leave his handgun in his temporarily vacant primary abode. The Second Amendment surely empowers the resident to take his or her lawfully owned and licensed firearm into that temporary residence both for purposes of self-defense and to ensure that the handgun is safe and secure. To deny that section 5-23 imposes a substantial burden on Second Amendment rights in such circumstances is to deny the importance of the right recognized in *Heller* altogether.

Moreover, maintaining proficiency in handgun use for self-defense in the home by practicing at firing ranges and shooting competitions forms part of the core right of self-defense in the home. "The right to possess firearms for protection implies a corresponding right to … maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). Indeed, *Heller* discussed at length the historical sources supporting this view—a discussion the district court

failed to even acknowledge. For example, Justice Scalia quoted Professor Cooley's exhortation that "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; … it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." *Heller*, 554 U.S. at 617-18 (quotation marks omitted). Maintaining proficiency in handgun use at gun ranges and shooting competitions therefore lies within the core of the right protected by the Second Amendment. The district court's contrary holding was error.

The Seventh Circuit's thoughtful opinion in *Ezell* provides a helpful contrast to the district court's dismissive approach. The city of Chicago required a permit to possess a firearm, and required firearm training at a firing range to obtain a permit. *Ezell*, 651 F.3d at 691. A separate ordinance banned all firing ranges in the city. *Id*. Permit applicants, however, could travel outside the city for the mandatory firing-range training. *Id.* at 693. The district court upheld the city's ban on firing ranges on the theory that "the safety of its citizens is at risk when compared to the minimal inconvenience of traveling outside of the City" to obtain fire arms training and maintain proficiency. *Ezell v. City of Chicago*, No. 10 C 5135, 2010 WL 3998104, at *8 (N.D. Ill. Oct. 12, 2010).

The Seventh Circuit reversed and struck down the ordinance. It held that maintaining proficiency formed part of the core right and, because the statute

prohibited "the 'law-abiding, responsible citizens' of Chicago from engaging in target practice in the controlled environment of a firing range," the statute was a severe infringement of the core right requiring strict scrutiny. *Ezell*, 651 F.3d at 708-09; *see also id.* at 712 (Rovner, J., concurring in judgment) (court applied "a standard akin to strict scrutiny"). That ranges were available outside the city, some conveniently close to the plaintiffs, was irrelevant to the inquiry. *Id.* at 697.

The district court brushed aside *Ezell* on the ground that section 5-23, unlike the Chicago ordinance, is not a "ban on firing ranges" but rather a "regulatory measure." JA194. The district court was wrong on every level. First, the presumed dichotomy between bans and regulatory measures is a false one. Many bans, including the one in *Ezell*, were defended as valid regulatory measures and many a valid regulatory measure takes the form of a ban on certain regulated conduct. Second, as already noted, there is no principled, hardline distinction between a "ban" and a "regulation" that stops short of a ban when it comes to fundamental constitutional rights. *See, e.g., Playboy*, 529 U.S. at 813. The state does not have carte blanche to "regulate" the right to keep and bear arms in any manner it chooses so long as it falls short of adopting a categorical ban.

Third, section 5-23 is every bit as much of a ban as the Chicago ordinance in *Ezell*; it simply operates in reverse. The Chicago ordinance banned firing ranges in the city on the rationale that alternatives were available *outside* the city. *Ezell*, 651

F.3d at 697.  Here, the City bans travelling to ranges outside the City on the rationale that ranges are available *in* the City.  Both ordinances operate as functional bans in a disfavored geographical area.  The fact that section 5-23 bans any use of firing ranges outside the City, rather than within, may add a distinct Commerce Clause problem, but it is no less a ban on readily-available ranges than the Chicago ordinance and is no more constitutional.

If this Court concludes that the most exacting level of scrutiny identified in *Kachalksy* applies in this case, then section 5-23 plainly cannot survive.  As already explained, the City never even tried to argue that section 5-23 could survive anything resembling strict scrutiny.  This tacit concession was made with good reason.  There are myriad ways to achieve the alleged safety interests cited by the district court and the City short of a near-complete ban on transporting handguns between two locations where they may be lawfully possessed.  Federal law amply demonstrates as much.  The Firearm Owners Protection Act ("FOPA"), 18 U.S.C. §926A, specifically authorizes individuals to take a firearm from one location where they are authorized to possess it to a second location where they are authorized to possess it.  That the federal law expressly permits what the City's regulation prohibits critically undermines the claim that section 5-23 could survive strict scrutiny (or any level of scrutiny more demanding than rational basis for that matter).

