# No. 15-638

## United States Court of Appeals

*for the*

## Second Circuit

THE NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC.,
ROMOLO COLANTONE, EFRAIN ALVAREZ, AND
JOSE ANTHONY IRIZARRY,

*Plaintiffs-Appellants,*

– v. –

THE CITY OF NEW YORK AND
THE NEW YORK CITY POLICE DEPARTMENT – LICENSE DIVISION,

*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, No. 1:13-cv-2115

**BRIEF OF AMICUS CURIAE NATIONAL RIFLE
ASSOCIATION OF AMERICA, INC. IN SUPPORT
OF PLAINTIFFS-APPELLANTS AND REVERSAL**

Charles J. Cooper
David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 220-9600
ccooper@cooperkirk.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The National Rifle Association of America, Inc. does not have a parent

corporation, nor does any publicly held corporation own 10% or more of its stock.


Dated:  June 23, 2015

s/ Charles J. Cooper
Charles J. Cooper

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTEREST OF AMICUS CURIAE .......................................................1

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................5

I.    Section 5-23 Severely Infringes the Core Second-Amendment Right To Use a Firearm for Self-Defense in the Home.............................................5

II.   Section 5-23's Limitations Should Be Subjected to Strict Scrutiny. ............11

III.  Section 5-23 Fails Any Measure of Heightened Constitutional Scrutiny.....14

      A.    The City's Compelling Interest in Public Safety and Crime Prevention Does Not Extend Outside of Its Own Borders.................15

      B.    The City Has Failed to Demonstrate that Section 5-23 Is Substantially Related to Its Interest in Public Safety.........................17

IV.  Section 5-23 Violates the Dormant Commerce Clause................................24

CONCLUSION ...................................................................................28

i

# TABLE OF AUTHORITIES

**Cases**      **Page**

*Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200 (2d Cir. 2003)........25

*Brown v. Entertainment Merchs. Ass'n*, 131 S. Ct. 2729 (2011) ...........................22

*C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994)......16, 25, 26, 28

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ............................................................23

*City of Phila. v. New Jersey*, 437 U.S. 617 (1978).................................5, 25, 27, 28

*Dean Milk Co. v. City of Madison*, 340 U.S. 349 (1951) ..................................25, 26

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................*passim*

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..............................2, 6, 8, 12

*Hughes v. Oklahoma*, 441 U.S. 322 (1979) .......................................................26, 28

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)...................*passim*

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) ...........................................8, 14

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ..................................................17, 22

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................................6

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................................19

*National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001).......................24

*Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93 (1994) ......27

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ...................................................24

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308 (6th Cir. 2014).............15, 16

*United States v. Bryant*, 711 F.3d 364 (2d Cir. 2013) ...............................................6

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)..............................13, 14, 18

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012) ...........................................6

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)......................................14

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010)...........................................14

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ...........................................14

*United States v. Virginia*, 518 U.S. 515 (1996) ...............................................17, 18

*Wesson v. Town of Salisbury*, 13 F. Supp. 3d 171 (D. Mass. 2014).....................6, 7

*Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015) .........................................23

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ........................................24

**Constitutional and Statutory Provisions**

U.S. CONST. art. I, § 8, cl. 3.......................................................24

18 U.S.C. § 926A ....................................................................23

10 N.Y. CITY ADMIN. CODE § 10.131(c)................................................25

38 RCNY

    § 3-02 ...........................................................................22

    § 3-03 ...........................................................................22

    § 3-14 ...........................................................................22

    § 5-02 ............................................................................2

    § 5-03(a)–(b) .....................................................................9

    § 5-23(a)(4) ...................................................................2, 3

**Other**

Andrew Haughwout, *et al.*, *The Price of Land in the New York Metropolitan Area*, 14 CURRENT ISSUES IN ECONOMICS AND FINANCE 1 (2008), http://goo.gl/ryXOHt..........................................................10

FIREARMS AND VIOLENCE (Charles F. Wellford, John V. Pepper & Carol V. Petrie eds., 2005)...................................................................19

Letters from The Federal Farmer, *Letter XVIII*, *in* 2 THE COMPLETE ANTI-FEDERALIST (Herbert J. Storing ed. 1981)........................................7

Whole Building Design Guide, NATIONAL INST. OF BLDG. SCIS., *Firing Range* (June 20, 2011), http://goo.gl/VxibZg .........................................10

The National Rifle Association of America, Inc. ("NRA") is the oldest civil rights organization in America and the Nation's foremost defender of Second Amendment rights. Founded in 1871, the NRA has approximately five million members and is America's leading provider of firearms marksmanship and safety training for civilians. The NRA has a strong interest in this case because its outcome will affect the ability of the many NRA members who reside in New York City to safely and effectively exercise their fundamental right to use a firearm for self-defense in their own homes. All parties have consented to the filing of this brief.[1]

