# No. 15-638

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

THE NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC.,
ROMOLO COLANTONE, EFRAIN ALVAREZ, AND JOSE ANTHONY IRIZARRY,
*Plaintiffs-Appellants*,

v.

THE CITY OF NEW YORK AND THE NEW YORK
CITY POLICE DEPARTMENT- LICENSE DIVISION,
*Defendants-Appellees*.

—————————————

On Appeal from the United States District Court
for the Southern District of New York, No. 1:13-cv-2115

—————————————

**BRIEF OF *AMICI CURIAE* WESTERN STATES SHERIFFS' ASSOCIATION, LAW ENFORCEMENT LEGAL DEFENSE FUND, LAW ENFORCEMENT ACTION NETWORK, CRPA FOUNDATION, LAW ENFORCEMENT ALLIANCE OF AMERICA, AND INTERNATIONAL LAW ENFORCEMENT EDUCATORS AND TRAINERS ASSOCIATION IN SUPPORT OF APPELLANTS AND IN SUPPORT OF REVERSAL**

Stephen P. Halbrook
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
Tel: (703) 352-7276

Dan M. Peterson
    Counsel of Record
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
Tel: (703) 352-7276

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Western States Sheriffs' Association is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Law Enforcement Legal Defense Fund is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Law Enforcement Action Network is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

CRPA Foundation is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Law Enforcement Alliance of America is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

International Law Enforcement Educators and Trainers Association is a corporation which has no parent corporation. It issues no stock, and therefore no

publicly held company owns 10% or more of its stock.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ...............................................................................v

INTEREST OF AMICI CURIAE..........................................................................1

STATEMENT PURSUANT TO RULE 29(c) .......................................................4

INTRODUCTION ..............................................................................................4

SUMMARY OF ARGUMENT ...........................................................................5

ARGUMENT ....................................................................................................7

I.  INDIVIDUALS WHO OBTAIN LICENSES TO POSSESS
OR CARRY HANDGUNS ARE HIGHLY LAW-ABIDING,
AND DO NOT POSE A PUBLIC SAFETY THREAT WHEN
TRANSPORTING THEIR UNLOADED, LOCKED FIREARMS.........................7

    A.  Premises licensees undergo an exhaustive
    screening by New York City.................................................................7

    B.  Data from other jurisdictions show that handgun license
    and permit holders present an extremely low risk of harm
    to public safety ...................................................................................12

II.  NO EVIDENCE WAS PRODUCED BY THE CITY
THAT ANY INTEREST IN PUBLIC SAFETY IS
ADVANCED BY SECTION 5-23 ..........................................................18

III.  SECTION 5-23 PROSCRIBES CONDUCT THAT IS
EXPRESSLY PROTECTED BY FEDERAL LAW FOR
EVERY U.S. CITIZEN WHO IS NOT DISQUALIFIED
FROM POSSESSING A FIREARM.........................................................26

CONCLUSION ...................................................................................................29

CERTIFICATE OF COMPLIANCE......................................................................31

CERTIFICATE OF SERVICE ...............................................................................32

# TABLE OF AUTHORITIES

**CASES**                                                          **Page**

*Edwards v. District of Columbia*, 755 F.3d 996 (D.C. Cir. 2014)........................... 18

*Heller v. District of Columbia*, No. 14-7071 (D.C. Circuit, pending)...............16, 17

*Matter of Lugo v. Safir*, 272 A.D.2d 216 (1st Dep't 2000) ....................................24

*People v. Lap*, 150 Misc.2d 724 (N.Y. Crim. Ct., N.Y. County 1991) ...................24

*People v. Ocasio*, 108 Misc.2d 211 (2d Dep't 1981) .............................................24

*People v Schumann*, 133 Misc.2d 499 (N.Y. Crim. Ct.,
Bronx County 1986)..................................................................................................24

*People v. Thompson*, 92 N.Y.2d 957 (1998) ..........................................................24

*Torraco v. Port Auth. of New York & New Jersey,*
615 F.3d 129 (2d Cir. 2010).......................................................................................29

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ...........................18

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997)...........................19

*United States v. Alvarez*, 132 S.Ct. 2537 (2012) ....................................................19

## CONSTITUTIONS, STATUTES, AND REGULATIONS

U.S. CONST. art. VI, cl. 2 .....................................................................................27, 29

18 U.S.C. Ch. 44 .......................................................................................................27

18 U.S.C. § 922(g) ....................................................................................................27

v

18 U.S.C. § 922(n) ................................................................27

18 U.S.C. § 922(y)(2) ..............................................................8

18 U.S.C § 926A .......................................................6, 26, 27, 28, 29

21 U.S.C. § 802 .....................................................................8

28 U.S.C. § 2201 ...................................................................29

28 U.S.C. § 2202 ...................................................................29

42 U.S.C. § 1983 ...................................................................29

N.Y. Criminal Procedure Law § 160.50(1)(d)(iii) ..................................16

N.Y. Penal Law § 265.01 .............................................................4

N.Y. Penal Law § 265.00(17)(b) .....................................................10

N.Y. Penal Law § 265.20(a)(3) ........................................................4

N.Y. Penal Law § 400.00(1) ..................................................7, 10, 27

N.Y. Penal Law § 400.00(1)(c) ......................................................10

N.Y. Penal Law § 400.00(1)(g) ........................................................7

