# No. 15-638

### UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

―――――――――――

THE NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC.,
ROMOLO COLANTONE, EFRAIN ALVAREZ, AND
JOSE ANTHONY IRIZARRY,

*Plaintiffs-Appellants*,

v.

THE CITY OF NEW YORK AND
THE NEW YORK CITY POLICE DEPARTMENT – LICENSE DIVISION,

*Defendants-Appellees.*

―――――――――――

On Appeal from the United States District Court
for the Southern District of New York, No. 1:13-cv-2115

―――――――――――

### REPLY BRIEF FOR APPELLANTS

―――――――――――

BRIAN T. STAPLETON
MATTHEW S. LERNER
GOLDBERG SEGALLA LLP
11 Martine Avenue
Suite 750
White Plains, NY 10606
(914) 798-5400
bstapleton@goldbergsegalla.com

PAUL D. CLEMENT
 *Counsel of Record*
D. ZACHARY HUDSON
ANDREW N. FERGUSON
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellants*

September 29, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ........................................................................................... 3

I.    The City's Handgun Transportation Ban Violates The Second Amendment............................................................................. 3

    A.    Section 5-23 Fails Strict Scrutiny or Any Similarly Rigorous Test. ............................................................................ 3

    B.    Section 5-23 Cannot Survive Intermediate Scrutiny, Properly Applied. ...........................................................................11

II.    Section 5-23 Violates The Commerce Clause. ........................... 19

III.    Section 5-23 Violates Plaintiffs' Fundamental Right To Travel. ................. 23

IV.    Section 5-23 Impermissibly Burdens Plaintiffs' First Amendment Rights. ...................................................................... 25

CONCLUSION ....................................................................................... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Abood v. Detroit Bd. of Educ.*,
   431 U.S. 209 (1977)...................................................................26

*Brown v. Entm't Merchs. Ass'n*,
   131 S. Ct. 2729 (2011).............................................................16

*C&A Carbone, Inc. v. Town of Clarkstown*,
   511 U.S. 383 (1994)................................................................22

*Chem. Waste Mgmt., Inc. v. Hunt*,
   504 U.S. 334 (1992)................................................................20

*City of Philadelphia v. New Jersey*,
   437 U.S. 617 (1978)................................................................20

*Clark v. Jeter*,
   486 U.S. 456 (1988)................................................................11

*Cleveland Bd. of Educ. v. LaFleur*,
   414 U.S. 632 (1974)................................................................19

*District of Columbia v. Heller*,
   554 U.S. 570 (2008).............................................................4, 6

*Elrod v. Burns*,
   427 U.S. 347 (1976)................................................................27

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ...............................................5, 12

*H. P. Hood & Sons, Inc. v. Du Mond*,
   336 U.S. 525 (1949)................................................................20

*Harman v. Forssenius*,
   380 U.S. 528 (1965)................................................................25

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ......................................12, 16

*Kachalsky v. Cty. of Westchester*,
701 F.3d 81 (2d Cir. 2012) ................................................................3, 8, 11, 12

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) ................................................................................6

*McCullen v. Coakley*,
134 S. Ct. 2518 (2014) ...........................................................................12

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) .................................................................14

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*,
511 U.S. 93 (1994) .................................................................................22

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) ...............................................................................21

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015) .............................................................................4

*Saenz v. Roe*,
526 U.S. 489 (1999) ...............................................................................24

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ...............................................................................12

*United States v. Decastro*,
682 F.3d 160 (2d Cir. 2012) .....................................................................8

*United States v. Playboy Entm't Grp.*,
529 U.S. 803 (2000) ........................................................................... 8, 13

*United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010) ...................................................................11

*United States v. Virginia*,
518 U.S. 515 (1996) ...............................................................................11

*W. Lynn Creamery, Inc. v. Healy*,
512 U.S. 186 (1994) ...............................................................................20

*Williams-Yulee v. Fla. Bar*,
    135 S. Ct. 1656 (2015) ...........................................................................16

**Statutes**

18 U.S.C. §926A .......................................................................................17

Act of May 8, 1792, 2 Cong. Ch. XXXIII, 1 Stat. 271 ............................ 7

N.Y. Penal Law §265.20(12) (McKinney 2014) .....................................17

N.Y. Penal Law §265.45 (McKinney 2013) ............................................10

N.Y.C. Admin. Code §10-312 ..................................................................10

**Rules**

38 R.C.N.Y. §3-14 ...................................................................................16

38 R.C.N.Y. §5-22(13) .............................................................................10

38 R.C.N.Y. §5-23 (current) ............................................................. 15, 17

38 R.C.N.Y. §5-23 (prior to July 30, 2001) ............................................15

## INTRODUCTION AND SUMMARY OF ARGUMENT

The City's response brief endorses a view of constitutional rights that only a state actor could embrace. The brief makes plain that, in the City's view, restrictions on fundamental constitutional rights like those imposed by section 5-23 should be subjected to no more than rational basis review. And even when a heightened standard of review is applicable, the City asserts that all it need do is offer a conclusory affidavit from a single City official to carry its burden. If the City's view of the law is endorsed, the constitutional rights of New Yorkers are just one conclusory affidavit away from severe restriction.