**B. Section 5-23 Cannot Withstand Intermediate Scrutiny, Properly Applied.**

Although the most rigorous level of scrutiny required by *Kachalsky* should govern this Court's analysis of section 5-23, whether strict or intermediate scrutiny applies is by no means outcome determinative in this case. Section 5-23 cannot survive even intermediate scrutiny, properly applied. Under this Court's precedents, in order to survive intermediate scrutiny the City bore the burden of proving—*i.e.*, providing actual evidence establishing (at this stage beyond material dispute)—that section 5-23 is "substantially related to the achievement of an important government interest." *Kachalsky*, 701 F.3d at 96; *see also Clark v. Jeter*, 486 U.S. 456, 461 (1988); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc). The City came nowhere close to carrying its burden.

The City asserted below that the interest served by section 5-23 is an interest in public safety and crime prevention, JA78, and, quoting *verbatim* the City's summary judgment motion, the district court agreed, JA198. But the City was required to do far more than offer conclusory statements about safety and crime prevention. While safety and crime prevention are obviously important public policy goals, and might—without more—support a challenged regulation where rational basis review governs the outcome of the case, if simply invoking those interests were sufficient to allow a law implicating the Second Amendment to pass muster under intermediate scrutiny (at the summary judgment stage no less) then no

such law would ever be invalidated. The dispositive question is whether the City has *shown* that its handgun transportation ban is substantially related to its asserted interests. It has not.

> **1.    The City failed to prove a substantial relationship between its asserted public safety interest and section 5-23.**

Copying substantial blocks of text from the City's summary judgment motion, the district court held that the City satisfied its burden under intermediate scrutiny. It reasoned that firearms outside the home are a public danger and that section 5-23 could prevent that danger in two ways. JA198. By confining Premises Residence license holders to firing ranges in the City, the handgun transportation ban ensures that licensees will not "transport firearms in their vehicles, thus eviscerating the restrictions on Premises Residence licenses." JA199. In reaching this conclusion, the district court relied on the City's "experience with the now-eliminated target license, and the abuse by target licensees who were caught travelling with their firearms when not on their way to or from an authorized range" as supporting its view. *Id.* The court also held that the City's police force can more easily monitor the activities of license-holders if they are confined to ranges located in the City. JA199-200.

The district court's borrowed reasoning is riddled with errors and cannot withstand even minimal scrutiny. Most problematically, the City's justification for section 5-23 was lacking a crucial component: evidence. As Judge Ginsburg has

explained, intermediate scrutiny requires that the government provide "meaningful evidence, not mere assertions … to show a substantial relationship between" the regulation and the purported government interest. *Heller II*, 670 F.3d at 1259. The City "must present more than anecdote and supposition." *Playboy*, 529 U.S. at 822. Under intermediate scrutiny, "[w]hen the Government defends a regulation … as a means to … prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion) (cited generally in support of the intermediate scrutiny standard in *Kachalsky*, 701 F.3d at 97). "It must *demonstrate* that the recited harms are real, not merely conjectural, and that the regulations will in fact alleviate these harms in a direct and material way." *Id.* (emphasis added).

Courts applying intermediate scrutiny in the Second Amendment context have required record evidence establishing a "tight fit" between the regulation and the purported justification. In *Ezell*, the city "produced no empirical evidence whatsoever and rested its entire defense of the [regulation] on speculation about accidents and theft." *Ezell*, 651 F.3d at 709. Without "data or expert opinion to support" the regulation, the court reasoned, it "ha[d] no way to evaluate the seriousness of [the city's] claimed public-safety concerns." *Id.*; *see also Skoien*, 614 F.3d at 642 (holding that federal statute limiting gun possession survived

intermediate scrutiny because "[b]oth logic and *data* establish a substantial relation" (emphasis added)).

Other courts have similarly required a substantial evidentiary showing to sustain the government's burden under the intermediate scrutiny standard. In *Heller II*, the D.C. Circuit held that the government's failure to provide "data or other evidence"—other than "testimony [containing] cursory rationales" from the police chief—to "substantiate its claim" that the challenged handgun registration regulation would promote the government's putative interests required remand for development of a factual record. *Heller II*, 670 F.3d at 1259. This Court in *Kachalsky* affirmed the state's "proper cause" licensing requirement for concealed handguns only after "New York … submitted studies and data demonstrating that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces." *Kachalsky*, 701 F.3d at 99. Similarly, the Supreme Court struck down a regulation under First Amendment intermediate scrutiny where the only evidence justifying the regulation was an affidavit "contain[ing] nothing more than a series of conclusory statements that add little if anything to the" government's argument. *Edenfield v. Fane*, 507 U.S. 761, 771 (1993); *see also City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 496 (1986) (holding that, unlike under rational basis scrutiny, a state must answer a First Amendment challenge with a record demonstrating that the alleged

harms are real); *Elrod v. Burns*, 427 U.S. 347, 362 (1976) ("[E]ncroachment [on First Amendment rights] cannot be justified upon a mere showing of a legitimate state interest.  The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest." (quotation marks and citation omitted)).