## INTRODUCTION

The "core protection" of the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," a right that provision "elevates above all other interests." *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008). Some laws infringe the right of armed self-defense directly, for example by "ban[ning] . . . handgun possession in the home." *Id.* at 635. Others do so indirectly, by preventing law-abiding citizens from "learning to

---

[1] This brief was not written in whole or in part by counsel for any party, no party or party's counsel made a monetary contribution to the preparation and submission of this brief, and no person or entity other than the NRA, its members, and its counsel has made such a monetary contribution.

handle and use" handguns "in a way that makes those who keep them ready for their efficient use." *Id.* at 618 (quoting THOMAS COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW 271 (1880) [hereinafter "COOLEY, CONSTITUTIONAL LAW"]). With the direct option taken "off the table" by *Heller*, *id.* at 636, the City of New York (the "City") has chosen the indirect route, enforcing an ordinance that makes it effectively impossible for most of its residents to engage in the regular practice and training that makes the core right to possess a handgun for self-defense meaningful. Because "[t]he right to possess firearms for protection . . . [doesn't] mean much without the training and practice that make it effective," *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), that ordinance—no less than the ban in *Heller*—is flatly inconsistent with the Second Amendment.

The only way an ordinary, law-abiding resident of New York City can lawfully possess a handgun is by obtaining a "Premises License" under 38 RCNY § 5-02. And even with such a license in hand, the law-abiding resident is categorically barred by Section 5-23 of Title 38 of the City's rules from removing the licensed handgun "from the address specified on the license" except in two narrow circumstances. "To maintain proficiency in the use of the handgun," the licensee may transport his handgun to "an authorized small arms range/shooting club" within city limits. (There is, according to Plaintiffs below, only one such shooting range open to the public.) And he may also transport that handgun "to and

from an authorized area designated by the New York State Fish and Wildlife Law" for the purpose of hunting. *Id.* § 5-23(a)(4). By severely restricting the ability of ordinary New Yorkers to practice using their lawfully-owned handguns, Section 5-23 invades "the *central component*" of the Second Amendment, *Heller*, 554 U.S. at 599—the right to self-defense—making it impossible for most residents of New York City to effectively exercise that right. And the lines it draws in the process are bizarre—restricting conduct (like target practice at ranges *outside* the city) that bears no demonstrable relationship to the City's purported public-safety rationale, and exempting conduct (like hunting) that is virtually indistinguishable, from a crime-prevention point of view, from the activities it prohibits.

The court below upheld the City's scheme only by straying from the path marked out by *Heller*, *McDonald*, and this Court's precedents in three fundamental ways. First, the court did not grasp how deeply the City's rules impinge upon the Second Amendment. Far from a "modest burden" on the right to keep and bear arms, Joint Appendix ("JA") 194, the City's restrictions strike at the very core of the Second Amendment: "the 'right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Kachalsky v. County of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012) (quoting *Heller*, 554 U.S. at 635). And they strike hard, severely impeding an ordinary, law-abiding New Yorker's ability to safely and effectively use firearms in defense of himself and his family.

Having misunderstood the gravity of the threat the City's rules pose to constitutionally-protected conduct, the district court next underestimated the level of scrutiny that this Circuit's cases require so severe a restriction to surmount. "[I]ntermediate level scrutiny is appropriate in analyzing Second Amendment challenges," the district court opined, "even those that touch upon the claimed 'core' Second Amendment right to self-defense in the home." JA 194. But that is not the law. Indeed, this cavalier approach to what both the Supreme Court and this Court have called "the 'core' protection of the Second Amendment," *Kachalsky*, 701 F.3d at 93 (quoting *Heller*, 554 U.S. at 634), is impossible to square with this Court's Second-Amendment jurisprudence. And it certainly cannot be squared with *Heller*.

Third, the district court's conclusion that the City's scheme passes constitutional muster is wrong even on its own terms. For Section 5-23 flunks intermediate scrutiny at every turn. The bulk of the challenged rule's applications fall outside city limits, where the City of New York has at most an attenuated regulatory interest. Even within the City's borders, where its compelling interest in public safety is legitimately in play, Section 5-23 fails to fit that interest in every way conceivable. That rule is cut with wide borders, not only sweeping in conduct that would remain untouched under rules more sensibly and narrowly drawn to

promote public safety, but also leaving gaping holes that permit a wide range of conduct that is practically identical in terms of that interest.

Finally, the City cannot pursue even a "legitimate goal"—much less the illegitimate goal at issue here—"by the illegitimate means of isolating the State from the national economy." *City of Phila. v. New Jersey*, 437 U.S. 617, 627 (1978). Because the City's restrictions on transporting firearms clearly discriminate against interstate commerce, they are unconstitutional under the Dormant Commerce Clause.

## ARGUMENT

### I. Section 5-23 Severely Infringes the Core Second-Amendment Right To Use a Firearm for Self-Defense in the Home.

The district court concluded that "the challenged rule does not impinge on the 'core' of the Second Amendment," and that the rule "is a minimal, or at most, modest burden" on the Second-Amendment right. JA 192, 194. That was wrong on both scores.