N.Y. Penal Law § 400.00(3)(a) ........................................................4

N.Y. Penal Law § 400.00(4) ...........................................................7

38 R.C.N.Y. § 5-23 ....................... 4, 6, 18, 19, 20, 22, 25, 26, 29

38 R.C.N.Y. § 5-23(a)(3) ..........................................................4, 5

38 R.C.N.Y. § 5-23(a)(4) .............................................................4

## OTHER AUTHORITIES

City of New York Police Department,
*Murder in New York 2012* (2012).............................................................15

Crime Prevention Research Center, *Concealed Carry
Permit Holders Across the United States* 7, 11 (2014)......................................12, 13

Mike DeBonis, "Security, not street crime, at risk after
gun ruling, D.C. Police Chief Cathy Lanier says,"
*Washington Post* (July 30, 2014)............................................................17

FBI, CRIME IN THE UNITED STATES 2013, table 69.................................................14

David B. Kopel, *Pretend "Gun-Free" School Zones*,
42 CONN. L. REV. 515 (2009).................................................................14

Jo Craven McGinty, *New York Times*, "New York Killers,
and Those Killed, by Numbers" (April 28, 2006)................................................15

Milwaukee Homicide Review Commission, *2013 Data
Report, Homicide and Non-Fatal Shootings* 36 (2014)..........................................15

NYPD website, "Frequently Asked Questions," available at
http://www.nyc.gov/html/nypd/html/firearms_licensing/gun_licensing_faq.shtml#
ArrestHistory................................................................................16

https://www.nraila.org/gun-laws/state-gun-laws/..............................................28

Website of County Sheriffs of Colorado,
available at http://csoc.org/ccw_application.asp ............................................14

<u>INTEREST OF</u> *AMICI CURIAE*

**Western States Sheriffs' Association**

The Western States Sheriffs' Association ("WSSA") was established in 1993, originally representing nine states. It now consists of hundreds of members from 15 member states throughout the Western United States (Arizona, California, Colorado, Idaho, Montana, North Dakota, New Mexico, Nevada, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming). Most of these states have "shall issue" concealed carry permit systems, and WSSA members thus have observed first hand that individuals who voluntarily obtain a license or permit tend to be strongly law-abiding and do not endanger public safety when transporting their firearms. WSSA also supports the ability of law-abiding citizens in all states to transport firearms across state lines for lawful purposes in accordance with federal law.

**Law Enforcement Legal Defense Fund**

Law Enforcement Legal Defense Fund ("LELDF") is a 501(c)(3) non-profit organization, headquartered in Alexandria, Virginia, that provides legal assistance to law enforcement officers. LELDF has aided nearly one hundred officers, many of whom have been acquitted, mostly in cases where officers have faced legal action for otherwise authorized and legal activity in the line of duty. While LELDF

supports measures that will further legitimate public safety interests and protection of law enforcement officers, it does not support provisions that violate the constitutional rights of law-abiding citizens and produce no public safety benefit.

## Law Enforcement Action Network

Law Enforcement Action Network ("LEAN") is a sister organization of LELDF, headquartered in Alexandria, Virginia, which has received 501(c)(4) status. LEAN promotes policies that protect law enforcement officers' personal and professional safety. LEAN seeks to provide insight to the Court about the lack of public safety implications of the challenged provisions for both police officers and the citizenry.

## CRPA Foundation

The CRPA Foundation is a non-profit entity that utilizes its financial resources to educate the public about firearms laws, the shooting sports, and firearms safety. CRPA Foundation advocates for the safe and responsible ownership of firearms to benefit the California Rifle and Pistol Association ("CRPA") and the CRPA's approximately 35,000 dues-paying members, tens of thousands of additional donors and supporters, and firearm owners in general. It endorses the position of the CRPA's New York counterpart, appellant New York State Rifle and Pistol Association, in this case.

**Law Enforcement Alliance of America, Inc.**

Law Enforcement Alliance of America, Inc. ("LEAA") is a non-profit, non-partisan advocacy and public education organization founded in 1992 and made up of thousands of law enforcement professionals, crime victims, and concerned citizens. LEAA represents its members' interests by assisting law enforcement professionals and seeking criminal justice reforms that target violent criminals, not law-abiding citizens.  LEAA has been an *amicus curiae* in numerous cases, and on the prevailing side in two United States Supreme Court cases.

**International Law Enforcement Educators and Trainers Association**

International Law Enforcement Educators and Trainers Association ("ILEETA") is an association of 4,000 professional law enforcement instructors committed to the reduction of law enforcement risk and to saving lives of police officers and the general citizenry through the provision of training enhancements for criminal justice practitioners.  ILEETA has joined this brief because it recognizes that citizens who are licensed to possess a handgun, who have no criminal record, and who have passed an extensive background investigation, do not present a public safety issue when transporting their firearms in an unloaded and locked condition.  ILEETA's *amicus* briefs were cited by Justice Breyer in *District of Columbia v. Heller*, and by Justices Alito and Stevens in *McDonald v. Chicago*.