To the extent the City purports to limit its miserly view of constitutional rights to the Second Amendment, that would only repeat an error the Supreme Court has twice corrected. The Supreme Court has made clear that the right to keep and bear arms is fundamental and that there is no such thing as a hierarchy of fundamental constitutional rights—all such rights are entitled to the full ambit of protections provided under the Constitution. The City may wish that *Heller* and *McDonald* were never decided, but they were. The City must therefore provide evidence supporting its prohibition on Premises Residence license holders transporting their handguns to shooting ranges or second homes outside the City. The City's failure to do so amounts to a clear violation of the Second Amendment.

The City's circumscribed view of Plaintiffs' constitutional rights is not limited to the Second Amendment. A restriction on using an article of commerce beyond city and state boundaries would violate the Commerce Clause even if the article were not subject to independent constitutional protection. In addressing the fatal Commerce Clause problems with section 5-23, the City suggests that Plaintiffs can rent or borrow guns for use at outside-the-City firing ranges (an assertion entirely unsupported by the record). That argument is predicated on a fundamental misunderstanding of the Commerce Clause. The Commerce Clause does not permit facially discriminatory burdens on interstate commerce as long as the obstacles to the free flow of commerce are not insuperable. And the City cannot create a local monopoly over one economic activity—gun-range services for consumers who wish to use their own firearms—because City residents are nonetheless permitted to engage in another, different economic activity—renting handguns. Were it otherwise, a long line of Commerce Clause precedent would have come out the other way. The City could not force its residents to patronize New York City movie theaters to the exclusion of all others so long as it stopped short of forbidding movie rentals outside the City.

The City's responses to Plaintiffs' right to travel and First Amendment arguments fare no better. Nothing the City says changes the fact that section 5-23 puts Plaintiffs to the unconstitutional choice of exercising either their right to travel

or their right to keep and bear arms.  And by limiting Plaintiffs to gun clubs only within the City, Plaintiffs' First Amendment rights are doubly infringed—Plaintiffs are precluded from associating with their preferred gun clubs and, if they want to exercise their Second Amendment right to maintain proficiency in the use of their firearms, forced to associate with City-sanctioned members-only clubs.

## ARGUMENT

**I.    The City's Handgun Transportation Ban Violates The Second Amendment.**

### A.    Section 5-23 Fails Strict Scrutiny or Any Similarly Rigorous Test.

As explained in Plaintiffs' opening brief, section 5-23's restrictions on the fundamental right to keep and bear arms should be subjected to the highest level of scrutiny contemplated by this Court's case law.  Opening Br.16-23.  The City's handgun transportation ban prevents City residents like Plaintiff Colantone from transporting their lawfully owned and licensed handguns to homes outside the City for the core purpose of defense of hearth and home.  *See Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012).  It also severely inhibits the ability of City residents to maintain proficiency in the use of their lawfully owned and licensed handguns—proficiency that is critical to the safe and effective exercise of the right to keep and bear arms.  These severe restrictions are a substantial burden on core Second Amendment rights.   The City has never asserted that its handgun transportation ban can survive strict scrutiny or any other similarly rigorous test.  As

a result, if this Court concludes that strict scrutiny (or something like it) applies, it must reverse the district court's judgment.

Rather than attempt to explain how section 5-23 is narrowly tailored to achieve a compelling state interest by the least restrictive means available, *see Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2231 (2015), the City argues that Plaintiffs' efforts to use their handguns at "target practice and competitive shooting events outside the City or to bring them to out-of-City second homes[] fall outside the scope of the Second Amendment" such that no scrutiny is required, City Br.18.  In other words, the City believes that the restrictions at issue are subject to only rational basis review.  That argument is irreconcilable with controlling precedents of this Court and the U.S. Supreme Court.  *See District of Columbia v. Heller*, 554 U.S. 570, 628 n.27 (2008) ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

The City's view rests on the misconception that the only right at the core of the Second Amendment is the right to keep a gun inside the home for self-defense and that even laws, like section 5-23, that burden that right without foreclosing it entirely do not trigger heightened scrutiny.  In short, in the City's view, the only thing the Second Amendment prohibits is a flat ban on keeping a firearm in the home for self-defense.  City Br.18-20.  Because section 5-23 permits possession of a handgun

in at least one home for self-defense, the City contends, the Second Amendment is not seriously implicated. The City is wrong. Its argument depends on an unsupportable view of the right protected by the Second Amendment and an equally unsupportable view of what constitutes a burden. The core of the right is not merely keeping a handgun in the nightstand drawer. It necessarily includes also the freedom to maintain proficiency in the use of that handgun by practicing at firing ranges and shooting competitions. Laws that make it more difficult to have a firearm in the home for self-defense—whether by hamstringing the ability of citizens to hone the skills necessary for the firearm's safe use or by blocking a citizen from using a single handgun at two residences—surely burden that right.