The district court's application of intermediate scrutiny cannot be squared with this precedent.  The City supplied a single piece of substantive evidence to the district court: the declaration of the Commanding Officer of the License Division, Deputy Inspector Andrew Lunetta.  ECF No. 15 and JA67-82.[3]  The declaration is devoted primarily to explaining the City's licensing regime and its firing-range-approval scheme.  *See* JA72-77, 79-82 ¶¶11-26, 32-42.  It also contains the occasional legal conclusion.  *See, e.g.*, JA69-70 ¶5 ("The general government interest in this case is public safety."); JA72 ¶10 ("The existing regulation fully allows Premises Residence license holders to protect their premises, practice and compete in New York City, and is closely tied to the government interest in enhancing public safety by limiting handgun possession in the public arena to those

---

[3] The City also submitted an attorney's declaration attaching the "Statement of Basis and Purpose" of the amendments to the Rules of New York that included current section 5-23. JA57.  The statement adds nothing to this litigation.  The only relevant discussion in the brief explanation of the rules is that "the amendments eliminate as a separate category the 'Target' handgun license."  *Id.*

who have demonstrated 'proper cause' to qualify for a carry license.").  The rest of the declaration is a series of suppositions and conclusory generalizations designed to reason backwards from Inspector Lunetta's basic thesis: that "there is less public danger if Premises Residence license holders do not bring their firearms into the public domain."  JA68 ¶2; *see also* JA69 ¶4 ("There is less risk to public safety if premises license holders bring their firearms into the public domain less frequently and the restriction may be more effectively monitored and enforced.").  Lunetta offers the following conclusions in support of his claim:

- Premises Residence license holders might not carry their handguns in a locked box separate from the ammunition when travelling with the handgun as the license requires, JA 68-69 ¶3;

- Allowing Premises Residence license holders to travel to out-of-city firing ranges would make it easier to travel to unauthorized destinations while pretending to travel to out-of-city ranges, whereas limiting license holders to City ranges and authorizing hunting areas would make the lie less believable, JA69-71 ¶¶5-8;

- It is easier for the police to enforce the Premises Residence license inside the city than outside of it, JA70-71 ¶7;

- Because carrying a handgun in public is "tempt[ing]" and the police uncover some violations, "it is reasonable to conclude that many additional instances

of carrying firearms by licensees with restricted licenses in violation of [their licenses] do not come to the attention of the License Division," JA72 ¶9; and

- The "Target License was eliminated for various reasons," including that target license holders were caught with their firearms in violation of the license, JA77-78 ¶¶27-30.

The City's evidence is therefore limited to the speculation of a single police officer who concludes that sometimes license holders violate the terms of their license and prevention of this violation is administratively easier when license holders are confined to the City.[4] And that is the extent of the City's evidence: a single City employee concluding that more draconian restrictions will make it easier for him to do his job. JA68 ¶2. It proffered no studies, no expert opinion, no data, and no empirical evidence of any kind. *See Ezell*, 651 F.3d at 708-09; *Heller II*, 670 F.3d at 1259; *Kachalsky*, 701 F.3d at 99. Nor did it identify the basis of Lunetta's suppositions. *Heller II*, 670 F.3d as 1258-59. Instead, it presents the conclusory statements that the Supreme Court and D.C. Circuit have both said cannot satisfy intermediate scrutiny. *Edenfield*, 507 U.S. at 771; *Heller II*, 670 F.3d at 1259.

---

[4] Of course, sometimes demonstrators riot and burn businesses. No court would sanction a prohibition on public demonstrations on that basis.

At bottom, the court applied little more than rational basis review, which no court has ever held applicable to an infringement of a fundamental right generally or to the evaluation of Second Amendment claims specifically. *See Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *Skoien*, 614 F.3d at 641 ("If a rational basis were enough, the Second Amendment would not do anything …."). The court failed to hold the City to its burden of "demonstrat[ing] that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664. The error is even more glaring given the procedural posture. The district court deprived Plaintiffs of their opportunity to "review the outcome-determinative evidence" and "subject it to normal adversarial testing." *Skoien*, 614 F.3d at 652 (Sykes, J., dissenting). The district court's misapplication of intermediate scrutiny requires reversal.

        **2.**      **The City's evidence is not just conclusory but clearly insufficient to carry its burden under intermediate scrutiny.**

The City's conclusory and insubstantial evidence is categorically incapable of carrying its burden under intermediate scrutiny. But even putting aside that categorical defect, the City's minimal proffer is deficient.