1. The Supreme Court has insisted that "[t]he very enumeration of the right takes out of the hands of government" the power to interfere with the Second Amendment's "core protection." *Heller*, 554 U.S. at 634. And this Court need hardly start from scratch in determining the metes and bounds of the Second Amendment's "core protection." This Court's previous opinions make clear that

the provision's heartland encompasses at least the use of a firearm for *self-defense* within the confines of *one's own home*.

As this Court has repeatedly recognized, "[t]he core lawful purpose of the right to bear arms . . . is for self-defense." *United States v. Bryant*, 711 F.3d 364, 368 (2d Cir. 2013) (quotation marks omitted); *see also United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012). This follows directly from *Heller*. Based on an exhaustive survey of pre-revolution English history, pre- and post-ratification commentary, and analogous, contemporary state constitutional provisions, the Supreme Court concluded in *Heller* that "the inherent right of self-defense has been central to the Second Amendment right." 554 U.S. at 628.

This centrally important right to act in "defense of self, family, and property," *Heller* noted, "is most acute" in "the home." *Id.* Based on this strand of *Heller*'s teaching, this Court has held that "Second Amendment guarantees are at their zenith within the home." *Kachalsky*, 701 F.3d at 89.

2.      The City's ban on transporting licensed firearms to nearly all practice ranges severely impedes this paradigmatic "right to possess a handgun in the home for the purpose of self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). As the Seventh Circuit has persuasively held, that "core right wouldn't mean much without the training and practice that make it effective." *Ezell*, 651 F.3d at 704; *see also Wesson v. Town of Salisbury*, 13 F. Supp. 3d 171, 178 (D.

Mass. 2014). Allowing possession of a handgun in the home for purposes of self-defense but eliminating, as the City has, any reasonable opportunity to gain familiarity and proficiency in that firearm's use is akin to acknowledging that the First Amendment prohibits a ban on books but then outlawing literacy.

The Seventh Circuit's recognition that curtailing firearm practice and training effectively guts the Second Amendment's core right follows directly from *Heller* and from the historical record on which that case drew. For example, *Heller* cited an influential 1880 treatise by Thomas Cooley, which insisted that "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use." 554 U.S. at 617–18 (quoting COOLEY, CONSTITUTIONAL LAW 271). And the right to "learn[ ] to handle and use" firearms was equally important to the Founding generation. *See* Letters from The Federal Farmer, *Letter XVIII*, *in* 2 THE COMPLETE ANTI-FEDERALIST 339, 342 (Herbert J. Storing ed. 1981) ("[T]o preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, especially when young, how to use them.").

The City has characterized *Ezell* as paying only "lip service" to the importance of practice and training and as based instead on the fact that the ordinance in that case "specifically required those with licenses to possess firearms to engage in a one-hour mandatory training at a range." Defendants' Opposition to

7

Summary Judgment at 4 (Aug. 15, 2014), Doc. 51 ("Defendants' Opposition").

Not so. In fact, the *cornerstone* of *Ezell*'s essential reasoning is that the "right to acquire and maintain proficiency" in the use of firearms is so critical to their effective use for self-defense that it can be considered "an important corollary" to that core Second Amendment right. 651 F.3d at 704, 708. And while *Ezell* did note that Chicago "mandate[d] one hour of range training as a prerequisite to lawful gun ownership," *id.* at 689–90, it did so only to emphasize that Chicago *itself* "considers live firing-range training so critical to responsible firearm ownership that it mandates this training as a condition of lawful firearm possession," *id.* at 704–05.

For most citizens who reside in New York City, the City has effectively eliminated the opportunity to become proficient in the use of handguns. Section 5-23 allows firearm "training and practice" only at authorized firing ranges that are within city limits, and no matter how you count them, the number of such ranges is plainly inadequate. According to NYSRPA's version of the facts—which, since this appeal is from an order granting summary judgment against them, must be given every benefit of the doubt, *Kwong v. Bloomberg*, 723 F.3d 160, 164 (2d Cir. 2013)—there is only *one* range in the city open to the public. Declaration of Christopher M. Shkreli at ¶¶ 3–4, Doc. 20-1 (July 2, 2013). And even if the City's count is credited instead, the number of publicly accessible ranges climbs only to

8

seven. JA 81. Seven ranges sprinkled throughout the City are clearly inadequate to serve the needs of all of the City's lawful handgun owners.

The City's restrictions on transporting licensed firearms to practice ranges thus make engaging in firearm training and practice functionally impossible for most New Yorkers, severely burdening the right to use a firearm in defense of hearth and home that lies at the very center of the Second Amendment. The court below attempted to escape this conclusion in two ways. Neither is persuasive.