## STATEMENT PURSUANT TO RULE 29(c)

No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than *amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

## INTRODUCTION

New York law requires a license to possess a handgun anywhere in the state. N.Y. Penal Law §§265.01, 265.20(a)(3). Licenses are issued at the city or county level. N.Y. Penal Law §400.00(3)(a). The individual plaintiff-appellants in this case are all holders of premises residence licenses in the City of New York. An administratively promulgated regulation of New York City, 38 R.C.N.Y. §5-23, prohibits a premises licensee from transporting his or her handgun to any location other than 1) "directly to and from an authorized small arms range/shooting club," or 2) "directly to and from an authorized area designated by the New York State Fish and Wildlife Law and in compliance with all pertinent hunting regulations," provided that the licensee obtains from the police a "Hunting Authorization" Amendment attached to his or her license. 38 R.C.N.Y. § 5-23(a)(3), 38 R.C.N.Y. § 5-23(a)(4). In both instances, the handgun must be transported "unloaded, in a locked container, the ammunition to be carried separately." *Id.*

Letters issued by the License Division have interpreted the term "authorized small arms range/shooting club" in § 5-23(a)(3) to mean only ranges authorized by the New York City Police Commissioner, which limits such ranges to those located in in New York City. *See, e.g,* JA 28-29. In practice, this means that premises residence licensees are prohibited from ever transporting their firearms out of state, and for nearly all purposes cannot transport them into the rest of New York State.

## SUMMARY OF ARGUMENT

To qualify for a premises residence license in New York City, an individual must satisfy rigorous requirements under state law, and undergo additional scrutiny by the License Division of the New York Police Department. The individuals who obtain premises licenses are unlikely to engage in violent crime while transporting their firearms, locked and unloaded, as the City speculates.

This is borne out by hard data gathered in other jurisdictions. In states with "shall issue" concealed carry permit systems, applicants must meet a number of objective criteria in order to be issued a permit or license to carry. These criteria are generally less restrictive than those in New York City. A wealth of official data generated by some of these states confirms that permit holders are extraordinarily law-abiding and commit very few serious crimes. Although New York does not publish data relating to crimes committed by premises licensees, those licensees can

5

be expected to be at least as law-abiding and non-violent as concealed carry permit holders elsewhere. Thus, the City's allegations that the restrictions in § 5-23 are necessary to prevent violent incidents outside the licensee's premises during transportation of a firearm are implausible.

More importantly, the City's allegations—based on a single Declaration—are completely unsupported by fact. Although the City cites "public safety" as a governmental interest, it has the burden to "prove the challenged regulations directly advance its asserted interests." This it has utterly failed to do. The supposed public safety dangers cited by the City are entirely speculative and conjectural. There is no evidence in the record that premises licensees commit violent crimes while transporting their firearms. Neither has the City shown that § 5-23 is tailored to reduce such entirely suppositional crimes. Old case law showing that the long-defunct "target licenses" were sometimes revoked due to confusion about their scope is irrelevant.

Finally, the restrictions on transporting firearms from a premise licensee's residence to locations outside New York State are in direct conflict with the provisions of 18 U.S.C. § 926A. That statute, which prevails over state and local laws under the Supremacy Clause, expressly entitles persons such as the plaintiffs to transport their firearms for lawful purposes from any place they may lawfully

possess them to any other place they may lawfully possess them, notwithstanding any other law or rule or regulation of a State or political subdivision.

## ARGUMENT

### I. INDIVIDUALS WHO OBTAIN LICENSES TO POSSESS OR CARRY HANDGUNS ARE HIGHLY LAW-ABIDING, AND DO NOT POSE A PUBLIC SAFETY THREAT WHEN TRANSPORTING THEIR UNLOADED, LOCKED FIREARMS.

#### A. Premises licensees undergo an exhaustive screening by New York City.

As the trial court's opinion stated, the local licensing officer's duties include, among other things:

> determining whether the applicant meets the eligibility requirements set forth under Penal Law § 400.00(1); inspecting mental hygiene records for previous or present mental illness; investigating the truthfulness of the statements in the application; and having the applicant's fingerprints forwarded for review against the records of the New York State Division of Criminal Justice Services and the FBI to ascertain any previous criminal record. See Penal Law §§ 400.00(1), 400.00(4). After an investigation, the licensing officer may not approve the application if, inter alia, "good cause exists for the denial of the license." Penal Law§ 400.00(1)(g).

JA 178.

Section 400.00(1) itself contains fourteen separate criteria which must be satisfied for an individual to be eligible for a premises license. That section provides:

7

Eligibility. No license shall be issued or renewed pursuant to this section except by the licensing officer, and then only after investigation and finding that all statements in a proper application for a license are true. No license shall be issued or renewed except for an applicant

(a) twenty-one years of age or older [except for honorably discharged veterans];

(b) of good moral character;

(c) who has not been convicted anywhere of a felony or a serious offense;

(d) who is not a fugitive from justice;

(e) who is not an unlawful user of or addicted to any controlled substance as defined in section 21 U.S.C. 802;

(f) who being an alien (i) is not illegally or unlawfully in the United States or (ii) has not been admitted to the United States under a nonimmigrant visa subject to the exception in 18 U.S.C. 922(y)(2);

(g) who has not been discharged from the Armed Forces under dishonorable conditions;

(h) who, having been a citizen of the United States, has not renounced his or her citizenship;

(i) who has stated whether he or she has ever suffered any mental illness;