The City concedes, as it must, that the Seventh Circuit has recognized that "the right to possess firearms for protection implies a corresponding right to … maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *see* City Br.21-22. The Seventh Circuit's view of the core right is a matter of common sense. The right to free speech would mean nothing if the state banned learning the language by which one exercises the right to speak freely, and the right to free press would mean nothing if the City could prevent its residents from learning how to write. Without the freedom to become proficient in their use, the right to bear arms is meaningless.

Beyond inviting the creation a circuit split by noting that this Court has not yet recognized the same core Second Amendment right identified in *Ezell*, the City argues that *Ezell* is distinguishable because while Chicago banned all ranges within city limits, the City bans its citizens from using their firearms in ranges outside of the city limits. City Br.21-22. To be sure, that is a factual difference between *Ezell* and this case, but the distinction makes no difference for the threshold question whether the Second Amendment is implicated and hardly means that the Second Amendment is not violated here. *Ezell* unequivocally recognized that the core Second Amendment right includes the right to become proficient in the use of firearms. And the Seventh Circuit is not alone—the Seventh Circuit's conclusion follows directly from the Supreme Court's decision in *Heller*, which explains that "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; … it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." *Heller*, 554 U.S. at 617-18 (quotation marks omitted); *see also* NRA Amicus Br.7. The right to bear arms includes the concomitant right to maintain proficiency in the use of arms no less than the right to free speech includes the concomitant right to receive speech. *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972).

It is no answer to the concerns addressed in *Ezell* and *Heller* to say that Plaintiffs are free to travel to out-of-City ranges and hone their skills with rented or borrowed guns. *See* City Br.22-23. As an initial matter, there is no evidence in the record of any kind supporting the City's newly-minted "rental" theory, such as where, when, and under what circumstances such rental is permissible.

The right to keep and bear arms applies to arms owned by the citizen. That right cannot be abrogated because another, different weapon might be obtainable on a limited basis elsewhere. The Founders undoubtedly did not believe that their right to keep and bear arms would be secure in a regime where the government permitted them one weapon to protect their homes, while forcing them to train with another for fulfilling that purpose. Certainly, both the Second Amendment and the Militia Act of 1792, Act of May 8, 1792, 2 Cong. Ch. XXXIII, 1 Stat. 271, envisioned the able-bodied citizenry assembling, training, and drilling with their own weapons. Moreover, if one of the Plaintiffs—or any other City resident for that matter—is ever in a position where he or she has to use a handgun to defend their home, the fact that he or she may have been able to practice with a different gun will be of little comfort.[1]

---

[1] The City even contends that actual firearms training is unnecessary because classroom training and "simulators" are available. City Br.22 n.7. Setting aside that there is nothing whatsoever in the record or the district court's opinion on this topic, this argument demonstrates just how circumscribed the City views Plaintiffs' Second

Not content to try to limit the core of the Second Amendment to the right to possess a firearm in the home, the City goes even further by suggesting that only a complete ban on in-home handgun possession burdens the right because both *Heller* and *McDonald* addressed only complete bans. City Br.18, 21 n.6; *see also* JA194. Like many of the City's other arguments, that contention ignores controlling precedent. This Court has made absolutely clear that the Second Amendment proscribes regulations that *burden* core Second Amendment rights, not just complete bans. *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012); *see also Kachalsky*, 701 F.3d at 93. The government does not have a free hand to regulate constitutionally protected conduct however it sees fit so long as it stops short of adopting a categorical ban. *See United States v. Playboy Entm't Grp.*, 529 U.S. 803, 812 (2000) ("The distinction between laws burdening and laws banning [constitutionally protected activity] is but a matter of degree."). Where, as here, a regulation burdens the exercise of fundamental constitutional rights, even if it does not ban the constitutionally protected activity, it must be subject to the highest level of scrutiny provided for by law.

While the City is manifestly incorrect about the scope of core Second Amendment rights, even under its narrow view of those rights, section 5-23 burdens

---

Amendment rights: live firearms training is unnecessary because the Plaintiffs may pretend to use firearms.

the right to keep and bear arms by restricting Plaintiffs' ability to train so that they can effectively use their handguns for self-defense in the home and precluding them from transporting lawfully-owned and licensed handguns between residences. For example, section 5-23 forbids Plaintiff Colantone from transporting his handgun to his second home solely for the purpose of defending that home, which is to say that section 5-23 burdens the exercise of the right that even the City recognizes as being at the core of the Second Amendment.