The City and the district court reasoned that "allowing" Plaintiffs to travel to out-of-City shooting ranges and homes with their unloaded firearms poses a danger to public safety. JA79; JA198. Neither the district court nor the City, however, explained how this danger is any different than the danger posed by allowing travel to authorized firing ranges. The City claims that allowing Plaintiffs to travel to New Jersey poses the risk that they will "transport firearms in their vehicles, thus, eviscerating the restrictions on the Premises Residence license." JA79-80. But given the far-flung locations of the City's ranges, there is no reason to think that Plaintiffs will not drive to authorized in-City ranges. Indeed, given the relative proximity of some of the New Jersey ranges, the City's regulation is positively counterproductive. For example, the City forbids Plaintiff Colantone from traveling with his unloaded handgun from his home in Staten Island directly across the Raritan Bay to a shooting club in Old Bridge, New Jersey. On the other hand, traveling from his home in Staten Island to the authorized range Olinville Arms in the Bronx, a far longer drive through the heart of the most populated city in North America, is perfectly permissible. Section 5-23's distinction between authorized and out-of-City ranges is thus arbitrary: it inexplicably authorizes arguably far more dangerous

behavior than it prohibits. Such a regulation cannot be said to tightly fit with the government interest in public safety. *Heller II*, 670 F.3d at 1258.[5]

The City next cites its "experience with the now-eliminated target license" to say that licensees are more likely to violate their licenses if they are permitted to travel anywhere with their licensed handguns. ECF No. 36, at 14. It argues that "by ensuring that Premises Residence licensees only travel with their firearms to authorized ranges in New York City, the City is able to ensure that licensees are only travelling to limited areas with their restricted licenses." *Id.* That argument fails on multiple levels. First, Plaintiffs are not challenging the elimination of the target license, but the draconian limitation on the premises license. Thus, experience with the target license is of minimal relevance. Second, the number of authorized destinations has little to do with the ease of enforcing those restrictions, especially given the reality of how handguns are transported. Plaintiffs seek the ability to transport their handguns unloaded and separate from their ammunition. Typically, the handgun would be in a locked case in the trunk of a car. It would be hardly

---

[5] Moreover, citing concerns about "eviscerating" the restrictions imposed by the Premises Residence license, JA199; ECF No. 36, at 14, as reason to uphold the restrictions gets it exactly backwards. The question in this case is whether those restrictions are inconsistent with the rights guaranteed by the Second and Fourteenth Amendments to the Constitution. If they are, then the Supremacy Clause eviscerates them. Citing the integrity of New York's licensing regime as a reason to uphold that regime in the face of a constitutional challenge is simple question begging. If the restrictions violate the Constitution, they must fall.

apparent to law enforcement that an individual in those circumstances had a handgun at all, whether or not there are only two, or ten, or twenty legitimate destinations to which the handgun could be transported. Presumably, the issue will only arise if an individual is stopped based on some other suspicion and then it would be straightforward to determine whether the handgun was being lawfully transported.

The City nonetheless argues that confining Premises Residence licensees to ranges within New York City would ease the burden of monitoring licensees and investigating potential violations. Given the limited number of authorized ranges, police officers could more easily tell whether a licensee was lying about where he or she was travelling with his or her firearm. ECF No. 36, at 15. The New York City police also would not have to rely on the investigative work of law enforcement agencies outside of the City to report violations of section 5-23 if licensees are confined to the City. *Id.* at 14-15.

This argument shifts the City's purported interest from public safety to a bizarre variant of administrative convenience. But it is well-established that easing the burden on law enforcement is no reason to restrict constitutional rights. *See Bounds v. Smith*, 430 U.S. 817, 825 (1977) ("[T]he cost of protecting a constitutional right cannot justify its total denial."). "[T]he Constitution recognizes higher values than speed and efficiency." *Stanley v. Illinois*, 405 U.S. 645, 656 (1972). Where those values clash with the convenient enforcement of a regulatory scheme,

efficiency and convenience must give way. *See Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 647 (1974) ("[A]dministrative convenience alone is insufficient to make valid what otherwise is a violation of due process of law."). This Court surely would not sign off on police conduct under the Fourth Amendment solely because that conduct eased the burden of investigating crime, *see Mincey v. Arizona*, 437 U.S. 385, 393 (1978) ("[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment."), or authorize the suppression of public expression because policing quiet streets is easier than policing demonstrations, *see Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) (per curiam) (holding that speech may not be suppressed because of the cost of policing the reaction of listeners). And the Second Amendment is entitled to the same respect as other bedrock constitutional rights. *See McDonald*, 561 U.S. at 781 (refusing government's plea to treat right to keep and bear arms "as a second-class right"); *Valley Forge Christian Coll.*, 454 U.S. at 484 (There is "no principled basis on which to create a hierarchy of constitutional values ...."). Moreover, the City's administrative convenience argument is a true outlier. It will always be easier to administer a licensing regime if there are fewer licenses granted and fewer actions licensed, but that is no justification where constitutionally-protected activity is at issue. A city that never issued a parade license would ensure

that no one ever violated the terms of their license, and would just as plainly violate the Constitution. The result is no different here.