First, the district court suggested that "[a] gun owner may apply for a different type of firearm license permitting transportation of a firearm throughout New York State should he or she qualify." JA 197. But the alternative state-wide licenses can be issued only if an applicant shows "proper cause" by demonstrating "[e]xposure . . . to extraordinary personal danger." 38 RCNY § 5-03(a)–(b). While this Circuit (mistakenly) has concluded that the right to publicly carry a firearm may be curtailed in this way, *Kachalsky*, 701 F.3d at 101, in doing so it relied on the "critical difference" between regulation of "the ability to carry handguns only *in public*" and a ban on the use of firearms "*in the home* where the need for defense of self, family, and property is most acute," *id.* at 94 (quotation marks omitted). The City cannot rely on what little is left of the right to *carry* firearms to justify an otherwise unacceptable restriction of the right to *keep* them.

Second, the district court reasoned that "the fact that few, or even no, [firing ranges open to the public] exist" is "a function of the market, and not the challenged rule." JA 193. But that cannot be the law, since that line of reasoning would eviscerate the Constitution's protections. To be sure, the market for shooting ranges within city limits is simply not as robust as it is in rural areas, likely due in large part to the exponentially higher cost of property there: on average, $366 per square foot in 2006[2]—a price that makes the operation of a firing range (with an average footprint on the order of 5,500 square feet[3]) prohibitively expensive. But the key point is that this was just as apparent to *the City* when it was *drawing* its regulations as it is to us today. Clearly, the City cannot justify its ban on target practice in those regions where the market for target ranges is robust and they are plentiful by pointing to an exception drawn precisely around that region where market forces will inevitably and predictably make them virtually nonexistent. And this is all the more true given that the City has increased the operating costs of firing ranges even further by subjecting them to onerous regulations that *themselves* distort the very "market" the City now attempts to blame. JA 116–17.

---

[2] Andrew Haughwout, *et al.*, *The Price of Land in the New York Metropolitan Area*, 14 CURRENT ISSUES IN ECONOMICS AND FINANCE 1, 4 (2008), http://goo.gl/ryXOHt.

[3] Whole Building Design Guide, NATIONAL INST. OF BLDG. SCIS., *Firing Range* (June 20, 2011), http://goo.gl/VxibZg.

Far from a "minimal, or at most, modest" infringement of the Second Amendment, JA 194, the City's rule thus strikes at the very heart of that provision—armed self-defense in the home. And its restraints on that core right are heavy ones, making it effectively impossible for most city residents to "learn[ ] to handle and use" firearms "in a way that makes those who keep them ready for their efficient use." *Heller*, 554 U.S. at 618 (quoting COOLEY, CONSTITUTIONAL LAW 271).

## II. Section 5-23's Limitations Should Be Subjected to Strict Scrutiny.

1.    Since it severely impairs the exercise of core Second Amendment rights in this way, Section 5-23 is, on any fair interpretation of *Heller*, *per se* unconstitutional. The Second Amendment, the Court noted in that case, "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," taking restrictions on that "core protection" simply "off the table." *Id.* at 634–36.

Of course, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. But the Court in *Heller* also made clear that the contours of those limits were not to be based on "future judges' assessments of [the Second Amendment's] usefulness," but rather discerned through an inquiry into "the scope [it was] understood to have when the people adopted [it]." *Id.* at 634–35. And it was for this reason—not because of any "interest-balancing inquiry"—

that the Court concluded that "longstanding" "regulatory measures," such as "prohibitions on the possession of firearms by felons and the mentally ill" or "laws imposing conditions and qualifications on the commercial sale of arms," are "presumptively lawful." *Id.* at 626–27 & n.26, 634.

Restrictions like the City's rule here are not longstanding, historically recognized carve-outs from the Second Amendment's reach. To the contrary, as noted above, *supra* pp. 6–8, the historical understanding from the founding through at least the final decades of the nineteenth century was that "the right to maintain proficiency in firearm use" is "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Ezell*, 651 F.3d at 708; *see also Heller*, 554 U.S. at 616–19. By *Heller*'s lights, this means—without any further "judge-empowering 'interest-balancing inquiry' "—that the City's rule is categorically unconstitutional. *Id.* at 634–36.

2. Despite the clarity of *Heller* and *McDonald*, in *Kachalsky* this Court rejected the view "that courts must look solely to the text, history, and tradition of the Second Amendment to determine whether a state can limit the right without applying any sort of means-end scrutiny." 701 F.3d at 89 n.9. But while *Kachalsky* dictates that some "sort of means-end scrutiny" applies, *id.* at 89 n.9, its support for the approach taken by the district court in this case ends there. For the reasoning of *Kachalsky* in fact directly contradicts the district court's conclusion that *Kachalsky*

somehow justifies subjecting restrictions like the City's only to intermediate scrutiny—even if such laws "may restrict the possession of handguns in the home." JA 190. *Kachalsky* itself applied intermediate scrutiny only because it first (mistakenly, in our view) concluded that the law at issue there—a limitation on carrying firearms in public—"falls outside the core Second Amendment protections identified in *Heller*." 701 F.3d at 94. And it fell outside the Second Amendment's core, *Kachalsky* reasoned, *precisely because* it did not apply "*in the home*." *Id.* (quotation marks omitted). "This," *Kachalsky* insisted, "is a critical difference." *Id.* The district court's reading of *Kachalsky* thus ignores that opinion's crucial conclusion that "[t]he state's ability to regulate firearms . . . is qualitatively different in public than in the home." *Id.*