(j) who has not been involuntarily committed to a facility under the jurisdiction of an office of the department of mental hygiene pursuant to article nine [hospitalization of mentally ill] or fifteen [admission of the mentally retarded to schools] of the mental hygiene law, article seven hundred thirty [mental disease or defect excluding fitness to

proceed] or section 330.20 [verdict or plea of not responsible by reason of mental disease or defect] of the criminal procedure law, section four hundred two [commitment of mentally ill inmates] or five hundred eight [removal of sick persons from jail including involuntary hospitalizations] of the correction law, section 322.2 [proceeding to determine capacity] or 353.4 [transfer of certain juvenile delinquents: mentally ill, mentally retarded or developmentally disabled] of the family court act, or has not been civilly confined in a secure treatment facility pursuant to article ten [sex offenders requiring civil commitment or supervision] of the mental hygiene law;

(k) who has not had a license revoked or who is not under a suspension or ineligibility order issued pursuant to the provisions of section 530.14 [suspension and revocation of a license to carry, possess, repair or dispose of a firearm or firearms pursuant to section 400.00 of the penal law and ineligibility for such a license; order to surrender firearms, upon issuance of temporary order of protection (non-domestic)] of the criminal procedure law or section eight hundred forty-two-a [suspension and revocation of a license to carry, possess, repair or dispose of a firearm or firearms pursuant to section 400.00 of the penal law and ineligibility for such a license; order to surrender firearms, upon issuance of temporary order of protection (domestic)] of the family court act;

(l) in the county of Westchester, who has successfully completed a firearms safety course and test as evidenced by a certificate of completion issued in his or her name and endorsed and affirmed under the penalties of perjury by a duly authorized instructor [with certain exceptions];

(m) who has not had a guardian appointed for him or her pursuant to any provision of state law, based on a determination that as a result of marked subnormal intelligence, mental illness, incapacity, condition or disease, he or she lacks the mental capacity to contract or manage his or her own affairs; and

(n) concerning whom no good cause exists for the denial of the license.[1]

Besides all felonies, 400.00(1)(c) references "serious offenses" that make an individual ineligible for a license. These include:

> any of the following offenses defined in the penal law: illegally using, carrying or possessing a pistol or other dangerous weapon; possession of burglar's tools; criminal possession of stolen property in the third degree; escape in the third degree; jostling; fraudulent accosting; endangering the welfare of a child; the offenses defined in article two hundred thirty-five [obscenity, disseminating indecent material to a minor]; issuing abortional articles; permitting prostitution; promoting prostitution in the third degree; stalking in the third degree; stalking in the fourth degree; the offenses defined in article one hundred thirty [sex offenses, sexual misconduct, rape, forcible touching, sexual abuse, female genital mutilation, sexually motivated felony, facilitating a sex offense with a controlled substance, sexual abuse, course of conduct against a child, predatory sexual assault, predatory sexual assault against a child]; the offenses defined in article two hundred twenty [criminal sale or possession of a controlled substance, use of child to commit controlled substance offense, criminal sale, or manufacture of methamphetamine, operating as a major trafficker].

N.Y Penal Law § 265.00(17)(b).

In addition, the NYPD website states that handgun applications may be denied for reasons such as:

A history of domestic violence incidents;

A history of driving under the influence of alcohol or drugs (DUI,

---

[1] The explanatory bracketed material has been added to the quotations from §§ 400.00(1) and 265.00(17)(b).

DWI, DWAI);

Your failure to cooperate with the investigation of your application;

A poor DMV history, including moving violations, failure to appear and answer summonses or failure to pay fines.

This is not a complete list. If your investigation results in a determination that you lack character and fitness for a license or permit, your application will be denied.[2]

Defendants' own evidence shows that, in addition to the above, applicants are also asked questions about their name change history, outstanding warrants, residence history, driving history, history of lost or stolen firearms, and medical conditions. JA 73-74.

Plainly, anyone who can pass all of these requirements, as well as the License Division's discretion to deny permits, is likely to be highly law-abiding, and not the kind of individual who presents a danger to public safety when transporting a handgun that is locked and unloaded. Hard data from other jurisdictions confirm that individuals who meet similar or less strict requirements to obtain a carry license or to register firearms are remarkably law-abiding.

---

[2] NYPD website, "Frequently Asked Questions," available at http://www.nyc.gov/html/nypd/html/firearms_licensing/gun_licensing_faq.shtml#ArrestHistory

**B.    Data from other jurisdictions show that handgun license and permit holders present an extremely low risk of harm to public safety.**

The requirements that must be met to obtain a premises license in New York City are at least as restrictive, and generally more restrictive, than the requirements for a concealed *carry* license in most states.

New York State does not publish data on violent crimes committed by licensees.[3]  But many states do publish data on crimes committed by carry permit holders and/or the number of permit revocations.  Most of these states are "shall issue" states, meaning that objective criteria are utilized, and that the state must issue the permit if no objective, disqualifying criteria are present.  Accordingly, the issuance rates are higher than in New York City, and the criteria less restrictive.

The data show that carry permit holders in other states are an extraordinarily law-abiding group.  A recent nationwide study of the data available noted the experience of Florida and Texas:

> During over two decades, from October 1, 1987 to May 31, 2014, Florida has issued permits to more than 2.64 million people, with the average person holding a permit for more than a decade. Few--168

---

[3] Crime Prevention Research Center, *Concealed Carry Permit Holders Across the United States* 11 (2014).