The City's efforts to resist this straightforward conclusion are unavailing. First, the City attempts to distract this Court from the fatal problems with section 5-23 by pointing out that Delaware County—the county where Plaintiff Colantone's second home is located—has an interest in requiring Delaware County-specific licenses for handguns in Delaware County homes. City Br.25-26. That argument is a red herring. Delaware County may have an interest in licensing Colantone's possession in his Delaware County home, but it has no interest in ensuring that the firearm possessed there is different from the one lawfully possessed in his New York City residence. To the contrary, if anything, Delaware County would seem to have an interest in ensuring that there is not a handgun in Colantone's Delaware County residence when he is in the City. But section 5-23 appears to demand that counterintuitive result.

Second, the City asserts that the burdens on Plaintiff Colantone's Second Amendment rights are "insubstantial" because he can purchase a separate gun for use in his Delaware County home. According to the City, "the one-time cost of purchasing a handgun is a cost that any person seeking to exercise Second Amendment rights within a residence must be prepared to bear." City Br.25-26. But the City is not asking Colantone to bear "the one-time cost of purchasing a handgun." The City is demanding that he bear an unnecessary and substantial two-time cost before he can exercise his Second Amendment right in Delaware County. If the City forced an early newspaper to purchase a distinct printing press for each publication, or forbade two pastors of different flocks from sharing a church building, it would plainly burden (and transgress) the First Amendment. The result should be no different here.

The City acknowledges that the one-handgun-per-residence rule it endorses raises serious safety concerns by ensuring that Plaintiff Colantone has a gun wherever he is *not* present. *See* City Br.31-33. This is more than a mere policy problem. Ameliorating the concern just adds to the burden of Second Amendment rights. In addition to purchasing multiple handguns, Plaintiff Colantone must also purchase multiple safety locking mechanisms in order to avoid criminal punishment. *See* City Br.31-32 (citing and discussing N.Y.C. Admin. Code §10-312, 38 R.C.N.Y. §5-22(13), and N.Y. Penal Law §265.45 (McKinney 2013)). Moreover, the City's

arguments on this score undermine its stated interest in public safety. There is no plausible argument that public safety is furthered by prohibiting law-abiding citizens like Plaintiff Colantone from transporting their lawfully owned and licensed handguns between residences. Doing so only makes it more difficult for Plaintiff Colantone to exercise his core Second Amendment rights and more likely that an intruder will acquire a handgun when burgling Plaintiff Colantone's home—either in Delaware County or the City—when it is vacant.

## B. Section 5-23 Cannot Survive Intermediate Scrutiny, Properly Applied.

When the City begrudgingly moves beyond insisting only rational basis review applies here to addressing heightened scrutiny, it merely repeats the district court's errors (which underscores that the district court's opinion was largely a cut-and-paste of the City's summary judgment briefing, *see* Opening Br.10, 41). To survive intermediate scrutiny the City was required to provide actual evidence, and at this stage evidence beyond material dispute, that section 5-23 is "substantially related to the achievement of an important governmental interest." *Kachalsky*, 701 F.3d at 96; *see also Clark v. Jeter*, 486 U.S. 456, 461 (1988); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc). The City came nowhere close to doing so. It offered only the conclusory affidavit of a single law enforcement officer to carry its "demanding" burden. *United States v. Virginia*, 518 U.S. 515, 533 (1996). The district court deemed that lone affidavit sufficient to carry the government's

burden only by applying rational basis scrutiny in all but name. *See* Opening Br.25-31.

Critically, the City was required to establish a "close fit between [its] ends and means," *McCullen v. Coakley*, 134 S. Ct. 2518, 2534-35 (2014), by producing "meaningful evidence, not mere assertions … show[ing] a substantial relationship between" section 5-23 and its purported interest, *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1259 (D.C. Cir. 2011), that is, "that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion).

The City concedes that the only proffered evidence of the requisite "close fit" between section 5-23 and the City's asserted public safety interest is the declaration of Andrew Lunetta, a police officer formerly in charge of the NYPD License Division ("Lunetta Declaration"). City Br.28. As Plaintiffs have explained, *see* Opening Br.26-31, that single declaration is incapable of carrying the City's demanding burden. The declaration provides no data, references no studies, and cites to no experts supporting its broad and self-serving conclusions. *See Ezell*, 651 F.3d at 708-09; *Heller II*, 670 F.3d at 1258-59; *Kachalsky*, 701 F.3d at 99. Instead, like the evidence rejected in *Heller II*, it contains only the "cursory rationales" of a police officer—indeed, the former head of a defendant in this litigation. *Heller II*,

670 F.3d at 1259. The City's failure to provide nothing other than "anecdote and supposition" to establish a substantial relationship between section 5-23 and the City's interest in public safety requires reversal. *Playboy*, 529 U.S. at 822.