The district court's error with respect to Plaintiff Colantone and his second home is even more glaring. The court held that section 5-23 does not infringe Plaintiff Colantone's right to keep arms in his home outside of the City because he may apply for a license in Delaware County. JA196. The district court misunderstands the nature of the prohibition imposed by section 5-23. That Plaintiff Colantone may apply for a license in Delaware County means that New York's county-by-county licensing regime does not violate the Second Amendment. It says *nothing* about whether section 5-23's prohibitions violate the Constitution. The district court's confusion as to the question before it means that it failed to engage with the critical issue. Had it done so, it surely would have found for Plaintiffs. There is no colorable argument that a prohibition on safely transporting an unloaded handgun between two locations where that handgun may be lawfully possessed can survive strict scrutiny, especially in light of an on-point federal statute authorizing exactly that. *See* FOPA, 18 U.S.C. §926A. For all the reasons already given, section 5-23 imposes an unconstitutional burden on Plaintiff Colantone's right to keep arms for self-defense in his home.

The district court believed that the New York Court of Appeals' decision in *Osterweil v. Bartlett*, 21 N.Y.3d 580 (2013), which held that only residence—as

opposed to domicile—is necessary to permit an individual to apply for a license, supported its holding on this score. JA196-97. But *Osterweil* only crystalizes the district court's error. Section 5-23 prohibits an individual who has been found to satisfy the requirements for possession of a licensed firearm by multiple licensing authorities from safely transporting his firearm between those jurisdictions. Instead, that individual must purchase multiple handguns—one for each jurisdiction in which he or she is licensed—in order to exercise his or her rights in two counties (even neighboring counties). That absurd outcome both underscores the burden section 5-23 imposes—multiplying the cost of exercising Second Amendment rights by the number of jurisdictions—and highlights the fundamental mismatch between the City's asserted safety interests and its handgun transport ban. If anything, the City's public safety is seriously undermined by forcing individuals with a home in the City and one outside of it to proliferate the number of handguns and increase the likelihood that one will be available to an intruder in whichever of the two homes is vacant at the time.

The district court was also under the mistaken impression that there was some license that Plaintiffs could have applied for that would have readily allowed them to transport their handguns to out-of-City shooting ranges and second homes. JA197 (citing 23 R.C.N.Y. §5-01). What the court was referring to, however, were licenses that permit City residents to carry weapons on their person. Setting aside the

comparative difficulty of obtaining such a license, Plaintiffs have no desire to carry their handguns on their person in the City. They simply want to be permitted to safely transport their unloaded handguns between locations where they may lawfully be used and possessed. Nor is it clear how the City's safety interests are furthered by artificially incentivizing individuals to obtain carry permits they would not otherwise want.

The First Amendment, to which courts turn for doctrinal guidance on Second Amendment questions, *see Decastro*, 682 F.3d at 167 (collecting cases), would never tolerate a restriction such as the City's under *any* standard of review. Section 5-23 is akin to forbidding travel outside of the City to engage in political expression—the "core" of the First Amendment right, *McCutcheon v. FEC*, 134 S. Ct. 1434, 1444 (2014), no differently than maintaining proficiency with handguns forms part of the "core" of the Second Amendment right—on the rationale that license holders may exercise those rights at select, heavily regulated locations in the City. *See Ezell*, 651 F.3d at 697; *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1169-70 (9th Cir. 2014). Such a statute would be struck down without hesitation. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76-77 (1981) ("'[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" (quoting *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939)). So too should section 5-23.

**II. The City's Handgun Transportation Ban Violates The Commerce Clause.**

The Constitution grants Congress the power to "regulate Commerce … among the several States." U.S. Const. art. I, §8, cl. 3. "Although the Constitution does not in terms limit the power of States to regulate commerce, [the Supreme Court] ha[s] long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). The Commerce Clause's implied restriction on state authority, referred to as the "dormant Commerce Clause," "is driven by a concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *McBurney v. Young*, 133 S. Ct. 1709, 1719 (2013) (quoting *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 273-74 (1988)). The Commerce Clause's prohibition on protectionist laws applies both to states and their political subdivisions. *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 47 (2d Cir. 2007); *Maine v. Taylor*, 477 U.S. 131, 151 (1986) ("The Commerce Clause significantly limits the ability of States *and localities* to regulate or otherwise burden the flow of interstate commerce." (emphasis added)).

"The fundamental objective of the dormant Commerce Clause is to 'preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors.'" *Brown &*

*Williamson Tobacco Corp. v. Pataki,* 320 F.3d 200, 208 (2d Cir. 2003) (quoting *Gen. Motors Corp. v. Tracy,* 519 U.S. 278, 299 (1997)). "The crucial inquiry" is "whether [the challenged regulation] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).