In support of its conclusion that intermediate scrutiny applies "to general challenges under the Second Amendment, even when reviewing statutes or laws that may restrict the possession of handguns in the home," the court below cited a number of opinions besides *Kachalsky*, most from other circuits. JA 190–91. Not one of the opinions it cites comes close to supporting that broad conclusion.

The bulk of the circuit court cases cited by the district court applied intermediate scrutiny to restrictions on gun possession by individuals who have previously been convicted of some unlawful conduct or otherwise have a history of violent behavior (or on guns typically possessed by such individuals). *See United*

13

*States v. Chester*, 628 F.3d 673, 681–83 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010); *United States v. Skoien*, 614 F.3d 638, 639, 641–42 (7th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010). But those restrictions clearly fall *outside* the core right identified by *Heller*, which on its face is limited to the possession of firearms by "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. Similarly, this Court's opinion in *Kwong v. Bloomberg*—which applied intermediate scrutiny to the "marginal, incremental" restriction posed by New York City's firearm possession licensing fee, 723 F.3d at 167–68—does not justify applying anything less than strict scrutiny to Section 5-23, which, as shown above, *severely* burdens the core right protected by the Second Amendment.

The district court here applied mere intermediate scrutiny in upholding a regulation that severely restricts the Second Amendment's central guarantee. In doing so, it ignored the clear teaching of both *Heller* and this Court's opinion in *Kachalsky*. That error must be reversed.

## III. Section 5-23 Fails Any Measure of Heightened Constitutional Scrutiny.

The district court was wrong to conclude that Section 5-23 is anything other than an oppressive restriction of conduct that lies at the very heart of the Second Amendment's protections, and it was also wrong to conclude that anything less than strict scrutiny applies to this acute infringement of the core Second

Amendment right. But quite apart from these errors, the district court's opinion fails on its own terms. A law subject to intermediate scrutiny must still be "substantially related to the achievement of an important governmental interest." *Kachalsky*, 701 F.3d at 96. And the City's rule falls short of meeting even this standard in multiple ways.

## A. The City's Compelling Interest in Public Safety and Crime Prevention Does Not Extend Outside of Its Own Borders.

Ordinarily, a restriction on Second Amendment rights has no difficulty meeting the "important government interest" prong of intermediate scrutiny, since such restrictions are generally justified by the government's important—indeed, compelling—interest in public safety and crime prevention. *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308, 329 (6th Cir. 2014), *vacated for reh'g en banc*, No. 13-1876 (6th Cir. Apr. 21, 2015). But here Section 5-23 stumbles even at this first step.

The City argued below that its limits on the transportation of firearms to a second residence or firing range outside city limits were justified in part by "th[e] great danger to the public" that "lies in allowing [individuals] to travel all across New York State with their firearms," pointing to "examples of persons . . . engaging in unlawful and dangerous conduct around the State of New York by transporting their firearms to places that they were not authorized to do so." Defendants' Opposition at 9–10. And the district court, following suit, concluded

15

that the City's restrictions on transportation outside its borders were justified in part because they would allow "law enforcement in New York State" to more fully curb "the illegal transport of firearms" outside city limits by individuals "falsely stating that [they are] en route to a range or shooting competition located anywhere in the state." JA 201. But any "unlawful and dangerous conduct" that is perpetrated "around the State of New York" Defendants' Opposition at 10, is primarily the concern *of the jurisdiction where it occurs*. While *that* locality—or the State as a whole—would clearly have a compelling interest in curbing such unlawful conduct, the City does not. *Cf. C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 393 (1994) (noting that town could not justify waste regulation as protecting the environment in "out-of-town" locations since "[t]o do so would extend the town's police power beyond its jurisdictional bounds").

This distinction may seem technical, but it is deeply important. That is so because the fundamental premise of any form of heightened scrutiny is that where it applies—to conflicts between the Constitution's solemn protection of some conduct and the government's substantial interest in restricting that conduct—a balance must be struck between the important interests that lie on *both* sides of the ledger. Scrutiny, that is, "entails assessing means and ends and costs and benefits." *Tyler*, 775 F.3d at 323. And while this Court has held that "[i]n the context of firearm regulation, the legislature is far better equipped than the judiciary to make"

16

these types of "sensitive public policy judgments (within constitutional limits),"
*Kachalsky*, 701 F.3d at 97 (quotation marks omitted), as between *alternative*
groups of politically-accountable officials, surely it is up to *each separate*
*jurisdiction* to strike the balance that it feels should govern within its domain. The
City has no authority to strike that balance *for* them.