(about 0.006%)--have had their permits revoked for any type of firearms related violation, the most common being accidentally carrying a concealed handgun into a gun-free zone such as a school or an airport, not threats or acts of violence. It is an annual rate of 0.0002 percent.

The already low revocation rate has been declining over time. Over the last 77 months from January 2008 through May 2014, just 4 permits have been revoked for firearms-related violations. With an average of about 875,000 active permit holders per year during those years, the annual revocation rate for firearms related violations is 0.00007 percent – 7 one hundred thousandths of one percentage point.

For all revocations, the annual rate in Florida is 0.012 percent. [footnotes omitted]

The study went on to note that:

The numbers are similarly low in Texas. In 2012, the latest year that crime data are available, there were 584,850 active license holders. Out of these, 120 were convicted of either a misdemeanor or a felony, a rate of 0.021 percent, with only a few of these crimes involving a gun. [footnotes omitted]

Crime Prevention Research Center, *Concealed Carry Permit Holders Across the United States* 7 (2014).

In several states which issue carry licenses in an objective manner, a state agency produces annual reports of all criminal justice incidents involving concealed handgun licensees. While the details of how the data are reported vary among the states, the reports unanimously show that almost all licensees are highly law-abiding.

For example, in Colorado in the five-year period 2009-13, there were 154,434 concealed handgun carry permits issued. During this same period, 1,390 permits were revoked. 931 of these permits were revoked following an arrest.[4] Contrast this with the arrests of over 200,000 Colorado adults in 2013 alone.[5] Data from other states are consistent:

*Minnesota*: One handgun crime (broadly defined, such as driving while under the influence if a handgun is in the car) per 1,423 licensees.[6]

*Michigan*: 161 charges of misdeeds involving handguns (including duplicate charges for one event, and charges which did not result in a conviction) in 2007 and 2008 out of an approximate Michigan population of 190,000 licensees.

*Ohio*: 142,732 permanent licenses issued since 2004, and 637 revocations for any reason, including moving out of state.

*Louisiana*: Licensee gun misuse rate, all reasons, of less than 1 in 1,000.

In sum, people with carry licenses are *much more law-abiding* than the

---

[4] In 2014, 21,874 new permits were issued. Of the approximately 175,000 issued in total, 195 were revoked following an arrest in 2014. Annual data are available on the website of County Sheriffs of Colorado, at http://csoc.org/ccw_application.asp

[5] FBI, CRIME IN THE UNITED STATES 2013, table 69, http://www.fbi.gov/about-us/cjis/ucr/crimein-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-69/table_69_arrest_by_state_2013.xls

[6] The full data and details for Minnesota, Michigan, Ohio, and Louisiana are presented in David B. Kopel, *Pretend "Gun-Free" School Zones*, 42 CONN. L. REV. 515, 564-69 (2009).

general population.

Although New York State does not publish similar statistics, an analysis of three years of homicide data by the New York Times revealed a compelling fact. According to the NYPD's Deputy Commissioner for Strategic Initiatives, Michael J. Farrell, more than 90 percent of the killers had criminal records; and of those who wound up killed, more than half had them. Jo Craven McGinty, *New York Times*, "New York Killers, and Those Killed, by Numbers" (April 28, 2006).[7] For 2012, the most recent year for which similar data is reported on the NYPD website, 87% of murder suspects "had at least one prior arrest," "38% of suspects had prior arrests for drug sales or possession," and "[o]ver one-quarter of suspects were on probation, parole, or had a warrant for their arrest at the time of their murder incident." City of New York Police Department, *Murder in New York 2012* (2012). People with criminal records cannot obtain a handgun premises license, or any kind of firearms license.[8]

---

[7] More recent data from another metropolitan area confirms this pattern. The most recent annual report for Milwaukee homicides states that in 2013, "92% of the homicide suspects had prior arrest histories," and noted that "this is consistent with data from years past." Milwaukee Homicide Review Commission, *2013 Data Report, Homicide and Non-Fatal Shootings* 36 (2014). Moreover, 76% of the homicide *victims* had prior arrest histories. *Id.* Most unlawful homicides, at least in urban areas, involve criminals killing each other.

[8] An arrest record, as opposed to record of conviction, is enough to deny a handgun

Evidence provided by the District of Columbia in a currently pending case shows the extreme infrequency in which the owners of registered firearms use their guns in violent crime in that urban jurisdiction.  The District of Columbia has a registration requirement for all firearms.  Data confirmed in sworn testimony by the District's Police Chief showed that from 2007 through early 2013, the District of Columbia police department recovered *more than 12,000 unregistered firearms*. *Heller v. District of Columbia*, No. 14-7071 (D.C. Circuit, pending), Doc. No. 1510367 at 52, 570, 572.  During a roughly similar time period, the police

---

premises license in New York City.  On the NYPD's website, in the "Frequently Asked Questions" section, the following question and answer appear:

> Do I have to disclose my arrest history if the charges against me were dismissed and sealed?