But the Lunetta Declaration not only stands alone; it is plainly insufficient. The City's reasoning boils down to the following assertion: "It is well established that the possession of firearms in public presents a greater public danger than the possession of firearms inside one's home" and therefore "[t]he City has ample basis to limit the ability of persons who have not applied for and obtained carry licenses to possess handguns in public on the streets of the nation's most densely populated city." City Br.28.

The City has a problem. There is nothing in the record supporting its factual premise or its conclusion. Recognizing as much, the City cites to *Kachalsky*, not the record, to support this proposition. But even if a case citation could serve as a substitute for record evidence, *Kachalsky* is silent on the critical premise underlying the City's argument—*viz.*, that allowing individuals who lawfully possess handguns to travel with those guns unloaded and stored separately from ammunition to second homes and firing ranges outside the City is more dangerous than possessing loaded firearms in the home or in all events will endanger public safety. And, as amicus National Rifle Association persuasively shows, the City's reasoning is doubtful as an empirical matter. NRA Amicus Br.19. Indeed, the Seventh Circuit recently

rejected this argument as sufficient to justify an intrusion onto Second Amendment protected activity. *See Moore v. Madigan*, 702 F.3d 933, 949-50 (7th Cir. 2012). This empirical claim therefore cannot serve to support section 5-23 because there is no evidence to support it in this case.

Taking a different tack, the City contends that its "experience with the now-eliminated target license, and the abuse by target licensees who were travelling with their firearms when not on their way to or from an authorized range, strongly demonstrates that the rule serves important public interests." City Br.30-31. It argues that, prior to 2001, sections 5-01 and 5-23 provided for a "target license" which "allowed the holder to travel with his or her firearm, unloaded and in a locked container, to authorized shooting ranges and competitions, not limited to those located within New York City." *Id.* at 10. Citing the Lunetta Declaration, the City contends that "[o]ver many years, [it] received reports of target licensees travelling with their firearms when it was apparent they were not travelling to or from an NYPD authorized range." *Id.* The City thus eliminated the target license in order "to reduce the number of firearms carried in public" and "to enhance NYPD's ability to verify a licensee's statement that he is transporting his gun to or from an authorized range." *Id.* at 11.

The City's reliance on "experience" with its now-extinct target license is misplaced. Importantly, there does not appear to be any substantive difference

between the target license and the current premises license in terms of how it operates with respect to where licensees can take their lawfully owned handguns. The target license authorized the licensee to "only remove the handgun(s) from [the licensee's] residence to transport them directly to and from an authorized range." 38 R.C.N.Y. §5-23(b)(5) (prior to July 30, 2001). The rules did not define what constituted an "authorized range," but listed as the only example "a pistol range which is duly certified by the New York City Police Commissioner pursuant to the New York City Administrative Code." *Id.* §5-23(b)(1) (prior to July 30, 2001). The current Premises Residence license provides nearly identically that "the licensee may transport her/his handgun(s) directly to and from an authorized small arms range/shooting club." *Id.* §5-23(a)(3) (current). Accordingly, the restrictions on the now-defunct target license appear identical to the restrictions on the current Premises Residence license. Now, as before, only ranges certified by New York Police Commissioner are authorized destinations. That means that whatever problems the City might have observed regarding the target license are in no way associated with transportation to places outside the City.[2]

---

[2] Indeed, if there is any difference between the two, it is that the target license required the applicant to "provide evidence of intention to use licensed handguns for regular recreational target shooting purposes, which indicates where and when the handgun(s) will be used." *Id.* §5-23(b)(1) (prior to July 30, 2001). This requirement was *more* restrictive than anything required by the current Premises Residence license.

In all events, the City provides no data on the level of alleged violations of the target license. It cites only "reports" of possible violations, and the Lunetta Declaration provides as examples a handful of state-court cases discussing the rule. *See* JA78. It provides no evidence showing that, after more than fourteen years, its purported narrowing of the locations to which City residents can lawfully transport their handguns has reduced the number of license infractions. That lack of evidence is particularly damning because the City has unique access to any evidence that exists. If the "reports" took the form of citations, formal warnings, license revocations or the like, surely the City has records to prove them. And if the "reports" were nothing more than rumors and hearsay, then they are plainly insufficient to justify section 5-23's curtailment of constitutional rights. *See Heller II*, 670 F.3d at 1258-59.