The first step of this inquiry is determining whether a law discriminates against interstate commerce. *Southold*, 477 F.3d at 47. "'[D]iscrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Env'tl Quality*, 511 U.S. 93, 99 (1994). The Supreme Court has identified three types of impermissible discrimination. *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004). First, "[w]hen a state statute clearly discriminates against interstate commerce, it will be struck down unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992) (citation omitted). A statute "clearly discriminates" against interstate commerce "(1) by discriminating against interstate commerce on its face; (2) by harboring a discriminatory purpose; or (3) by discriminating in its effect." *Southold*, 477 F.3d at 48 (citations omitted).

Second, "nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Or. Waste*, 511 U.S. at 99 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). If the statute regulates "a legitimate local purpose," "then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142.

Third, "a statute will be invalid *per se* if it has the practical effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the state in question." *Freedom Holdings*, 357 F.3d at 216. "Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy v. Beer Inst.*, 491 U.S. 324, 336-37 (1989).

Lifting six pages of analysis from the City's summary judgment motion nearly word-for-word, the district court rejected Plaintiffs' Commerce Clause claim. *Compare* JA209-214, *with* ECF No. 36, at 24-28. But that analysis was no more persuasive in the district court's opinion than it was in the City's motion. Section 5-23 discriminates against interstate commerce, imposes burdens on commerce that

far exceed any purported local benefits, and impermissibly attempts to control economic activity that takes place entirely outside New York City.

**A.  Section 5-23 Facially Discriminates Against Interstate Commerce and Is Invalid *Per Se*.**

Section 5-23 permits Plaintiffs to consume firing range services only from "authorized" firing ranges. 38 R.C.N.Y. §5-23(a)(3).  The City interprets "authorized" to refer only to those ranges expressly approved by the Commissioner to operate in New York City. *See* JA37-39; JA48-50.  The regulation therefore prohibits Plaintiffs from engaging in the interstate commercial activity of traveling with their handguns to patronize firing ranges in states beyond the borders of New York City.

Even if regulation of economic activity is not the primary purpose of section 5-23, it has the effect of baldly discriminating against interstate commerce.  *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 194-95 (1994) (striking down facially neutral tax for having clearly discriminatory effect).  Doing so insulates New York City firing ranges from competition in violation of the Commerce Clause, *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 538 (1949) ("[T]he state may not use its admitted powers to protect the health and safety of its people as a basis for suppressing competition …."), and denies its citizens "the long run prosperity and salvation [that] are in union and not division," *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935) (Cardozo, J.).

The City could not limit its residents to purchasing their groceries at in-City stores, or dispose of waste at in-City dumps, or use their tennis racquets at in-City courts. The City certainly has no freer hand when it comes to constitutionally-protected commercial activity. Section 5-23 is no different from a number of local processing statutes the Supreme Court has long held facially violate the Commerce Clause. In *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994), for example, a New York municipality required that all waste within its jurisdiction be processed at a local waste processing plant before leaving the jurisdiction. *Id.* at 386. The plaintiff sought to process its waste at out-of-state facilities and the city prevented it. *Id.* at 388. The Supreme Court held that because the ordinance directed all solid waste "to a designated site within the local jurisdiction, its economic effects are interstate in reach." *Id.* at 389. In so doing, the ordinance "deprive[d] out-of-state businesses of access to a local market." *Id.* Because the ordinance "squelche[d] competition" from out-of-state waste processors, the ordinance was invalid *per se*. *Id.* at 392.

The Supreme Court views "with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere. Even where the State is pursuing a clearly legitimate local interest, this particular burden on commerce has been declared to be virtually per se illegal." *Pike*, 397 U.S. at 145. *C&A Carbone*, then, is one in a long line of cases

43

striking down statutes requiring economic activity to be performed in the promulgating jurisdiction. *See, e.g. S. Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82 (1984) (striking down statute requiring all timber cut down and exported in Alaska to be processed in Alaska after challenge from merchant who sold timber for processing outside state); *Dean Milk Co. v. City of Madison*, 340 U.S. 349 (1951) (striking down statute requiring that all milk sold within jurisdiction be pasteurized within jurisdiction after challenge from distributor who wished to pasteurize elsewhere); *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1 (1928) (striking down Louisiana statute requiring removal of heads and tails of shrimp in the state before export in face of challenge from merchant who wished to remove heads and tails outside the state).