### B. The City Has Failed To Demonstrate that Section 5-23 Is Substantially Related to Its Interest in Public Safety.

The City of course does possess an important interest in promoting public
safety *within* city limits. But in order to meet intermediate scrutiny, the
government must still prove that its law is "substantially related" to the
achievement of that interest. *Id*. at 96. Though intermediate scrutiny, unlike strict
scrutiny, does not impose a "least restrictive means" requirement, the government
still must show under either standard, as the Supreme Court clarified only last
Term, that its restrictions are "narrowly tailored," possessing a "close fit between
ends and means." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534–35 (2014). "The
burden of justification is demanding and *it rests entirely on the [government]*."
*United States v. Virginia*, 518 U.S. 515, 533 (1996) (emphasis added).  Here, the fit
is anything but close.

1. Section 5-23's restrictions are substantially over-inclusive, sweeping
in far more constitutionally protected conduct than necessary to advance the City's
public-safety goals. Indeed, because the City failed to come forward with evidence

17

demonstrating *any link* between its restrictions on handgun transportation and public safety, the *entirety* of the conduct prohibited by section 5-23 is prohibited gratuitously.

The City bears the burden of justification under intermediate scrutiny, and it therefore must come forward with "sufficient evidence to establish a substantial relationship between [its ban] and an important governmental goal." *Chester*, 628 F.3d at 683 (emphasis omitted). Here, the only "evidence" the City put forward of the link between the challenged rule and its purported public-safety rationale was a single declaration submitted by Andrew Lunetta, the Commanding Officer of the License Division.[4] One scours this declaration in vain in search of material that would satisfy the City's evidentiary burden.

The declaration begins with the broad, conclusory assertion that "[c]learly, there is less public danger if . . . license holders do not bring their firearms into the public domain." JA 68. But *no support whatsoever* is offered for that claim. Adding the word "clearly" before the assertion does not satisfy the State's "demanding" "burden of justification," *Virginia*, 518 U.S. at 533; nor does

---

[4] Mr. Lunetta's declaration was first submitted in opposition to Plaintiffs' Motion for Preliminary Injunction. Defendants later submitted a revised and modestly expanded version of the declaration in support of their Cross-Motion for Summary Judgement. We generally cite to this second, revised version of the declaration.

repeating the naked assertion several times, *see* JA 69. Far from "clear," this empirical question is in fact hotly contested.

For example, in 2005 the National Academies of Science's National Research Council published the results of a comprehensive survey and analysis of "the existing research and data on gun violence," ultimately finding "that with the current evidence, it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." FIREARMS AND VIOLENCE 13, 150 (Charles F. Wellford, John V. Pepper & Carol V. Petrie eds., 2005). And the Seventh Circuit recently concluded, after an exhaustive survey of "the empirical literature on the effects of allowing the carriage of guns in public," that the evidence failed to show anything more "than merely that the public *might* benefit on balance from . . . curtail[ing] [public firearm carriage], though there is no proof it would." *Moore v. Madigan*, 702 F.3d 933, 939–40 (7th Cir. 2012). Here, the City's evidence does not even support that there *might* be a public-safety benefit; the City submitted no evidence at all.

Even if the City could help itself to the premise that "[t]he general government interest in . . . public safety . . . is maintained by limiting handgun access in public places," JA 69, it still failed to substantiate the claimed link between that premise and the specific restrictions imposed by the rule challenged here—a ban on transporting an *unloaded* handgun, in a *locked container*, *separate*

from its ammunition, to a second residence or a firing range *other* than one the City has authorized. The City's theory, apparently, is that the copious limits on how and where handguns may be transported could be "easily ignored" if "ranges anywhere in the State were authorized," since licensees could carry their firearms at will and, if discovered, "create an explanation about traveling for target practice or shooting competition." *Id.* at 69, 70. Only by limiting transportation to authorized ranges (or hunting locations), the theory goes, can "these restrictions be effectively monitored and enforced." *Id.* at 72.

But, again, the City submitted no evidence to back up these assertions. Though it vaguely references "myriad examples" of individuals disregarding the limitations on transport imposed by the more-lenient licensing regime that predated the rule challenged here, *id.* at 77, it provides no evidence of the magnitude of such noncompliance, except to cite five exemplary cases, *id.* at 78—out of the thousands of city residents licensed to keep a handgun in their home. And it doesn't even *try* to provide empirical evidence supporting its assertion that Section 5-23's limits will allow the City's other restrictions to "be more effectively monitored and enforced," much less its belief that this will lead to "less risk to public safety." *Id.* at 69. Indeed, Mr. Lunetta's statement that since the new regime was instituted in 2001, "investigations have revealed a large volume and pattern of [residents] violati[ng] . . . the restrictions on their license," *id.* at 72, suggests just the opposite.