> Yes, New York State Criminal Procedure Law §160.50(1)(d)(iii) grants the License Division authority to obtain the sealed criminal records of any person who has applied for a license to possess guns. License Division rules require all applicants to disclose their arrest history and submit a Certificate of Disposition showing the offense and disposition of the charges, along with a notarized statement describing the circumstances surrounding each arrest. This information must be provided even if the case was dismissed, the record sealed or the case nullified by operation of law. Failure or refusal to disclose this information will result in the disapproval of your application for a license or permit.

http://www.nyc.gov/html/nypd/html/firearms_licensing/gun_licensing_faq.shtml#ArrestHistory

recovered *only 37 registered firearms* owned by private individuals and associated with crime scenes. *Id.* at 443, 572.[9]

The District of Columbia, like New York City, has some of the most stringent firearms registration/licensing requirements in the country. When the District was in the process of devising (pursuant to court order) a new set of laws allowing issuance of concealed carry permits, the District's Chief of Police properly recognized that "Law-abiding citizens that register firearms, that follow the rules, are not our worry."[10]

Law enforcement officers know that most murders and violent crimes are committed by a relatively small group of repeat offenders. Those people are not eligible to obtain a license in New York, and virtually none would do so if they could. People who do not have criminal records and who voluntarily undergo extensive inquiries into their personal lives to obtain a premises license are, like carry permit holders elsewhere, extraordinarily unlikely to commit violent crimes

---

[9] The undisputed evidence in that case showed that only two of these 37 resulted in convictions of the registered owner of an actual crime of violence apparently involving a firearm, and only seven others resulted in any kind of conviction or sentence of probation against the registered owner. *Id.*, Doc. No. 1510366 at 6.

[10] Mike DeBonis, "Security, not street crime, at risk after gun ruling, D.C. Police Chief Cathy Lanier says," *Washington Post* (July 30, 2014) available at http://www.washingtonpost.com/local/dc-politics/security-not-street-crime-at-risk-after-gun-ruling-dc-police-chief-cathy-lanier-says/2014/07/30/f8b17e1c-1808-11e4-9e3b-7f2f110c6265_story.html

affecting public safety.  As shown below, the City produced no evidence at all that any violent firearms crimes are committed by premises licensees outside their homes, or that the transportation restrictions on premises licensees in § 5-23 would reduce this supposed but completely unproven harm.

## II.    NO EVIDENCE WAS PRODUCED BY THE CITY THAT ANY INTEREST IN PUBLIC SAFETY IS ADVANCED BY SECTION 5-23.

Under intermediate scrutiny, the government must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994) ("*Turner I*").

The trial court's opinion and defendants' brief below repeatedly cite "public safety" as justifying § 5-23 under intermediate scrutiny review.[11]  But merely citing an important public interest says nothing about whether the regulation actually achieves or advances that interest.  "That the [government's] asserted interests are substantial in the abstract . . . does not end our inquiry. To satisfy narrow tailoring, the [government] must prove the challenged regulations directly advance its asserted interests." *Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014),

---

[11] Regardless of the constitutional standard of review to be applied, § 5-23 cannot withstand any level of heightened scrutiny, including intermediate scrutiny.

citing *United States v. Alvarez*, 132 S.Ct. 2537, 2549 (2012) ("There must be a direct causal link between the restriction imposed and the injury to be prevented.").

In *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 195 (1997) ("*Turner II*"), the Court first considered, after an evidentiary remand, whether the "provisions were designed to address a real harm, and whether those provisions will alleviate it in a material way." The second portion of the inquiry "concerns the fit between the asserted interests and the means chosen to advance them." *Id*. at 213. A restriction must promote "a substantial governmental interest that would be achieved less effectively absent the regulation," and must not "burden substantially more [activity] than is necessary to further" that interest. *Id*. at 213-14.

Section 5-23 fails these tests, because the City has not shown any actual harm to public safety resulting from transport of their firearms by licensees outside the city and state, has not shown by any evidence that § 5-23 would reduce the purely suppositional harm to public safety, and has not demonstrated that prohibiting all such transport outside the city and state does not burden substantially more activity than necessary.

Defendants submitted only one piece of evidence to support their Cross-Motion for Summary Judgment. It was the Declaration of Andrew Lunetta ("Lunetta Declaration"), Commanding Officer of the New York City police

department's license division.  JA 67.

Inspector Lunetta begins by stating that he will explain "how the specific restriction [in § 5-23] is necessary to address the public safety concerns that inherently arise when a handgun is removed from a premise and taken onto public streets."  JA 67-68.  However, those "concerns" turn out to be purely speculative, and not grounded in any evidence that premises license holders do, or are likely to, commit violent crimes with their handguns when transporting them, locked and unloaded, out of state or to other parts of New York State.

Inspector Lunetta's experience tells him that:

> license holders in a public setting are just as susceptible as anyone else to stressful situations, including ones where it would be better to not have the presence of a firearm included. These include, driving situations that sometimes lead to or have the potential to lead to road rage incidents, the stress and injury of traffic accidents, crowd situations, demonstrations, family disputes, all other types of disputes between individuals, being a victim of a crime or harassment, and any other stress-inducing circumstance outside of the home.  Premise license holders have not demonstrated proper cause to carry a concealed handgun in public. Clearly, there is less public danger if Premises Residence license holders do not bring their firearms into the public domain.

JA 68.

But Inspector Lunetta does not say why a license holder is more likely to engage in "road rage" when transporting his locked and unloaded handgun to a

shooting competition out of the City than when going to an authorized range within the City, and provides no evidence regarding *any* such instances by premises licensees. And what is one to make of the observation that licensees may be subject to "the stress and injury of traffic accidents?" Persons injured in traffic accidents don't generally unpack their locked guns and start shooting. As for "crowd situations" and "demonstrations," what is that supposed to mean? That a licensed individual who has undergone extensive criminal and mental health background checks will unlock and load the firearm she is transporting to her second home upstate and start shooting if she sees a crowd or demonstration?