The City's response brief highlights yet another problem with section 5-23: It is under-inclusive in a way that "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring" protected constitutional activity, *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2740 (2011), or that suggests that the regulation simply is not actually advancing the interest the government claims it is, *see Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1668 (2015). As the City points out, section 5-23's prohibition applies only to handguns, not rifles or shotguns. City Br.5 n.1 (discussing 38 R.C.N.Y. §3-14). The City provides no

explanation for why the presence of locked, unloaded handguns in public is more dangerous than locked, unloaded long guns. Relatedly, the City authorizes licensees to transport their firearms out of the City to engage in hunting. *See* 38 R.C.N.Y. §5-23(a)(4) (current). Although the City contends that it is easier to verify whether a licensee stopped by a police officer is going on an authorized hunting trip rather than to an authorized shooting range, it provides no reason to believe that the hunting authorization will not be abused more frequently than would a similar authorization for out-of-City shooting ranges.

More problematically, the City cites to New York state law permitting certain non-New York residents to transport their handguns through the City on their way to a shooting competition. City Br.23 (citing and discussing N.Y. Penal Law §265.20(12) (McKinney 2014)).[3] The City provides no explanation for why it is more dangerous to permit persons licensed by the City to undertake this same conduct while permitting non-New York residents—as to whom New York officials know almost nothing—to do the same thing. It instead rather glibly suggests that Plaintiffs should lobby the legislature for the same privilege. *Id.*

Section 5-23 also authorizes conduct far more dangerous than it prohibits. As Plaintiffs pointed out in their opening brief, section 5-23 would prohibit Plaintiff

---

[3] Federal law provides even further transportation rights to non-New York residents. *See* 18 U.S.C. §926A.

Colantone from travelling with his unloaded handgun from his home in Staten Island across the Raritan Bay to a shooting club in Old Bridge, New Jersey, but would permit him to drive with his handgun from Staten Island all the way to the authorized range Olinville Arms in the Bronx. City Br.32. Driving the handgun lawfully to the Bronx would leave his handgun on the streets of New York for far longer, and in the presence of millions more New Yorkers, than would a trip across the Bay to New Jersey. The City's argument, then, that section 5-23 serves the City's purported interest in public safety is simply implausible.

Although the City disclaims it, *see* City Br.30, its constitutional defense of section 5-23 necessarily reduces to administrative convenience. By limiting the number of places where a licensee may go with his or her firearm, the reasoning goes, the police may more easily double-check a licensee's explanation for why he is travelling outside of his or her premises with a firearm. *Id.* This argument makes little sense. It is unlikely that a police officer could more easily determine whether a Staten Island resident is honestly travelling through the entire City to a Bronx shooting club than whether that same resident is travelling to a nearby shooting club in Old Bridge, New Jersey (if such trips were permitted).

Nor is there any indication in the record, nor has the City argued, that less-restrictive alternatives are unavailable. Police officers every day are tasked with ensuring whether countless suspects' asserted justifications for skirting the law are

valid. Whatever additional inquiry may be required to assess a licensee's credibility, it cannot justify section 5-23's trampling of Plaintiffs' Second Amendment rights. That the protection of constitutional rights may make law enforcement's job more difficult is no reason to abrogate them. Nor has the City explained why, instead of intruding upon the Second Amendment rights of law-abiding licensees, it could not have expended greater resources in enforcing the licensing laws to ensure compliance while also permitting licensees to lawfully engage in target shooting outside of the City.

At bottom, it does not matter whether section 5-23's prohibition on travelling to out-of-City firing ranges or second homes makes things easier for City police officers. "[A]dministrative convenience alone is insufficient to make valid what otherwise is a violation" of the Constitution. *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 647 (1974). Because the City has provided no evidence demonstrating that section 5-23 is substantially related to the preservation of public safety, it cannot survive intermediate scrutiny.

## II.     Section 5-23 Violates The Commerce Clause.

Section 5-23's incompatibility with the Commerce Clause is equally stark. The handgun transportation ban prohibits City residents from engaging in the interstate commercial activity of traveling with their handguns to patronize firing ranges beyond the borders of New York City in direct conflict with controlling

Commerce Clause case law. *See* Opening Br.39-46. And it restricts an article of commerce to City and state boundaries. The City could not restrict its residents to patronizing New York grocery stores, movie theaters, or waste disposal centers, or to using their bicycles and skateboards in the City without violating the Commerce Clause. The City does not have greater license to violate the Commerce Clause when the underlying activity and article implicate other enumerated rights as well.