The rule of these cases is clear: "State and local governments may not use their regulatory power to favor local enterprise by prohibiting patronage of out-of-state competitors or their facilities." *C&A Carbone*, 511 U.S. at 394. Section 5-23 does precisely that. It forbids law-abiding Premises Residence license holders from transporting their lawfully acquired, lawfully possessed handguns to engage in constitutionally protected commercial activity in another state, instead requiring that activity to take place within New York City. And it does so even though it is indisputable that many (if not most) New York City residents could "more

efficiently" engage in the relevant commerce outside New York City. *Pike*, 397 U.S. at 145. The City's facially discriminatory regulation should be struck down.[6]

### B. Section 5-23 Impermissibly Controls Economic Activity Occurring Entirely Outside New York City.

The City's handgun transportation ban suffers an additional fatal flaw under the Commerce Clause: it attempts to impermissibly control economic activity taking place entirely outside of New York City. The City forbids Plaintiffs, law-abiding owners of lawfully acquired handguns, from entering into lawful transactions with firing ranges taking place entirely outside of the City. That is a straightforward Commerce Clause violation. "'[E]xtraterritorial' control of commerce occurring entirely outside the boundaries of the state" has been categorically proscribed since the Founding. *Freedom Holdings*, 357 F.3d at 216; *see also Healy*, 491 U.S. at 331. Regulation of transactions that take place outside New York City are the business of legislatures beyond New York City and those legislatures alone. The Commissioner

---

[6] This discussion also highlights the absurdity of the district court's and City's argument that the number of firing ranges in New York City "is a function of the market, and not the challenged rule." ECF No. 36, at 11 n.5; JA193. The City has erected significant regulatory and administrative barriers to opening gun ranges. JA39-41 ¶¶32-38. Potential entrants into the firing range market can hardly respond to market forces in light of these barriers to entry. Moreover, the City excludes competition from all out-of-City firing ranges by prohibiting patronage of those ranges. The number of firing ranges in the City is therefore a function of a state-sanctioned oligopoly protected by state-constructed barriers to entry, not the forces of the free market.

has no authority under the Commerce Clause of the federal Constitution to prescribe rules for those transactions, much less to prohibit them entirely.[7]

## III. The Handgun Transportation Ban Violates Plaintiffs' Fundamental Right To Travel.

Section 5-23 is unconstitutional for the distinct reason that it violates Plaintiffs' fundamental constitutional right to interstate and intrastate travel. The fundamental constitutional right to travel finds its origin in both the Privileges and Immunities Clause of Article IV, §2 of the U.S. Constitution, and the Privileges and Immunities and Equal Protection clauses of the Fourteenth Amendment to the U.S. Constitution. *See Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986). This right "protects the right of a citizen of one State to enter and to leave another State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999); *see United States v. Guest*, 383 U.S. 745 (1966); *Edwards v. California*, 314 U.S. 160 (1941). More than this, pursuant to

---

[7] Along the same lines, section 5-23 imposes burdens on interstate commerce that far exceed the regulation's putative local benefits. Section 5-23 imposes a disparate impact on every firing range which Plaintiffs and other Premises Residence license holders might patron outside of the City of New York. For example, all three Plaintiffs wish to patron the Old Bridge Rifle & Pistol Club in Old Bridge, New Jersey. *See* JA32 ¶6; JA42 ¶7; JA46 ¶7. The regulation forbids them from safely transporting their lawfully acquired and lawfully possessed handguns to Old Bridge and thereby denies the shooting club their patronage. No local gun range faces such an encumbrance; the City insists that Plaintiffs are free to engage in the protected commercial activity of consuming firing range services at any of the public ranges in the City. Accordingly, section 5-23 disparately impacts non-local economic interests to the advantage of local ones. And, as discussed *supra*, the City has failed to identify any local interests that are actually served by the regulation.

Article IV, §2, "a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits." *Saenz*, 526 U.S. at 501.

The Supreme Court has held that the right to travel—which clearly includes the right to travel with chattels—embraces at least three different components: (1) the right of a citizen of one State to enter and to leave another State; (2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and (3) for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State. *Saenz*, 526 U.S. at 500. A law "implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." *Soto-Lopez*, 476 U.S. at 903 (quotation marks and citations omitted). Section 5-23 fails on all three grounds.

The district court, again copying and pasting from the City's motion for summary judgment, held that section 5-23 did not deny Plaintiffs' constitutional right to travel. It held that section 5-23 is, at most, a "minor restriction[]" akin to a regulation requiring payment of tolls to use a highway, or a time, place, and manner restriction on the use of city streets. JA202 (citing *Town of Southold*, 477 F.3d at 53). But the record in this case makes plain that section 5-23 is much more than a

minor restriction on travel; the City's handgun transportation ban deters travel to points outside New York City.  All of the individual Plaintiffs in this case have stated that they would travel to various target shooting competitions but for the strict limitations of section 5-23.  *See* JA33 ¶¶11, 13; JA42-43 ¶¶9-10; JA46-47 ¶¶9-10.  In effect, the regulation forces Plaintiffs to choose which constitutional right they would rather exercise: their right to travel or their right to keep and bear arms.  If Plaintiffs attempt to exercise both of these rights at the same time, by traveling to a gun range outside of the state, they run the risk of having their licenses revoked, which would completely deprive them of their Second Amendment rights.  *See Harman v. Forssenius*, 380 U.S. 528, 540 (1965) ("It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution.").