Finally, even if the City had shouldered its burden of showing that Section 5-23's restrictions furthered to some degree its interest in public safety, the variety of less-restrictive means of advancing that end would still render that rule unconstitutionally over-inclusive. As an initial matter, if, as the City owns, its real interest is in preventing "violation of the rules governing the transportation of firearms," *id.* at 69, then it should consider dedicating more resources into *enforcing the rules governing the transportation of firearms*. The City's attempt to prevent violation of these existing limitations by larding *additional* limitations on the constitutional rights of the *law abiding* essentially gives lawbreakers a heckler's veto over the lawful exercise of Second Amendment rights.

The City's treatment of the two narrow types of transportation it does allow—for hunting in designated areas and for training and practice at the handful of authorized firing ranges—underscores the availability of alternative and less restrictive means. The district court held that neither exception posed an unacceptable public safety risk in part because both allowed transportation only to specific, known locations, making it easier "to investigate the credibility of licensees' assertions regarding the purpose for transporting their handguns." *Id.* at 199. But there is nothing in the record to suggest that the License Division could not similarly maintain—and make available to law enforcement—a list of active ranges outside the city, along with their locations; and the City could require the

License Division to verify and list a licensee's *second* residence on the face of the license, just as it lists their first. These alternatives may be less administratively convenient than Section 5-23's regime; but "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less [constitutionally protected conduct] would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 134 S.Ct. at 2540.

2.      The restrictions on transportation imposed by Section 5-23 are also significantly *under*-inclusive, "rais[ing] serious doubts about whether the government is in fact pursuing the interest it invokes," *Brown v. Entertainment Merchs. Ass'n*, 131 S. Ct. 2729, 2740 (2011), rather than targeting conduct protected by the Second Amendment out of simple hostility to that right.

Whole categories of conduct that raise essentially the same public-safety concerns as the transportation Section 5-23 prohibits are left completely untouched. To begin with, the City's stringent limitations on transporting *handguns* do not apply to *long* guns. An individual may obtain from the City a rifle or shotgun permit based on roughly the same showing that is required for a licensee to possess a handgun. *See* 38 RCNY § 3-02, 3-03. But a long gun held pursuant to such a permit may generally be transported *anywhere*, so long as it is locked, unloaded, and out of sight. *Id.* § 3-14. Similarly, the likelihood that Section

22

5-23 will do anything to advance the City's stated public-safety goal is even further reduced by the fact that *as a matter of federal law*, out-of-city residents from places that respect the Second Amendment may *freely* transport their arms through *any* part of the city, 18 U.S.C. § 926A—even though, unlike its own citizens, the City has had no hand in screening the qualifications or backgrounds of these individuals. The strangely-drawn under-inclusiveness that results from these peculiar distinctions "raises a red flag" under intermediate scrutiny's tailoring requirement. *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1668 (2015).

Perhaps even more significant, the City's rules do not apply to the two exceptions enumerated in the restrictions themselves: transportation to authorized, *in-city* firing ranges and to designated *out-of-city* hunting locations. If firearm practice or training poses such a risk to public safety, the City's choice to allow its residents to shoot only at ranges *within city limits* is at least counterintuitive. And if allowing residents to transport their firearms *outside* the city so vitiates the government's attempts to prevent crime and protect the public safety, its decision to allow such transportation for some lawful purposes but not others is also puzzling. The bizarre lines drawn by Section 5-23 serve to "diminish the credibility of the government's rationale for restricting [Second Amendment conduct] in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994). If the City has concluded that its public safety interest does not warrant restricting the

transportation of firearms by sportsmen engaged in game hunting, surely the right to engage in effective self-defense in the home—"the *central component*" of the Second Amendment, *Heller*, 554 U.S. at 599—should be given at least equal weight on any fair set of scales.

## IV.    Section 5-23 Violates the Dormant Commerce Clause.

Article I, Section 8 of the Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. "It is long established that, while a literal reading evinces a grant of power to Congress, the Commerce Clause also directly limits the power of the States to discriminate against interstate commerce." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992). A state or local government can run afoul of this "dormant" aspect of the Commerce Clause "in one of two ways: it may clearly discriminate against interstate commerce, in which case it is virtually invalid per se, or even if it does not evince such discriminatory effect, it may still be unconstitutional if it imposes a burden on interstate commerce incommensurate with the local benefits secured." *National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 108 (2d Cir. 2001) (citations omitted). Here, this Court need not reach the latter inquiry into whether Section 5-23 imposes a burden on interstate commerce that "is clearly excessive in relation to the putative local benefits," *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 847 (1970), because the provision's restriction on transportation of handguns out of the City is

plainly discriminatory and thus subject to "a virtually *per se* rule of invalidity,"
*City of Phila. v. New Jersey*, 437 U.S. 617, 624 (1978).