"Family disputes?" Common experience tells us that violence among family members takes place overwhelmingly within the home, not in vehicles while traveling to a legitimate sporting activity or event. "All other disputes between individuals?" Again, those are not likely to take place while traveling in a vehicle to a place outside the City, isolated and away from individuals back home. "Being a victim of crime or harassment" is similarly insupportable as a reason. People traveling toward a destination outside the City are not usually victims of crime while on the way. Individuals purposefully traveling to a destination outside the City are also generally not "victims of harassment," having little interaction with those outside their vehicles, and able to simply drive on if they did.

These statements do not even pass the common sense test.[12]  But more importantly, they are all pure speculation without any grounding in fact or evidence. If anyone should know all of the specific incidents of murder, rape, armed assault, and armed robbery committed by premises licensees outside the home it would be the NYC License Division, which Inspector Lunetta heads.  But his Declaration does not cite a single instance of violent crime committed by premises licensees with a handgun at all, much less one committed by a licensee while transporting his handgun outside the premises.[13]

The closest thing to a factual assertion to attempt to justify § 5-23 as promoting public safety is Inspector Lunetta's assertion that:

Since the elimination of the Target license in 2001, investigations have

---

[12] Thousands upon thousands of competitive shooting events, from weekly club competitions to state, regional, or national events, are held across the 50 states every year, not to mention countless training sessions.  Such events are held elsewhere in New York State.  If outbreaks of violence by persons going to and from competitions and training events have occurred, as the Lunetta Declaration imagines, they are a well-kept secret.  Certainly, they are not mentioned in that Declaration.

[13] Inspector Lunetta's statement that "Premise license holders have not demonstrated proper cause to carry a concealed handgun in public" misses the point.  First, people do not receive premises licenses because they are less law-abiding and trustworthy than those who receive carry licenses.  Typically, they simply cannot satisfy the requirement to show "proper cause" to carry; that is, a special need to carry a handgun outside the home.  Second, this case is not about the ability to carry a loaded handgun concealed, but rather about the ability to transport openly an unloaded handgun in a locked container.

revealed a large volume and pattern of premises license holders who are found in possession of their handguns in violation of the restrictions on their license. Given the volume and nature of these incidents, it is reasonable to conclude that many additional instances of carrying firearms by licensees with restricted licenses in violation of the restrictions do not come to the attention of the License Division.

JA 72. There are two problems with this statement.

First, what investigations? The Declaration does not say. What constitutes a "large volume and pattern" over the past 14 years? Surely the License Division keeps records of what it does and finds. The Lunetta Declaration could have provided some actual statistics to show the number and nature of these purported violations.

Second, and more importantly, even if there was a "large volume and pattern" of licensees who are "found in possession" of a registered handgun outside the premises, that does not mean that public safety has been harmed. The Lunetta Declaration provides not one shred of evidence that these licensees were committing violent crimes that harmed or endangered the public. No evidence has been provided regarding whether these handguns were merely being transported in a locked and unloaded condition to some unauthorized place, whether they were loaded or uncased, or whether they were used in actual crimes of violence.

The rationale is entirely circular. The City attempts to justify the regulation

by noting that people sometimes violate it. But there is no evidence whatsoever that violation of the regulation has caused *actual* harm or injury to public safety. Transportation of a locked, unloaded handgun to anyplace other than two restricted locations is not *malum in se*; it is merely (and only in New York City, not elsewhere in the state or country) *malum prohibitum*.

The Lunetta Declaration's reliance on cases concerning the long-defunct "target license" adds nothing to this case. In the five reported decisions cited at JA 77-78,[14] none of the individuals was involved in any criminal activity or charged with any crimes, violent or otherwise.[15] Public safety was not harmed. Furthermore, as the cases make clear, the places and conditions under which one could carry or transport a firearm were confusing under the old "target license," which was eliminated in 2001. As the Lunetta Declaration admits, "Courts

---

[14] *Matter of Lugo v. Safir*, 272 A.D.2d 216 (1st Dep't 2000); *People v. Thompson*, 92 N.Y.2d 957 (1998); *People v. Lap*, 150 Misc.2d 724 (N.Y. Crim. Ct., N.Y. County 1991); *People v Schumann*, 133 Misc.2d 499 (N.Y. Crim. Ct., Bronx County 1986); *People v. Ocasio*, 108 Misc.2d 211 (2d Dep't 1981).

[15] The Lunetta Declaration contends that "Although the Courts found that the defendants were engaged in activity in violation of the terms and conditions of their licenses, the Courts concluded that it was unclear if the defendants could be charged with criminal possession of a weapon without a license." That is not true. The courts were unanimous and very clear that the defendant in each of the five cases cited could not be charged with a crime. "The Police Commissioner cannot make new crimes." *Lap,* 150 Misc. 2d at 727. JA 111.

24

struggled to precisely define the restrictions associated with the target licenses." JA 78. Interestingly, the City does not cite any cases involving premises licensees after that time. The five cited cases are from 2000, 1998, 1991, 1986, and 1981. *Supra*, n. 14.