The City's opening salvo is that the Commerce Clause is not even implicated here because it does "not reflect any form of economic protectionism, but rather is a public-safety measure to control the presence of handguns in public, an entirely appropriate concern of local officials." City Br.34. Public safety interests, however, are not a panacea and the Supreme Court has clearly held that "the state may not use its admitted powers to protect the health and safety of its people as a basis for suppressing competition." *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 538 (1949). No matter what purpose the City hoped to accomplish, the Constitution forbids it from accomplishing that purpose by discriminating against interstate commerce. *See Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 340-41 (1992); *accord W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 194-95 (1994); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 626-27 (1978). In this regard, the City's failure to show any greater risk from a short trip to New Jersey than a long trip within the City, *see supra*, is particularly problematic.

In the same vein as one of its many ill-fated Second Amendment arguments, the City posits that section 5-23 does not violate the Commerce Clause because out-of-City gun ranges are free to engage in a form of interstate commerce similar to that banned by the regulation: although they may not compete with in-City ranges in the market for City residents who use their own firearms at firing ranges, they may compete with in-City ranges for the "rental market" where residents rent a firearm at the range. Of course, there is nothing in the record, or in the City's briefing below, even discussing rentals. More fundamentally, the City cannot eliminate the concerns that flow from its protectionism with respect to one market by funneling commerce into another. Section 5-23 insulates local markets from interstate competition by "requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 145 (1970). It is therefore a *per se* violation of the Commerce Clause and must be struck down.

Nor is the alternative market the City envisions a true alternative. Plaintiffs, like many others, consume gun range services *precisely because* they wish to obtain or maintain competition-level proficiency with the same weapon they will use to protect their homes or in subsequent competitions, or because they wish to participate in a competition with the weapon on which they have long trained. They are not even participants in the market for rented or borrowed handguns. Section 5-

23 therefore forecloses all out-of-City firing ranges from competing for consumers who, like Plaintiffs, derive value primarily from being able to train with a particular weapon. This foreclosure in favor of a small, exclusive set of purely in-City firing ranges is as plain a violation of the Commerce Clause as this Court is likely to see. *See C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 389 (1994) (an ordinance that "deprives out-of-state businesses of access to a local market" is unconstitutional).

The City's argument also ignores that the difference between the "rental market" and the market for ranges that allow Plaintiffs to train with their own guns is itself a product of an independent Commerce Clause violation: the restriction of an article of commerce to use within the City. The purpose of the Commerce Clause is to facilitate a national commercial market and avoid economic balkanization. *See Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98-99 (1994). Few laws would be more antithetical to those purposes than a state law that restricts an article of commerce so that it can be used only in-state. A law that forbade New York residents from taking their bicycles or cars outside the City would violate the Commerce Clause. The possibility of renting bicycles or cars in New Jersey would not eliminate the violation, but rather would illustrate the problem.

Once the City's non sequitur is stripped away, section 5-23 is revealed to be an unadulterated violation of the Commerce Clause. Section 5-23 hermetically seals

the City from competition from out-of-City gun ranges and confers a monopoly on City gun ranges. No matter the City's aim in enacting section 5-23, its obvious discrimination against interstate commerce requires that it fall.[4]

## III. Section 5-23 Violates Plaintiffs' Fundamental Right To Travel.

Section 5-23 also violates Plaintiffs' fundamental right to travel. The record in this case makes plain that section 5-23 deters travel to points outside New York City. Plaintiffs have attested that they would travel to various target shooting competitions outside the City but for the strict limitations of section 5-23. *See* JA33-34 ¶¶11, 13; JA42-43 ¶¶9-10; JA46-47 ¶¶9-10. As a result, the regulation's effect is to force Plaintiffs to choose which constitutional right they would rather exercise: their right to travel or their right to keep and bear arms. If Plaintiffs attempt to exercise both of these rights at the same time, they run the risk of having their licenses revoked, which would completely deprive them of their Second Amendment rights.

---

[4] The City argues that section 5-23 does not impermissibly control extraterritorial commerce because "it neither projects the City's regulatory regime into other states nor controls activity occurring out-of-state," nor does it set the price of out-of-state transaction. City Br.36. But this is a Pollyannaish view of section 5-23's interstate effects. The regulation sets as the price of engaging interstate competitors either fines or jail. Plaintiffs may not participate in interstate commerce by patronizing out-of-state ranges *with their own firearms* without risking criminal sanctions. Such a regulatory scheme undoubtedly controls those transactions by essentially forbidding them.

The City's counterargument, while unpersuasive, is straightforward: the fundamental right to travel is not implicated here because Plaintiffs can travel wherever they like and then secure handguns once they arrive at their outside-the-City destination. City Br.39-40. This argument only underscores the City's resistance to *Heller* and *McDonald* and highlights its lack of respect for Second Amendment rights. Indeed, were the City to be bold enough to advance this argument with respect to any other form of chattel, this Court would reject it out of hand. If, for example, the City passed a regulation prohibiting its citizens from leaving their residences with an iPhone, the government could not maintain with a straight face that such a statute had no effect on the constitutional right to travel. Even if an individual leaving on vacation could rent an iPhone at the terminus of his or her journey, a statute forbidding travel with a phone would obviously infringe "the right of a citizen of one State to enter and to leave another State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999).