That the exercise of two fundamental rights is implicated by the regulation's application should lead this Court to subject the regulation to the most rigorous scrutiny.  The only thing standing between Plaintiffs and participation in a shooting competition in New Jersey is section 5-23.  The only thing standing between Plaintiffs and engagement in target practice at a licensed shooting range in Yonkers is section 5-23.  The only thing standing between Plaintiffs and traveling to a second residence with their licensed firearm in furtherance of their Second Amendment rights is section 5-23.  Restrictions on the fundamental right to intrastate and

interstate travel are unconstitutional "'unless shown to be necessary to promote a compelling governmental interest.'" *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) (quoting *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969)). The City has never even attempted to identify a compelling governmental interest that might support its derogation of two fundamental constitutional rights in one fell swoop.

## IV. The Handgun Transportation Ban Impermissibly Burdens Plaintiffs' First Amendment Rights.

To exercise their rights as law-abiding owners of lawfully obtained handguns, Plaintiffs must associate with firing ranges and gun clubs located exclusively in New York City. Plaintiffs want to associate with gun clubs outside of New York City in order to exercise their constitutional rights. *See* JA32 ¶6; JA42 ¶7; JA46 ¶7. But the City flatly forbids them from transporting their guns to engage in this associational activity. Denying Plaintiffs this right violates the First Amendment.

"An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Thus, "implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political,

social, economic, educational, religious, and cultural ends." *Boy Scouts v. Dale*, 530 U.S. 640, 647 (2000) (quotation marks omitted).

Just as laws forbidding individual public expression violate the First Amendment, "impediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment." *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987) (quotation marks and brackets omitted); *see also Knox v. Serv. Emps. Int'l Union*, 132 S. Ct. 2277, 2288 (2012) ("[T]he ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed.").

Notwithstanding the constitutional right to associate with like-minded individuals, a right which must surely be at its zenith when the association is for the mutual exercise of another constitutional right, the district court held that section 5-23 satisfied constitutional scrutiny because it permitted Plaintiffs to associate with shooting clubs in New York City, although it did not require it. JA208. The district court missed the point. Plaintiffs allege that section 5-23 impedes their right to associate with whom they choose; that other clubs are available does not alleviate this impediment. A law forbidding protected conduct cannot survive First Amendment scrutiny merely because it leaves some other category of protected conduct available. *Cf. Schad*, 452 U.S. at 76-77.

Lest there be any doubt, the restriction on Plaintiffs' First Amendment freedoms is severe. New York City residents are forbidden from participating in competitive shooting events outside New York City's borders. In point of fact, they are effectively prohibited from doing so anywhere given that such events do not regularly take place at the only range available to the public. Indeed, the only way section 5-23's restriction on First Amendment freedoms could be more severe would be if the regulation expressly prohibited participation in recreational and competitive shooting events. But there is no real difference between this hypothetical and the way New York City's prohibition operates in fact.

What is more, New York City residents who want to comply with section 5-23 but participate in competitive shooting events are effectively coerced into joining private clubs that they may prefer not to join. As the one restricted public range does not offer such competitions, the only option left to New York City residents is private clubs located within the City. This coercion infringes Plaintiffs' First Amendment rights. Just as the First Amendment prevents the government from unduly burdening speech, it also prevents the government from compelling individuals to speak or associate against their will. *See United States v. United Foods, Inc*., 533 U.S. 405, 410 (2001); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977); *Keller v. State Bar of Cal*., 496 U.S. 1 (1990). The forced association imposed by

section 5-23 further underscores the First Amendment problems the regulation engenders

## CONCLUSION

For the reasons set forth above, this Court should reverse the judgment of the district court.

Respectfully submitted,

<u>s/Paul D. Clement</u>

BRIAN T. STAPLETON
MATTHEW S. LERNER
GOLDBERG SEGALLA LLP
11 Martine Avenue
Suite 750
White Plains, NY 10606
(914) 798-5400
bstapleton@goldbergsegalla.co

PAUL D. CLEMENT
 *Counsel of Record*
D. ZACHARY HUDSON
ANDREW N. FERGUSON
BANCROFT PLLC
500 New Jersey Avenue NW
7th Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellants*

June 16, 2015

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 12,836 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

June 16, 2015

s/Andrew N. Ferguson
Andrew N. Ferguson

## CERTIFICATE OF SERVICE

I hereby certify that, on June 16, 2015, an electronic copy of the foregoing Brief for Appellant was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

s/Paul D. Clement
Paul D. Clement