"Regulations may discriminate unconstitutionally against interstate
commerce on their face and in their effect." *Brown & Williamson Tobacco Corp. v.
Pataki*, 320 F.3d 200, 209 (2d Cir. 2003). Section 5-23 does both. That rule by its
clear terms discriminates against interstate commerce by *entirely blocking* out-of-
state firing ranges from competing for the business of handgun owners residing in
the City. Section 5-23 itself allows licensees to "transport her/his handgun(s)" only
to "an authorized small arms range/shooting club;" and the only way a range can
become "authorized" is through the City Police Commissioner's authority under
the New York City Administrative Code to designate certain "premises" "*in the
city*" as areas where firearms may be lawfully discharged. 10 N.Y. CITY ADMIN.
CODE § 10.131(c) (emphasis added).

It is plain from the face of these provisions, taken together, that out-of-city
and out-of-state firing ranges have been wholly "deprived of access to local
demand for their services." *C & A Carbone*, 511 U.S. at 392; *see Dean Milk Co. v.
City of Madison*, 340 U.S. 349, 350–51 (1951) (finding a city ordinance clearly
discriminatory because it both "prohibits the sale of milk . . . unless from a source
of supply possessing a permit issued after inspection by Madison officials" and
"relieves municipal authorities from any duty to inspect farms located beyond

twenty-five miles from the center of the city"). "Put another way, the offending local laws hoard a local resource"—here, the demand of resident firearm owners to practice shooting their handguns—"for the benefit of local businesses that treat it." *C & A Carbone*, 511 U.S. at 392. And even if this naked discrimination against out-of-state ranges were not obvious on the face of Section 5-23, it is clearly and inevitably "the practical impact of the law." *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979). The district court's conclusion that "out-of-state entities 'remain free to conduct commerce on their own terms,' " JA 213 (quoting *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 221 (2d Cir. 2004)), is thus simply inexplicable.

The district court never squarely treated with NYSRPA's argument that Section 5-23 clearly discriminates against interstate commerce, apparently out of the (incorrect) belief that the argument had not been raised. *Compare id.* at 210 (suggesting that Plaintiffs had challenged Section 5-23 only as an "extraterritorial control of commerce" and under the *Pike* balancing test), *with* Plaintiffs Summary Judgment Brief, Doc. 44, at 30 (July 16, 2014) ("Plaintiffs' Brief") ("New York City's restrictions on target practice and competitive shooting for its residents clearly discriminate against non-New York City interests."). But elsewhere in its Dormant Commerce Clause analysis, the court reached two conclusions that might also cut against such a claim. Both were in error.

First, the district court concluded that under either the "clear discrimination" or the *Pike* balancing prongs of Dormant Commerce Clause analysis, Plaintiffs bore the initial burden of "demonstrat[ing] that the statute has a 'disparate impact' on interstate commerce," JA 211 (quoting *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007)), a burden it thought they had failed to carry. It is certainly the case that for a plaintiff to show that a law is clearly discriminatory it must point to some "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 99 (1994). But NYSRPA clearly *carried* that burden by pointing out that Section 5-23 on its face "sets forth a *de facto* monopoly for in-city target ranges to the exclusion of all out-of-city ranges to handle all target shooting for residents with a premises license." Plaintiffs' Brief at 30. It is difficult to imagine a more "disparate impact" than that.

Second, the court elsewhere suggested that Section 5-23 could not violate the Dormant Commerce Clause since its *purpose* was not obviously protectionist: "the rule regarding where restricted licensees may carry their firearms has nothing to do with economic interests." JA 212. But the Supreme Court has long made clear that "the purpose of, or justification for, a law has no bearing on whether it is facially discriminatory." *Oregon Waste Systems*, 511 U.S. at 100. That is so because "the evil of protectionism can reside in legislative means as well as

27

legislative ends," and "whatever [the City's] ultimate purpose, it may not be accomplished by discriminating against [interstate] commerce." *City of Philadelphia*, 437 U.S. at 626–27.

Because Section 5-23 clearly discriminates against out-of-state firing ranges, it is "*per se* invalid" unless "the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C & A Carbone*, 511 U.S. at 392. Enough has been said above to show that the City cannot bear that burden. For if Section 5-23 is not "substantially related" to the City's interest in crime prevention under *intermediate* scrutiny, *see supra* pp. 14–24, it clearly cannot survive "the strictest scrutiny" imposed upon patently discriminatory regulations by the Dormant Commerce Clause. *Hughes*, 441 U.S. at 337.

## CONCLUSION

For the reasons given above, Amicus Curiae respectfully submits that the district court's judgment should be reversed.

Dated: June 23, 2015

Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper
David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
(202) 220-9600
(202) 220-9601
ccooper@cooperkirk.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of FED. R. APP. P. 29(d) because it contains 6,782 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated:   June 23, 2015                           s/ Charles J. Cooper
                                                 Charles J. Cooper

                                                 *Counsel for Amicus Curiae*