There is a complete absence of evidence showing that transportation of handguns by licensees into other parts of the state or into other states has any negative effect on public safety. As noted, the City has not provided an iota of evidence of any violent crimes committed by premises licensees while transporting firearms. Nor has the City provided evidence of any other kinds of public safety issues associated with such transportation. An accidental discharge resulting in injury is literally impossible when the gun is unloaded and in a locked container with the ammunition carried separately. If a licensee plans to commit suicide with a handgun, he or she certainly would not do so while in the process of transporting the firearm under lock and key and unloaded. The City has shown no harm resulting from transport of locked, unloaded firearms out of or within the City by licensees, and the City has not sustained its burden to demonstrate that § 5-23 advances any interest in public safety.[16]

---

[16] As the law enforcement community recognizes, proficiency and safe gun handling are perishable skills which require periodic practice and training to

## III. SECTION 5-23 PROSCRIBES CONDUCT THAT IS EXPRESSLY PROTECTED BY FEDERAL LAW FOR EVERY U.S. CITIZEN WHO IS NOT DISQUALIFIED FROM POSSESSING A FIREARM.

In Count II of their Amended Complaint, plaintiffs affirmatively pled that § 5-23 deprives them of their fundamental right to travel with their firearms to other locations within the state of New York and to other states. In addition, they pled that § 5-23 violates their statutory right to transport an unloaded firearm in the manner specifically protected by 18 U.S.C. § 926A. JA 19-21. Section 926A, enacted by Congress in 1986, provides:

> Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: Provided, That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console.

Section 5-23 purports to prohibit any premises residence licensee from transporting a handgun lawfully possessed by him at his residence to any location

---

maintain. To the extent that § 5-23 discourages practice and training at ranges, competitions, and training events outside New York City, it has a negative effect on safety.

outside New York State. That prohibition is plainly invalid under § 926A and the Supremacy Clause. U.S. Const. art. VI, cl. 2. The Supremacy Clause provides, in relevant part:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

Five requirements must be met for § 926A to apply.

First, the individual must be a "person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm." Persons who are prohibited from transporting, shipping, or receiving a firearm under 18 U.S.C. Ch. 44 are listed in 18 U.S.C. §§ 922(g) and (n). They include convicted felons, fugitives from justice, unlawful users of controlled substances, the mentally ill, certain aliens, persons who have been dishonorably discharged from the U.S. armed forces or have renounced their U.S. citizenship, persons under certain kinds of restraining orders, persons who have committed certain misdemeanor crimes of domestic violence, and persons under felony indictments. Plaintiffs are not prohibited under these provisions, or they would be disqualified from receiving and maintaining a premises license under Penal Law § 400.00(1).

Second, the transport must be for a "lawful purpose." Plaintiffs have alleged

that they wish to transport their handguns to other states for lawful purposes such as shooting competitions. JA 13-14; *see also* JA 26.

Third, the transport must be "from any place where [the individual] may lawfully possess and carry such firearm." Plaintiffs are all premises licensees who may lawfully possess and carry their firearms at their premises.

Fourth, the transport must be to some "other place where [the individual] may lawfully possess and carry such firearm." Plaintiffs have alleged that they formerly traveled to New Jersey for shooting competitions (JA 10-11), and desire to attend (but have refrained from doing so) shooting competitions in New Jersey and Connecticut. JA 13-14.[17]

Fifth, certain storage requirements during transportation must be observed: the firearm is "unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle . . . ." These storage requirements are easily met.

Thus, § 926A entitles plaintiffs and other premises license holders to

---

[17] Possession of a handgun without a license or permit is not a crime in most states. Most states allow carrying a handgun either under a "shall issue" concealed carry permit regime, and many allow open carrying without any kind of permit or license. *See* summaries of individual state laws at https://www.nraila.org/gun-laws/state-gun-laws/

transport their handguns out of New York City and into other states where their possession and use is lawful, "[n]otwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof . . . ." Because § 926A affirmatively entitles plaintiffs to transport their firearms to other states for lawful purposes, § 5-23 prohibits them from doing so, and § 926A must prevail under its own terms and the Supremacy Clause, plaintiffs' request for declaratory and injunctive relief should be granted.[18]

## CONCLUSION

The decision of the District Court should be reversed.

Respectfully submitted,

/s/ Dan M. Peterson
Dan M. Peterson
    Counsel of Record
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
dan@danpetersonlaw.com

---

[18] *Amici* are aware of *Torraco v. Port Auth. of New York & New Jersey,* 615 F.3d 129 (2d Cir. 2010). However, the issue decided in that case was whether § 926A could be enforced through an action for damages under 42 U.S.C. § 1983. Furthermore, it did not address whether a licensee could transport a firearm out of New York by automobile. Plaintiffs' request for injunctive and declaratory relief regarding their entitlement to legally transport their handguns out-of-state pursuant to § 926A, as opposed to being prohibited from doing so by § 5-23, may be granted in the case at bar pursuant to 28 U.S.C. §§ 2201 and 2202.

Stephen P. Halbrook
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
protell@aol.com

Counsel for *Amici Curiae*

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 6,806 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the foregoing brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in Microsoft Word.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

Date: June 23, 2015

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2015, an electronic PDF of the foregoing Brief of *Amici Curiae* Western States Sheriffs' Association *et al.* was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

<u>/s/ Dan M. Peterson</u>
Dan M. Peterson