Section 5-23 is more egregious than this unsustainable hypothetical regulation in two ways. First, it targets a specific type of travel. Plaintiffs would travel to out-of-City firing ranges and competitions solely for the purpose of using the very weapon they are prohibited from transporting. Forbidding them from transporting their weapons as part of their travel entirely obviates the value of the trip and discourages them from undertaking the travel in the first place. Like a law

forbidding an antiquarian bookseller from bringing her books to an out-of-state book fair, the law entirely defeats the purpose of the travel.

Second, that section 5-23 targets this specific sort of travel is further problematic because the travel which the City prohibits is travel in order to engage in constitutionally protected activity. Plaintiffs wish to undertake the travel prohibited by section 5-23 solely to obtain and maintain proficiency in the use of their handguns and for defense of hearth and home. Section 5-23 thus charges a premium on the exercise of both rights: to travel, Plaintiffs must forego their Second Amendment rights. To exercise their Second Amendment rights, Plaintiffs must forgo their right to travel. Such a scheme is inconsistent with the Constitution. *See Harman v. Forssenius*, 380 U.S. 528, 540 (1965) ("It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution.").

## IV. Section 5-23 Impermissibly Burdens Plaintiffs' First Amendment Rights.

The City's handgun transportation ban also severely restricts Plaintiffs' First Amendment freedoms. City residents are forbidden from participating in competitive shooting events outside the City's borders. And if they want to participate in such events, they are forced to associate with City-sanctioned, members-only clubs. *See* Opening Br.49-52.

The City's answer to the Plaintiffs' First Amendment concerns is based on a fundamental misunderstanding of the Amendment and its protective scope. The City contends that section 5-23 does not deny Plaintiffs the right to freely associate because they are free to join gun clubs outside of the City. From the City's perspective, the ability to use one's lawfully owned and licensed handgun at the club is unnecessary—so long as a City resident can join the club of his or her choice, there is no First Amendment problem. *See* City Br.42-45. But joining a gun club without being able to use one's own firearm is a hollow act and does not constitute "joining" the club in any meaningful sense of the word. The City's conception of the First Amendment would leave legislatures free to ban political advocacy so long as citizens were free to join political advocacy organizations. The purpose of joining the club would be to engage in the constitutionally protected activity of acquiring and maintaining proficiency with firearms. A statute which permits joining a gun club while prohibiting the joiner from using his or her firearm there is tantamount to a ban on membership.

Relying on, *inter alia*, the Supreme Court's decision in *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), the City contends that section 5-23 presents no forced association problem because Plaintiffs are not being required to "speak." City Br.45. The City is wrong and its reliance on *Abood* and its brethren is misplaced. In *Abood*, for example, the question was whether there was any ideological union

conduct for which a state could constitutionally force a non-member employee to pay. The answer to that question is immaterial to the constitutionality of section 5-23, which requires something quite different. The City's handgun transportation ban requires that Plaintiffs actually join a private organization, the conduct of which Plaintiffs may object to, in order to exercise their fundamental Second Amendment rights. That raises First Amendment problems of the highest order that the district court simply failed to consider. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347 (1976) (holding that requiring a person to join a private organization in order to obtain a public benefit violates the freedom of association).[5]

---

[5] The City contends that there is no forced association problem because "if plaintiffs did have to join a private club to engage in this elective activity, it would not be a result of the challenged rule. It would be a result of the business or organizational decision of the shooting range to charge a membership fee." City Br.45. That argument is risible. The City has limited Plaintiffs to gun ranges within the City, and has then set the stringent conditions under which those ranges may exist. The City *is* choosing which ranges Plaintiffs must join in order to exercise their constitutional rights.

## CONCLUSION

For the reasons set forth above, as well as those in Plaintiffs' opening brief, this Court should reverse the judgment of the district court.

Respectfully submitted,

s/Paul D. Clement

BRIAN T. STAPLETON
MATTHEW S. LERNER
GOLDBERG SEGALLA LLP
11 Martine Avenue
Suite 750
White Plains, NY 10606
(914) 798-5400
bstapleton@goldbergsegalla.com

PAUL D. CLEMENT
 *Counsel of Record*
D. ZACHARY HUDSON
ANDREW N. FERGUSON
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellants*

September 29, 2015

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 6,695 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

September 29, 2015

s/Andrew N. Ferguson
Andrew N. Ferguson

## CERTIFICATE OF SERVICE

I hereby certify that, on September 29, 2015, an electronic copy of the foregoing Reply Brief for Appellants was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

s/Paul D. Clement
Paul D. Clement